

# FORM 10-K

## AUTOZONE INC – AZO

**Filed: November 25, 1998 (period: August 29, 1998)**

Annual report which provides a comprehensive overview of the company for the past year

# Table of Contents

## PART I

**ITEM 1.** BUSINESS
**ITEM 2.** PROPERTIES
**ITEM 3.** LEGAL PROCEEDINGS
**ITEM 4.** SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

## PART II

**ITEM 5.** MARKET FOR REGISTRANT'S COMMON STOCK AND RELATED STOCKHOLDER
**ITEM 6.** SELECTED FINANCIAL DATA
**ITEM 7.** MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND
**ITEM 7A.** QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK
**ITEM 8.** FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA
**ITEM 9.** CHANGES IN AND DISAGREEMENTS WITH INDEPENDENT AUDITORS ON

## PART III

**ITEM 10.** DIRECTORS AND OFFICERS OF THE REGISTRANT
**ITEM 11.** EXECUTIVE COMPENSATION
**ITEM 12.** SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT
**ITEM 13.** CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

## PART IV

**ITEM 14.** EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON
SIGNATURES
EXHIBIT INDEX
EX-3.3
EX-21.1 (Subsidiaries of the registrant)
EX-23.1 (Consents of experts and counsel)

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C.  20549

FORM 10-K

[X]  Annual Report under section 13 or 15(d) of
the Securities Exchange Act of 1934
for the fiscal year ended August 29, 1998

or

[  ]  Transition report pursuant to section 13 or 15(d) of the
Securities Exchange Act of 1934
For the transition period from _____ to _____.

Commission file number 1-10714

AUTOZONE, INC.
(Exact name of registrant as specified in its charter)

| Nevada | 62-1482048 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

123 South Front Street, Memphis, Tennessee  38103
(Address of principal executive offices)   (Zip Code)

Registrant's telephone number, including area code (901) 495-6500

Securities registered pursuant to Section 12(b) of the Act:

| TITLE OF EACH CLASS | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
|---|---|
| Common Stock ($.01 par value) | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:
None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (<section> 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

The aggregate market value of the 126,263,042 shares of voting stock of the registrant held by non-affiliates of the registrant (excluding, for this purpose, shares held by officers, directors, or 10% stockholders) was $3,432,776,454 based on the last sales price of the Common Stock on October 20, 1998 as reported on the New York Stock Exchange. The number of shares of Common Stock outstanding as of October 20, 1998, was 150,361,561.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Annual Report to Stockholders for the year ended August 29, 1998, are incorporated by reference into Parts I and II.

Portions of the definitive Proxy Statement dated October 30, 1998, for the Annual Meeting of Stockholders to be held December 17, 1998, are incorporated by reference into Part III.

FORWARD-LOOKING STATEMENTS

Certain statements contained in this Annual Report on Form 10-K are forward-looking statements.  These statements discuss, among other things, expected growth, domestic and international development and expansion strategy, business strategies, and future performance.  The forward-looking statements are subject to risks, uncertainties and assumptions including, without limitation, competition, product demand, domestic and international economy, government approvals, inflation, the ability to hire and retain qualified employees, the ability to convert acquired stores in a profitable and timely manner, consumer debt levels and the weather. Actual results may materially differ from anticipated results. Please refer to the Risk Factors section of this Form 10-K for more details.

PART I

## ITEM 1.  BUSINESS

### INTRODUCTION

We are the nation's leading specialty retailer of automotive parts and accessories, primarily focusing on do-it-yourself customers. We began operations in 1979 and at August 29, 1998, operated 2,657 auto parts stores in 38 states, under the "AutoZone" and "Chief" store names. Each auto parts store carries an extensive product line for cars, vans and light trucks, including new and re-manufactured automotive hard parts, maintenance items, and accessories. At August 29, 1998, 1,385 of our AutoZone stores also had a commercial sales program, which provides commercial credit and prompt delivery of parts and other products to local repair garages, dealers and service stations. We do not sell tires nor do we perform automotive repairs or installations. We anticipate converting all of the Chief stores to the AutoZone store name and format.

In addition, we sell heavy-duty truck parts and accessories through 43 TruckPro stores and automotive diagnostic and repair information software through our ALLDATA subsidiary.

At August 29, 1998, our auto parts stores were in the following locations:

| | | | | | |
|---|---|---|---|---|---|
| Alabama | 79 | Louisiana | 73 | Rhode Island | 12 |
| Arizona | 70 | Maryland | 9 | South Carolina | 50 |
| Arkansas | 46 | Massachusetts | 52 | Tennessee | 110 |
| California | 436 | Michigan | 63 | Texas | 382 |
| Colorado | 37 | Mississippi | 62 | Utah | 20 |
| Connecticut | 20 | Missouri | 80 | Vermont | 1 |
| Delaware | 3 | Nevada | 34 | Virginia | 41 |
| Florida | 116 | New Hampshire | 10 | Washington, DC | 1 |
| Georgia | 100 | New Mexico | 24 | West Virginia | 14 |
| Illinois | 81 | New York | 42 | Wisconsin | 15 |
| Indiana | 93 | North Carolina | 92 | Wyoming | 3 |
| Iowa | 13 | Ohio | 174 | | ---- |
| Kansas | 43 | Oklahoma | 62 | | |
| Kentucky | 53 | Pennsylvania | 41 | TOTAL | 2,657 |

### RECENT DEVELOPMENTS

On October 21, 1998, we acquired the real estate associated with 100 Express auto parts stores from Pep Boys-Manny, Moe & Jack for approximately $108 million. We intend to convert these store locations to the AutoZone store name and format.

On November 4, 1998, we issued $150 million of 6% Notes due November 2003. The proceeds of the Notes will be used for general corporate purposes and, pending such application, were used to pay down borrowings under our bank credit facilities.

### MARKETING AND MERCHANDISING STRATEGY

We are dedicated to providing customers with superior service, value, and quality parts selection at conveniently located, well-designed stores.  Key elements of this strategy are:

#### CUSTOMER SERVICE

We believe that do-it-yourself auto parts customers value customer service; therefore, customer service is the most important element in our marketing and merchandising strategy. We emphasize that our AutoZoners should always put customers first. To do so, we employ parts personnel with technical expertise to advise customers regarding the correct part type and application, utilize a wide range of training methods to educate and motivate our AutoZoners, and provide store personnel with significant opportunities for promotion and incentive compensation. Our electronic parts catalogs assist in the selection of parts; we offer free testing of starters, alternators, batteries, sensors and actuators; and we were among the first auto parts companies to offer lifetime warranties on many of the parts we sell. Our satellite system helps us to speed up credit card and check approval processes and locate parts at neighboring AutoZone stores. Our auto parts stores generally open at 8 a.m. and close between 8 and 10 p.m. (with some open to midnight) Monday through Saturday and typically open at 9 a.m. and close between 6 and 7 p.m. on Sunday.

ALLDATA has developed a database system that provides comprehensive and up-to-date automotive diagnostic, service and repair information, which it markets to professional repair shops.  ALLDATA also sells computer software on CD-ROM for individual cars for use by do-it-yourselfers.

PRODUCTS

This table shows the types of products we sell in our auto parts stores:

| HARD PARTS | MAINTENANCE ITEMS | ACCESSORIES | MISCELLANY |
|---|---|---|---|
| Alternators | Antifreeze | Floor Mats | Air Fresheners |
| Batteries | Brake Fluid | Lights | Dent Filler |
| Brake Drums, Rotors | Oil | Mirrors | Hand Cleaner |
| Shoes &Pads | Oil and Fuel Additives | Stereos | Paint |
| Carburetors | Oil, Air, and Fuel Filters | | Repair Manuals |
| Clutches | Power Steering Fluid | | Tools |
| Engines | Transmission Fluid | | |
| Mufflers | Wash and Wax Chemicals | | |
| Shock Absorbers | Windshield Wipers | | |
| Spark Plugs | | | |
| Starters | | | |
| Struts | | | |
| Water Pumps | | | |

Our auto parts stores generally offer between 16,000 and 21,000 stock keeping units ("SKUs") covering a broad range of vehicle types. Each auto parts store carries the same basic product line with minor regional differences based on climate, demographics and age and type of vehicle registration. Our "flexogram" program enables us to tailor our hard parts inventory to the makes and models of the automobiles in each store's trade area. The AutoZone stores sell a number of products, including batteries, engines, starters, alternators, water pumps, brake parts, and filters, under its private label names. We also offer a range of products, consisting principally of hard parts, through our express parts program, which provides overnight delivery of lower turnover products to our AutoZone stores.

PRICING

We employ an everyday low price strategy and attempt to be the price leader in hard parts categories. We believe that our prices overall compare favorably to those of our competitors.

COMMERCIAL SALES PROGRAM

Our commercial sales program in the auto parts stores provides credit and prompt delivery of parts and other products to local repair garages, dealers and service stations. At August 29, 1998, this program was offered in 1,385 AutoZone stores. Commercial customers generally pay the same everyday low prices as paid by do-it-yourself customers.

STORE DESIGN AND VISUAL MERCHANDISING

We design and build stores for a high visual impact. AutoZone stores have an industrial "high tech" appearance by utilizing colorful exterior signage, exposed beams and ductwork, and brightly lighted interiors. Maintenance products, accessories, and miscellaneous items are attractively displayed for easy browsing by customers, with specialized gravity-feed racks for batteries and, in many stores, oil. We employ a uniform ("planogrammed") store layout system to promote consistent merchandise presentation in all of our auto parts stores. In-store signage and special displays aid customers in locating merchandise and promoting products.

STORE DEVELOPMENT AND EXPANSION STRATEGY

This table shows the auto parts store development during the past five fiscal years:

| | Fiscal Year | | | | |
|---|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1997 | 1998 |
| Beginning Stores | 783 | 933 | 1,143 | 1,423 | 1,728 |
| New Stores (1) | 151 | 210 | 280 | 308 | 952 |
| Replaced Stores (2) | 20 | 29 | 31 | 17 | 12 |
| Closed Stores (2) | (21) | (29) | (31) | (20) | (35) |
| Ending Stores | 933 | 1,143 | 1,423 | 1,728 | 2,657 |

(1) Includes stores obtained through Chief and Auto Palace acquisitions in 1998.
(2) Replaced stores are either relocations or conversions of existing stores. Closed stores include replaced stores.

In 1998, we acquired ADAP, Inc., which was doing business as "Auto Palace," and Chief Auto Parts Inc. We made the acquisitions to give us locations and employees where we did not have many stores before.

We believe that expansion opportunities exist both in markets in which we do not currently serve, and in markets where we can achieve a larger presence, for both AutoZone and TruckPro stores. We attempt to obtain high visibility sites in high traffic locations and undertake substantial research prior to entering new markets. Key factors in selecting new site and market locations include population, demographics, vehicle profile, and number and strength of competitors' stores. We generally seek to open new stores within or contiguous to existing market areas and attempt to cluster development in new urban markets in a relatively short period of time in order to achieve economies of scale in advertising and distribution costs. In addition to continuing to construct our own stores, we regularly evaluate potential acquisition candidates in new as well as in existing markets.

Our net sales have grown significantly in recent years, increasing from $1.5 billion in fiscal 1994 to $3.2 billion in fiscal 1998. Continued growth and financial performance will be dependent, in large part, upon our ability to open new stores on a profitable basis in existing and new markets and also upon our ability to continue to increase sales in existing stores. We make no assurance that we can continue to open and operate new stores on a timely and profitable basis, successfully integrate stores that we acquire from third parties or continue to attain increases in comparable store sales.

STORE OPERATIONS

   STORE FORMATS

   As of August 29, 1998, we had auto parts stores in the following square footage ranges:

| SQUARE FOOTAGE | NUMBER OF STORES |
| --- | --- |
| Less than 4,000 | 280 |
| 4,000 to 7,000 | 1,608 |
| More than 7,000 | 769 |

Substantially all AutoZone stores are based on standard store formats resulting in generally consistent appearance, merchandising and product mix. Approximately 85% to 90% of each store's square footage is selling space, of which approximately 30% to 40% is dedicated to hard parts inventory. The hard parts inventory area is fronted by a counter which generally runs the depth or length of the store, dividing the hard parts area from the remainder of the store. The remaining selling space contains displays of accessories and maintenance items.

At the hard parts counter, we have knowledgeable parts personnel available to assist customers with their parts needs utilizing our proprietary electronic parts catalog with a video screen which is visible to both the AutoZoner (employee) and the customer. The parts catalog will suggest additional items that a customer should purchase in order to properly install the part being purchased.

All of the auto parts stores of less than 4,000 square feet in size are stores acquired from Chief Auto Parts. We have developed a format for some of these stores which we believe will make them productive in the AutoZone store system. In addition, some of these stores will be closed, expanded or relocated.

Approximately 1,900 of our auto parts stores are freestanding, with the balance principally located within strip shopping centers. Freestanding large format stores typically have parking for approximately 45 to 50 cars on a lot of approximately 3/4 to one acre. Smaller AutoZone stores typically have parking for approximately 25 to 40 cars and are usually located on a lot of approximately 1/2 to 3/4 acre.

   STORE PERSONNEL AND TRAINING

Each AutoZone store typically employs from 9 to 20 AutoZoners, including a manager and an assistant manager. AutoZoners typically have prior automotive experience. Although we rely primarily on on-the-job training, we also provide formal training programs, which include regular store meetings on specific sales and product issues, standardized training manuals and a specialist program where AutoZoners can obtain certification in several areas of technical expertise from both the company and from independent certification agencies. Training is supplemented with frequent store visits by management.

Store managers get financial incentives through performance-based bonuses and grants of stock options. In addition, our growth has provided opportunities for the promotion of qualified AutoZoners. We believe these opportunities are important to attract, motivate and retain quality personnel.

Our stores are primarily supervised through area advisors who oversee approximately five to six stores each and who report to district

managers. District managers with approximately 45 to 60 stores each, in turn, report to eight regional managers. Purchasing, merchandising, advertising, accounting, cash management, store development, systems technology and support and other store support functions are centralized in our store support center in Memphis, Tennessee. We believe that this centralization enhances consistent execution of our merchandising and marketing strategy at the store level.

STORE AUTOMATION

All AutoZone stores have proprietary electronic parts catalogs that provide parts information based on the make, model and year of an automobile. The catalog display screens are placed on the hard parts counter where both AutoZoners and customers can view the screen. In addition, our satellite system enables the AutoZone stores to speed up credit card and check approval processes and locate parts at neighboring AutoZone stores.

All AutoZone stores utilize our computerized Store Management System, which includes bar code scanning and point-of-sale data collection terminals. The Store Management System provides administrative assistance and improved personnel scheduling at the store level, as well as enhanced merchandising information and improved inventory control. We believe the Store Management System also enhances customer service through faster processing of transactions and simplified warranty and product return procedures.

PURCHASING AND DISTRIBUTION

Merchandise is selected and purchased for all AutoZone and TruckPro stores at our store support center in Memphis. No one class of product accounts for as much as 10% of our total sales. In fiscal 1998, we purchased products from approximately 300 suppliers and no single supplier accounted for more than 7% of our total purchases. During fiscal year 1998, our ten largest suppliers accounted for approximately 33% of our purchases. We generally have few long-term contracts for the purchase of merchandise. We believe that we have excellent relationships with suppliers. We also believe that alternative sources of supply exist, at similar cost, for substantially all types of product sold.

Substantially all of our merchandise is shipped by vendors to our distribution centers. Orders are typically placed by stores on a weekly basis with orders shipped from the warehouse in our trucks on the following day.

COMPETITION

We compete principally in the do-it-yourself and, more recently, the commercial automotive aftermarket. Although the number of competitors and the level of competition experienced by our stores varies by market area, the automotive aftermarket is fragmented and generally very competitive. We principally compete using store location, customer service, product selection, product warranty and price. While we believe that we compete effectively across the United States, some of our competitors have been operating longer in particular geographic areas and may be more familiar with particular regional needs or may have a name more recognizable in a particular region.

In addition to competing with other auto parts retailers, we compete with jobber stores, which principally sell to wholesale accounts and installers, but also have significant sales to do-it-yourself customers. In addition, we also compete with mass merchants which sell automotive maintenance products such as oil, filters, windshield wiper blades, wash and wax chemicals, and batteries.

Recently, several large auto parts chains have merged or announced plans to merge. We do not know what impact these mergers will have upon competition in the retail automotive aftermarket.

TRADEMARKS AND PATENTS

We have registered several service marks and trademarks in the United States Patent and Trademark office, including our service mark "AutoZone" and trademarks "AutoZone," "Duralast," "Valucraft," "Ultra Spark," "Deutsch," "Albany," "ALLDATA" and "TruckPro". We believe that the "AutoZone" service mark and trademarks have become an important component in our merchandising and marketing strategy.

In the 1998 fiscal year we were granted a patent by the Patent and Trademark Office for a starter and alternator tester which is being used exclusively in our AutoZone stores. This tester gives us greater testing accuracy and improved customer service.

EMPLOYEES

As of August 29, 1998, we employed approximately 38,500 persons, approximately 27,400 of whom were employed full-time. Approximately 90%

We have never experienced any material labor disruption, and believe that our labor relations are generally good.

of our employees were employed in stores or in direct field supervision, and approximately 7% in distribution centers and approximately 3% in store support functions.

EXECUTIVE OFFICERS OF THE REGISTRANT

The following table lists our executive officers. The title of each executive officer includes the words "Customer Satisfaction," which reflects our commitment to customer service as part of our marketing and merchandising strategy. Officers are elected by and serve at the discretion of the Board of Directors.

JOHNSTON C. ADAMS, JR., 50 -- CHAIRMAN, CHIEF EXECUTIVE OFFICER, AND DIRECTOR

Johnston C. Adams, Jr., has been a director since 1996. Mr. Adams was elected Chairman and Chief Executive Officer in March 1997. He had been President and Chief Executive Officer since December 1996, and had been Vice Chairman and Chief Operating Officer since March 1996. Previously, he was Executive Vice President-Distribution since 1995. From 1990 to 1994, Mr. Adams was a co-owner of Nicollas Enterprises, Inc., a food distribution company. From 1981 to 1990, Mr. Adams was president of the Miami Division of Malone & Hyde, Inc. ("Malone & Hyde"), AutoZone's former parent company.

TIMOTHY D. VARGO, 47 -- PRESIDENT, CHIEF OPERATING OFFICER, AND DIRECTOR

Timothy D. Vargo has been a director since 1996 and was elected President and Chief Operating Officer in March 1997. Previously, Mr. Vargo had been Vice Chairman and Chief Operating Officer since March 1996. Mr. Vargo was Executive Vice President-Merchandising and Systems Technology since 1995 and had been Senior Vice President-Merchandising in 1995. Mr. Vargo was senior Vice President-Merchandising from 1986 to 1992 and was Director of Stores for AutoZone from 1984 to 1986.

LAWRENCE E. EVANS, 54 -- EXECUTIVE VICE PRESIDENT - STORE DEVELOPMENT AND ASSISTANT SECRETARY

Lawrence E. Evans has been Executive Vice President-Store Development since 1995. Previously he was Senior Vice President-Development from 1993 to 1995 and Vice President-Real Estate since 1992. Mr. Evans was Vice President of Real Estate and had been an attorney for either Malone & Hyde or AutoZone since 1986. Mr. Evans was first employed by Malone & Hyde from 1969 until 1976 and returned to Malone & Hyde in 1986.

ROBERT J. HUNT, 49 -- EXECUTIVE VICE PRESIDENT, CHIEF FINANCIAL OFFICER, AND DIRECTOR

Robert J. Hunt was elected a director in September 1997 and has been Executive Vice President and Chief Financial Officer since 1994. Prior to that time, Mr. Hunt was Executive Vice President, Chief Financial Officer, and a Director of The Price Company from 1991 to 1993. Previously, Mr. Hunt had been employed by Malone & Hyde since 1984, where he was Executive Vice President and Chief Financial Officer from 1988 to 1991.

GERALD E. COLLEY, 46 -- SENIOR VICE PRESIDENT-STORES

Gerald E. Colley was elected Senior Vice President-Stores in October 1997. He had been Vice President-Stores since April 1997, and had been a Regional Manager since February 1997. Previously, Mr. Colley was an Executive Vice President for Tire Kingdom, Inc., in 1996, and had been President of Kose Auto Stores Florida, Inc., in 1995. Prior to that time Mr. Colley had been employed by AutoZone since 1987, and had been a Vice President from 1988 to 1995.

HARRY L. GOLDSMITH, 47 -- SENIOR VICE PRESIDENT, SECRETARY, AND GENERAL COUNSEL

Harry L. Goldsmith was elected Senior Vice President, Secretary, and General Counsel in 1996. Previously he was Vice President, General Counsel and Secretary from 1993 to 1996.

MICHAEL E. LONGO, 37 -- SENIOR VICE PRESIDENT - DISTRIBUTION

Michael E. Longo has been Senior Vice President - Distribution since March of 1998. Prior to that time, he had been Vice President - Distribution since 1996, and a Director of Distribution in 1993. Mr. Longo began working with AutoZone in 1992.

ANTHONY DEAN ROSE, JR., 38 -- SENIOR VICE PRESIDENT - ADVERTISING

Anthony Dean Rose, Jr., has been Senior Vice President-Advertising since 1995. Prior to that time, he had been Vice President-Advertising since 1989 and a Director of Advertising since 1987. Mr. Rose has been employed by AutoZone or Malone & Hyde since 1982.

STEPHEN W. VALENTINE, 36 -- SENIOR VICE PRESIDENT - INTERNATIONAL

Stephen W. Valentine has been Senior Vice President-International since October 1998, and had been Senior Vice President-Systems Technology and Support since 1995. Prior to that time, he had been Vice President-Store Systems Technology and Support since 1994, and a Director of Store Management Systems since 1990. Mr. Valentine began working with AutoZone in 1989.

DAVID J. WILHITE, 36 -- SENIOR VICE PRESIDENT - MERCHANDISING
     David J. Wilhite was elected Senior Vice President-Merchandising in
September 1997.  Previously Mr. Wilhite was a Vice President-
Merchandising since 1996.  He has been an employee of AutoZone or Malone
& Hyde since 1984.

MICHAEL E. BUTTERICK, 47 -- VICE PRESIDENT - CONTROLLER
     Michael E. Butterick has been Vice President-Controller since 1995.
Prior to that time, Mr. Butterick was Chief Financial Officer of United
Medical Incorporated from 1993 to 1995.  From 1990 to 1993 Mr. Butterick
was Vice President-Finance of the Mid South General Merchandise Division,
a division of Fleming Companies.  Previously, Mr. Butterick had been
employed by Malone & Hyde or AutoZone since 1983, where he was Controller
of AutoZone from 1986 to 1990.

ANDREW M. CLARKSON, 61 -- DIRECTOR AND CHAIRMAN OF THE FINANCE COMMITTEE
     Andrew M. Clarkson has been a director since 1986 and is an employee
serving as Chairman of the Finance Committee.  Mr. Clarkson had been Vice
President and Treasurer in 1986, Senior Vice President and Treasurer from
1986 to 1988, was Secretary from 1988 to 1993 and was Treasurer from 1990
to 1995.  Previously, Mr. Clarkson was Chief Financial Officer of Malone
& Hyde from 1983 to 1988.


RISK FACTORS

   GROWTH STRATEGY

     We have significantly increased our store count in the past five
fiscal years, growing from 783 stores at August 28, 1993, to 2,657 stores
at August 29, 1998, an average store count increase per year of 28%.  We
do not expect that we can continue our store count growth rate at the
historic pace.  In addition, a portion of our total sales increases each
year results from increases in sales at existing stores.  We cannot make
any assurance that we can continue to increase same store sales as our
stores mature in their markets.

   INTEGRATION OF ACQUISITIONS

     In addition to opening our own store locations, we acquired 672 auto
parts stores from Chief Auto Parts and Auto Palace in the 1998 fiscal
year.  We have converted the Auto Palace stores to the AutoZone store name
and format, and intend to make a similar conversion for the Chief stores.
We can make no assurances as to our ability to convert the Chief stores
in a timely or profitable manner.  In addition, other auto parts retailers
competing in California, Chief's principal market, and in New England,
Auto Palace's principal market, have been in those markets for a longer
period of time, have a trade name more recognizable than the name
AutoZone in those markets, and may have a better understanding of the
particular customer needs and expectations in these markets.  In addition,
the Chief stores are substantially smaller than our traditionally sized
AutoZone auto parts stores and therefore, the Chief stores, even after
conversion, may not achieve the sales and profitability of a traditional
AutoZone store.

   EMPLOYEES

     We have an ever-increasing need for qualified employees.  In fiscal
year 1998, our consolidated employee count increased from approximately
28,700 at the beginning of the year to about 38,500, a 34% increase in
the year.  We can make no assurances that we can continue to hire and
retain qualified employees at current wage rates.

   COMPETITION

     Recently, several large auto parts chains have merged or announced
plans to merge.  We do not know what impact these mergers will have upon
competition in the retail automotive aftermarket.  If our merging
competitors are able to achieve efficiencies in their mergers, then there
may be greater competitive pressures in the markets in which they are
strongest.

   DEMAND FOR PRODUCTS

     Demand for products sold by our stores depends on many factors.  In
the short term, it may depend upon:

     * the weather, as vehicle maintenance may be deferred during
       periods of inclement weather.

     * the economy, as during periods of good economic conditions,
       more of our do-it-yourself customers may pay others to repair and
       maintain their cars instead of working on their own cars.  This
       factor is tempered by our commercial parts sales program which
       sells parts to installers.  In periods of declining economic
       conditions, both do-it-yourself and do-it-for-me customers may
       defer vehicle maintenance or repair.

     For the long term, demand for our products may depend upon:

* the quality of the vehicles manufactured by the original
  vehicle manufacturers, and the length of the warranty offered on
  new vehicles.

* the law.  Contrary to the terms of the federal Clean Air
  Act, the U.S. Environmental Protection Agency has adopted
  regulations that would limit access to computerized diagnostic
  information (commonly referred to as "on-board diagnostics")
  relating to vehicle emission systems on cars and light trucks
  beginning with the 1996 model year.  These regulations have been
  challenged by several automotive aftermarket trade associations.
  However, we cannot make any prediction as to the outcome of these
  challenges.  If these regulations are found to be proper and are
  fully enacted, do-it-yourself customers and commercial installers
  not associated with the original manufacturers will have little
  or no access to on-board diagnostic information for vehicles,
  which may limit their ability to diagnose, maintain, or repair
  the emissions systems of vehicles.

INTERNATIONAL DEVELOPMENT

    We intend to open auto parts stores in Mexico during the 1999 fiscal
year.  Although we believe that there is great potential for auto parts
stores in the fragmented international auto parts market, we have no
experience opening or operating stores outside of the United States, and
no assurances can be made that we can open stores in any other country in
a timely or profitable manner.

VENDORS

    Recently, several of our vendors have merged and others have
announced plans to merge. Further vendor consolidation could limit the
number of vendors from which we may purchase products and could
materially affect the prices we pay for these products.

ITEM 2.  PROPERTIES

    This table shows the square footage and number of leased and owned
properties for our auto parts stores:

|        | NO. OF STORES | SQUARE FOOTAGE |
|--------|---------------|----------------|
| Leased | 1,282         | 7,115,287      |
| Owned  | 1,375         | 9,384,212      |
| Total  | 2,657         | 16,499,499     |

    We have 3,479,192 square feet in our distribution centers, all of
which is owned, except for 815,992 square feet which is leased.  The
distribution centers are located in Arizona, California, Georgia,
Illinois, Louisiana, Ohio, Tennessee, and Texas.

    Our store support center, which we own, is located in Memphis,
Tennessee, and consists of 360,000 square feet.

    We also own and lease other properties which are not material
in the aggregate.

ITEM 3.  LEGAL PROCEEDINGS

    AutoZone, Inc., and its wholly-owned subsidiary AutoZone Stores, Inc.,
were defendants in a purported class action entitled "Joe C. Proffitt,
Jr., on behalf of himself and all others similarly situated, vs.
AutoZone, Inc., and AutoZone Stores, Inc.," filed in the Circuit Court
for Jefferson County, Tennessee, on or about October 17, 1997.  In the
complaint, which was similar to other class action complaints filed
against several other retailers of aftermarket automotive batteries, the
plaintiff alleges that we sold "old," "used," or "out of warranty"
automotive batteries to customers as if the batteries were new, and
purported to state causes of action for unfair or deceptive acts or
practices, breach of contract, breach of duty of good faith and fair
dealing, intentional misrepresentation, fraudulent concealment, civil
conspiracy, and unjust enrichment. The plaintiff was seeking an
accounting of all moneys wrongfully received, compensatory and punitive
damages, as well as plaintiff's costs.  On May 21, 1998, on the
plaintiff's motion, the court dismissed the case without prejudice.

    Chief Auto Parts Inc., a wholly-owned subsidiary of AutoZone, Inc.,
is a defendant in a class action entitled "Doug Winfrey, et al. on their
own behalf and on behalf of a class and all others similarly situated,
vs. Chief Auto Parts Inc. et al.," filed in the Superior Court of
California, County of San Joaquin on August 22, 1995, and then
transferred to the Superior Court of California, County of San Francisco

on October 26, 1995. The Superior Court denied the plaintiffs' motion
for class certification on December 7, 1996. On February 6, 1998, the
Court of Appeals reversed the Superior Court's order denying class
certification and remanded the case to the Superior Court for further
proceedings. On November 16, 1998, the Superior Court certified the
class.

The plaintiffs allege that Chief had a policy and practice of
denying hourly employees in California mandated rest periods during their
scheduled work hours. The plaintiffs are seeking damages, restitution,
disgorgement of profits, statutory penalties, declaratory relief,
injunctive relief, prejudgment interest, and reasonable attorney fees,
expenses and costs. We are unable to predict the outcome of this lawsuit
at this time, but believe that the potential damages recoverable by any
single plaintiff against Chief are minimal. However, if the plaintiff
class were to prevail on all of its claims, the aggregate amount of
damages could be substantial. We are vigorously defending against this
action.

We are also a party to various claims and lawsuits arising in the
ordinary course of business, which, in the opinion of management, are
not, singularly or in the aggregate, material to our results of
operations or financial condition.


ITEM 4.  SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

None

PART II

ITEM 5.  MARKET FOR REGISTRANT'S COMMON STOCK AND RELATED STOCKHOLDER
MATTERS

Common Stock Market Prices for our common stock as traded on the New
York Stock Exchange as shown on page 14 of the Annual Report to
Stockholders for the fiscal year ended August 29, 1998 are incorporated
herein by reference.

At October 20, 1998, we had 3,225 stockholders of record, excluding
the number of beneficial owners whose shares were represented by security
position listings.

On May 1, 1998, as a portion of the consideration for the
acquisition of the assets of TruckPro Limited Partnership, we transferred
to certain owners of TruckPro 30,000 shares of common stock, $0.01 par
value.  The transaction was exempt from registration under Section 4(2)
of the Securities Act of 1933.

ITEM 6.  SELECTED FINANCIAL DATA

Selected financial data contained in the Ten-Year Review on pages 12
and 13 of the Annual Report to Stockholders for the fiscal year ended
August 29, 1998, are incorporated herein by reference.

ITEM 7.  MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND
RESULTS OF OPERATIONS

Financial Review on pages 15 through 17 of the Annual Report to
Stockholders for the fiscal year ended August 29, 1998, are incorporated
herein by reference.

ITEM 7A.  QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

The section entitled "Financial Market Risk" on page 16 of the
Annual Report to Stockholders for the fiscal year ended August 29, 1998,
is incorporated herein by reference.

ITEM 8.  FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

The financial statements and related notes included on pages 18
through 27 and the quarterly summary on page 14 of the Annual Report to
Stockholders for the fiscal year ended August 29, 1998, are incorporated
herein by reference.

ITEM 9.  CHANGES IN AND DISAGREEMENTS WITH INDEPENDENT AUDITORS ON
ACCOUNTING AND FINANCIAL DISCLOSURE

None

PART III

ITEM 10.  DIRECTORS AND OFFICERS OF THE REGISTRANT

The information required by this item is incorporated by reference
to Part I of this document and to the definitive Proxy Statement dated
October 30, 1998, filed pursuant to Regulation 14A under the Securities
Exchange Act of 1934 in connection with the annual meeting of
stockholders to be held December 17, 1998.

ITEM 11.  EXECUTIVE COMPENSATION

The information required by this item is incorporated by reference to the definitive Proxy Statement dated October 30, 1998, filed pursuant to Regulation 14A under the Securities Exchange Act of 1934 in connection with the annual meeting of stockholders to be held December 17, 1998.

ITEM 12.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The information required by this item is incorporated by reference to the definitive Proxy Statement dated October 30, 1998, filed pursuant to Regulation 14A under the Securities Exchange Act of 1934 in connection with the annual meeting of stockholders to be held December 17, 1998.

ITEM 13.  CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

The information required by this item is incorporated by reference to the definitive Proxy Statement dated October 30, 1998, filed pursuant to Regulation 14A under the Securities Exchange Act of 1934 in connection with the annual meeting of stockholders to be held December 17, 1998.

PART IV

ITEM 14.  EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON
FORM 8-K

(a)  1.  Financial Statements
         The following financial statements included on pages 18 through
         27 in the Annual Report to Stockholders for the fiscal year
         ended August 29, 1998, are incorporated by reference in Item 8:

         Report of Independent Auditors
         Consolidated Statements of Income for the fiscal years ended
              August 29, 1998, August 30, 1997, and August 31, 1996
         Consolidated Balance Sheets as of August 29, 1998, and August
              30, 1997
         Consolidated Statements of Stockholders' Equity for the fiscal
              years ended August 29, 1998, August 30, 1997, and August 31,
              1996
         Consolidated Statements of Cash Flows for the fiscal years
              ended August 29, 1998, August 30, 1997, and August 31, 1996
         Notes to Consolidated Financial Statements


     2.  Financial Statement Schedule II - Valuation and Qualifying
         Accounts

         All other schedules are omitted because the information is not
         required or because the information required is included in the
         financial statements or notes thereto.

     3.  The following exhibits are filed as a part of this report:

         3.1  Articles of Incorporation of AutoZone, Inc. Incorporated
              by reference to Exhibit 3.1 to the Form 10-K for the
              fiscal year ended August 27, 1994.

         3.2  Amendment to Articles of Incorporation of AutoZone, Inc.,
              dated December 16, 1993, to increase its authorized shares
              of common stock to 200,000,000. Incorporated by reference
              to Exhibit 3.2 to the Form 10-K for the fiscal year ended
              August 27, 1994.

         3.3  Amended and Restated By-laws of AutoZone, Inc.

         4.1  Form of Common Stock Certificate. Incorporated by
              reference to Exhibit 4.1 to Pre-Effective Amendment No. 2
              to the Registration Statement filed on Form S-1 under the
              Securities Act of 1933 (No. 33-45649).

         4.2  Registration Rights Agreement between AutoZone, Inc. and
              J. Dale Dawson and Judith S. Dawson dated May 1, 1998.
              Incorporated by reference to the Form 10-Q for the quarter
              ended May 9, 1998.

         4.3  Senior Indenture, dated as of July 22, 1998, between
              AutoZone, Inc. and the First National Bank of Chicago.
              Incorporated by reference to Exhibit 4.1 to the Form 8-K
              dated July 17, 1998.

        *10.1  Director Stock Option Plan. Incorporated by reference to
               Exhibit 4.1 to the Form S-8 (No. 333-48981) dated March
               31, 1998.

        *10.2  1998 Director Compensation Plan. Incorporated by reference
               to Exhibit 4.1 to the Form S-8 (No. 333-48979) dated March
               31, 1998.

        *10.3  Amended and Restated Stock Option Plan, as amended on
               February 26, 1991. Incorporated by reference to Exhibit
               10.4 to the Form S-1 (No. 33-39197) filed April 1, 1991.

        *10.4  Amendment No. 1 dated December 18, 1992, to the Amended
               and Restated Stock Option Plan. Incorporated by reference
               to Exhibit 10.5 to the Form 10-K for the fiscal year ended
               August 28, 1993.

        *10.5  Amended and Restated 1996 Stock Option Plan. Incorporated
               by reference to Exhibit 10.2 to the Form 10-Q for the
               quarter ended November 22, 1997.

        *10.6  Employment and Non-Compete Agreement between John C.
               Adams, Jr., and AutoZone, Inc., dated June 11, 1997.
               Incorporated by reference to the Form 10-K for the fiscal
               year ended August 29, 1997.

*10.7 Employment and Non-Compete Agreement between Timothy D. Vargo, and AutoZone, Inc., dated June 11, 1997. Incorporated by reference to the Form 10-K for the fiscal year ended August 29, 1997.

*10.8 Employment and Non-Compete Agreement between Robert J. Hunt, and AutoZone, Inc., dated June 11, 1997. Incorporated by reference to the Form 10-K for the fiscal year ended August 29, 1997.

*10.9 Employment and Non-Compete Agreement between Stephen W. Valentine, and AutoZone, Inc., dated July 7, 1997. Incorporated by reference to the Form 10-K for the fiscal year ended August 29, 1997.

*10.10 Employment and Non-Compete Agreement between Harry L. Goldsmith, and AutoZone, Inc., dated June 11, 1997. Incorporated by reference to the Form 10-K for the fiscal year ended August 29, 1997.

*10.11 Executive Incentive Compensation Plan. Incorporated by reference to Exhibit A to the definitive Proxy Statement dated November 14, 1994.

10.12 Amended and Restated Agreement between J.R. Hyde, III, and AutoZone, Inc., dated October 23, 1997. Incorporated by reference to Exhibit 10.1 to the Form 10-Q for the quarter ended November 22, 1997.

10.13 Credit Agreement dated as of February 23, 1998 among AutoZone, Inc., the several lenders from time to time party thereto, and NationsBank, N.A. as Agent and SunTrust Bank, Nashville, N.A. as Documentation Agent. Incorporated by reference to Exhibit 10.1 the Form 10-Q for the quarter ended May 9, 1998.

10.14 Credit Agreement among AutoZone, Inc., as Borrower, the several lenders from time to time party thereto, NationsBank, N.A., as Agent, and SunTrust Bank, Nashville, N.A. as Co-Agent, dated December 20, 1996. Incorporated by reference to the Form 10-Q for the quarter ended February 15, 1997.

10.15 Amendment No. 1 to Credit Agreement among AutoZone, Inc., as Borrower, the several lenders from time to time party thereto, NationsBank, N.A., as Agent, and SunTrust Bank, Nashville, N.A. as Co-Agent, dated December 20, 1996. Incorporated by reference to Exhibit 10.2 to the Form 10-Q for the quarter ended February 14, 1998.

13.1 Annual Report to Stockholders for the fiscal year ended August 29, 1998. Incorporated by reference to the Annual Report filed with the Securities and Exchange Commission via EDGAR pursuant to Rule 101(b)(1) of Regulation S-T.

21.1 Subsidiaries of the Registrant.

23.1 Consent of Ernst & Young LLP.

_____
*Management contract or compensatory plan or arrangement.

(b)   Reports on Form 8-K.

The Registrant filed the following reports on Form 8-K during the fiscal quarter ended August 29, 1998:

1. May 11, 1998:  The Registrant reported that it had executed a definitive agreement to acquire the outstanding common stock of Chief Auto Parts Inc.

2. July 29, 1998:  The Registrant reported that it had closed the acquisition of Chief Auto Parts Inc., and filed the purchase agreement as an exhibit.

3. July 17, 1998:  The Registrant filed exhibits on Form 8-K related to its offering of 6 1/2 % Debentures due 2008, registered under the Securities Act of 1933 on Form S-3 (No. 333-58565).

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the
Securities Exchange Act of 1934, the Registrant has duly caused this
report to be signed on its behalf by the undersigned, thereunto duly
authorized.

AUTOZONE, INC.


By: /S/ J.C. ADAMS, JR.                    November 25, 1998
    --------------------------------
    J.C. Adams, Jr.
    Chairman, Chief Executive Officer
    and Director
    (Principal Executive Officer)

        Pursuant to the requirement of the Securities Exchange Act of 1934,
this report has been signed below by the following persons in the
capacities and on the dates indicated:


SIGNATURE                         TITLE                          DATE


/s/ J.C. ADAMS, JR.               Chairman, Chief Executive      November 25, 1998
- -----------------------------      Officer and Director
J.C. Adams, Jr.                   (Principal Executive Officer)


/s/ TIMOTHY D. VARGO              President, Chief Operating     November 25, 1998
- -----------------------------      Officer, and Director
Timothy D. Vargo


/s/ ROBERT J. HUNT                Executive Vice President, Chief  November 25, 1998
- -----------------------------      Financial Officer and Director
Robert J. Hunt                    (Principal Financial Officer)


/s/ MICHAEL E. BUTTERICK          Vice President and Controller  November 25, 1998
- -----------------------------
Michael E. Butterick              (Principal Accounting Officer)


/s/ ANDREW M. CLARKSON            Director                       November 25, 1998
- -----------------------------
Andrew M. Clarkson


- -----------------------------    Director
N. Gerry House


/s/ J.R. HYDE, III                Director                       November 25, 1998
- -----------------------------
J.R. Hyde, III


/s/ JAMES F. KEEGAN               Director                       November 25, 1998
- -----------------------------
James F. Keegan


/s/ MICHAEL W. MICHELSON          Director                       November 25, 1998
- -----------------------------
Michael W. Michelson


/s/ RONALD A. TERRY               Director                       November 25, 1998
- -----------------------------
Ronald A. Terry


/s/ GEORGE R. ROBERTS             Director                       November 25, 1998

George R. Roberts

SCHEDULE II

AUTOZONE, INC.
VALUATION AND QUALIFYING ACCOUNTS
(in thousands)

| | COL B | COL C | | COL D | COL E |
|---|---|---|---|---|---|
| COL A | | ADDITIONS | | | |
| CLASSIFICATION | Balance Beginning of Period | (1) Charged to Costs and Expenses | (2) Charged to Other Accounts-Describe | Deductions- Describe | Balance at End of Period |
| Year Ended August 31, 1996: | | | | | |
|   Reserve for warranty claims | $12,613 | $26,982 | | $25,443 (1) | $14,152 |
|   Other reserves | 9,229 | | | | 9,015 |
| Year Ended August 30, 1997: | | | | | |
|   Reserve for warranty claims | $14,152 | $40,303 | | $35,333 (1) | $19,122 |
|   Other reserves | 9,015 | | | | 11,227 |
| Year Ended August 29, 1998: | | | | | |
|   Reserve for warranty claims | $19,122 | $58,511 | | $56,847 (1) | $20,786 |
|   Other reserves | 11,227 | | | | 14,296 |

<FN>
(1) Cost of product for warranty replacements, net of salvage and amounts collected from customers.

EXHIBIT INDEX

3.1  Articles of Incorporation of AutoZone, Inc. Incorporated
     by reference to Exhibit 3.1 to the Form 10-K for the
     fiscal year ended August 27, 1994.

3.2  Amendment to Articles of Incorporation of AutoZone, Inc.,
     dated December 16, 1993, to increase its authorized shares
     of common stock to 200,000,000. Incorporated by reference
     to Exhibit 3.2 to the Form 10-K for the fiscal year ended
     August 27, 1994.

3.3  Amended and Restated By-laws of AutoZone, Inc.

4.1  Form of Common Stock Certificate. Incorporated by
     reference to Exhibit 4.1 to Pre-Effective Amendment No. 2
     to the Registration Statement filed on Form S-1 under the
     Securities Act of 1933 (No. 33-45649).

4.2  Registration Rights Agreement between AutoZone, Inc. and
     J. Dale Dawson and Judith S. Dawson dated May 1, 1998.
     Incorporated by reference to the Form 10-Q for the quarter
     ended May 9, 1998.

4.3  Senior Indenture, dated as of July 22, 1998, between
     AutoZone, Inc. and the First National Bank of Chicago.
     Incorporated by reference to Exhibit 4.1 to the Form 8-K
     dated July 17, 1998.

*10.1  Director Stock Option Plan. Incorporated by reference to
       Exhibit 4.1 to the Form S-8 (No. 333-48981) dated March
       31, 1998.

*10.2  1998 Director Compensation Plan. Incorporated by reference
       to Exhibit 4.1 to the Form S-8 (No. 333-48979) dated March
       31, 1998.

*10.3  Amended and Restated Stock Option Plan, as amended on
       February 26, 1991. Incorporated by reference to Exhibit
       10.4 to the Form S-1 (No. 33-39197) filed April 1, 1991.

*10.4  Amendment No. 1 dated December 18, 1992, to the Amended
       and Restated Stock Option Plan. Incorporated by reference
       to Exhibit 10.5 to the Form 10-K for the fiscal year ended
       August 28, 1993.

*10.5  Amended and Restated 1996 Stock Option Plan. Incorporated
       by reference to Exhibit 10.2 to the Form 10-Q for the
       quarter ended November 22, 1997.

*10.6  Employment and Non-Compete Agreement between John C.
       Adams, Jr., and AutoZone, Inc., dated June 11, 1997.
       Incorporated by reference to the Form 10-K for the fiscal
       year ended August 29, 1997.

*10.7  Employment and Non-Compete Agreement between Timothy D.
       Vargo, and AutoZone, Inc., dated June 11, 1997.
       Incorporated by reference to the Form 10-K for the fiscal
       year ended August 29, 1997.

*10.8  Employment and Non-Compete Agreement between Robert J.
       Hunt, and AutoZone, Inc., dated June 11, 1997.
       Incorporated by reference to the Form 10-K for the fiscal
       year ended August 29, 1997.

*10.9  Employment and Non-Compete Agreement between Stephen W.
       Valentine, and AutoZone, Inc., dated July 7, 1997.
       Incorporated by reference to the Form 10-K for the fiscal
       year ended August 29, 1997.

*10.10 Employment and Non-Compete Agreement between Harry L.
       Goldsmith, and AutoZone, Inc., dated June 11, 1997.
       Incorporated by reference to the Form 10-K for the fiscal
       year ended August 29, 1997.

*10.11 Executive Incentive Compensation Plan. Incorporated by
       reference to Exhibit A to the definitive Proxy Statement
       dated November 14, 1994.

10.12  Amended and Restated Agreement between J.R. Hyde, III,
       and AutoZone, Inc., dated October 23, 1997. Incorporated
       by reference to Exhibit 10.1 to the Form 10-Q for the
       quarter ended November 22, 1997.

10.13  Credit Agreement dated as of February 23, 1998 among
       AutoZone, Inc., the several lenders from time to time

party thereto, and NationsBank, N.A. as Agent and SunTrust Bank, Nashville, N.A. as Documentation Agent. Incorporated by reference to Exhibit 10.1 the Form 10-Q for the quarter ended May 9, 1998.

10.14 Credit Agreement among AutoZone, Inc., as Borrower, the several lenders from time to time party thereto, NationsBank, N.A., as Agent, and SunTrust Bank, Nashville, N.A. as Co-Agent, dated December 20, 1996. Incorporated by reference to the Form 10-Q for the quarter ended February 15, 1997.

10.15 Amendment No. 1 to Credit Agreement among AutoZone, Inc., as Borrower, the several lenders from time to time party thereto, NationsBank, N.A., as Agent, and SunTrust Bank, Nashville, N.A. as Co-Agent, dated December 20, 1996. Incorporated by reference to Exhibit 10.2 to the Form 10-Q for the quarter ended February 14, 1998.

13.1 Annual Report to Stockholders for the fiscal year ended August 29, 1998. Incorporated by reference to the Annual Report filed with the Securities and Exchange Commission via EDGAR pursuant to Rule 101(b)(1) of Regulation S-T.

21.1 Subsidiaries of the Registrant.

23.1 Consent of Ernst & Young LLP.

---

*Management contract or compensatory plan or arrangement.

</TEXT>
</DOCUMENT>

AMENDED AND RESTATED
BY-LAWS
OF
AUTOZONE, INC.

ARTICLE I.

OFFICES

Section 1. The Corporation may have offices at such places both within and without the State of Nevada as the Board of Directors may from time to time determine or the business of the corporation may require.

ARTICLE II.

MEETINGS OF STOCKHOLDERS

Section 1. All meetings of the stockholders shall be held at any place within or outside the State of Nevada as shall be designated from time to time by the Board of Directors. In the absence of any such designation, stockholders' meetings shall be held at the principal executive office of the corporation.

Section 2. The annual meeting of stockholders shall be held on such date and at such time and place as may be fixed by the Board of Directors and stated in the notice of the meeting, for the purpose of electing directors and for the transaction of such other business as is properly brought before the meeting in accordance with these By-laws.

To be properly brought before the annual meeting, business must be either (i) specified in the notice of annual meeting (or any supplement or amendment thereto) given by or at the direction of the Board of Directors, (ii) otherwise brought before the annual meeting by or at the direction of the Board of Directors, or (iii) otherwise properly brought before the annual meeting by a stockholder. In addition to any other applicable requirements, for business to be properly brought before an annual meeting by a stockholder, the stockholder must have given timely notice thereof in writing to the Secretary of the corporation. To be timely, a stockholder's notice must be delivered to or mailed and received at the principal executive offices of the corporation, not less than ninety (90) days prior to the meeting. A stockholder's notice to the Secretary shall set forth (i) a brief description of the business desired to be brought before the annual meeting, (ii) the name and record address of the stockholder proposing such business, (iii) the class, series and number of shares of the corporation which are beneficially owned by the stockholder, and (iv) any material interest of the stockholder in such business.

Notwithstanding anything in the By-laws to the contrary, no business shall be conducted at the annual meeting except in accordance with the procedures set forth in this Article II, Section 2. The officer of the corporation presiding at an annual meeting shall, if the facts warrant, determine and declare to the annual meeting that business was not properly brought before the annual meeting in accordance with the provisions of this Article II, Section 2, and if he should so determine, he shall so declare to the meeting and any such business not properly brought before the annual meeting shall not be transacted. Written notice of the annual meeting stating the place, date and hour of the annual meeting shall be given to each stockholder entitled to vote at such meeting not less than ten (10) nor more than sixty (60) days before the date of the meeting.

Section 3. The holders of a majority of the voting power of the Corporation's stock at any meeting of stockholders, which are present in person or represented by proxy, shall constitute a quorum for the transaction of business except as otherwise provided by law, by the Articles of Incorporation, or by these By-laws. A quorum, once established, shall not be broken by the withdrawal of enough votes to leave less than a quorum and the votes present may continue to transact business until adjournment. If, however, such quorum shall not be present or represented at any meeting of the stockholders, a majority of the voting power represented in person or by proxy may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally notified. If the adjournment is for more than thirty days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote thereat.

Section 4. When a quorum is present at any meeting, the holders of a majority of the voting power of the corporation's stock present in person or represented by proxy shall decide any question brought before such meeting, unless the question is one upon which, by express provision of the statutes, or the Articles of Incorporation, or these By-laws, a different vote is required in which case such express provision shall govern and control the decision of such question.

Section 5. At each meeting of the stockholders, each stockholder having the right to vote may vote in person or may authorize another person or persons to act for him by proxy appointed in a reasonable manner as may be permitted by law, including, without limitation, a signed writing, telegram, facsimile, and electronic communication. All proxies must be filed with the Secretary of the Corporation at the beginning of each meeting in order to be counted in any vote at the meeting. Each stockholder shall have one vote for each share of stock having voting power, registered in his name on the books of the Corporation on the record date set by the Board of Directors as provided in Article V, Section 6 hereof.

Section 6. Special meetings of the stockholders, for any purpose, or purposes, unless otherwise prescribed by statute or by the Articles of Incorporation, may be called by the President and shall be called by the President or the Secretary at the request in writing of a majority of the Board of Directors, or at the request in writing of the holders of a majority of the voting power of the Corporation's stock. Such request shall state the purpose or purposes of the proposed meeting. Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice.

Section 7. Whenever stockholders are required or permitted to take any action at a meeting, a written notice of the meeting shall be given which notice shall state the place, date and hour of the meeting and the purpose or purposes for which the meeting is called. The written notice of any meeting shall be given to each stockholder entitled to vote at such meeting not less than ten nor more than sixty days before the date of the meeting. If mailed, notice is given when deposited in the United States mail, postage prepaid, directed to the stockholder at his address as it appears on the records of the Corporation.

Section 8. The officer who has charge of the stock ledger of the Corporation shall prepare and make, at least ten days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten days prior to the meeting, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to be held. The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.

Section 9. Unless otherwise provided in the Articles of Incorporation, any action required to be taken at any annual or special meeting of stockholders of the Corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of a majority of the voting power of the Corporation's stock. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.

ARTICLE III

DIRECTORS

Section 1. Subject to any limitations in the laws of the State of Nevada, the Articles of Incorporation or these By-Laws, the number of directors may be changed from time to time by resolutions adopted by the Board of Directors or the stockholders. No reduction of the number of directors shall have the effect of removing any director prior to the expiration of his term of office. A director need not be a stockholder of the Corporation. Nominations of persons for election to the Board of Directors of the Corporation at the annual meeting may be made at such meeting by or at the direction of the Board of Directors, by any committee or persons appointed by the Board of Directors or by any stockholder of the Corporation entitled to vote for the election of directors at the meeting who complies with the notice procedures set forth in this Article III, Section 1. Such nominations by any stockholder shall be made pursuant to timely notice in writing to the Secretary of the Corporation. To be timely, a stockholder's notice shall be delivered to or mailed and received at the principal executive offices of the Corporation not less than ninety (90) days prior to the meeting. Such stockholder's notice to the Secretary shall set forth (i) as to each person whom the stockholder proposes to nominate for election or reelection as a director, (a) the name, age, business address and residence address of the person, (b) the principal occupation or employment of the person, (c) the class and number of shares of capital stock of the Corporation which are beneficially owned by the person, and (d) any other information relating to the person that is required to be disclosed in solicitations for proxies for election of directors pursuant to the Rules and Regulations of the Securities and Exchange Commission under Section 14 of the Securities Exchange Act of 1934, as amended; and (ii) as to the stockholder giving the notice (a) the name and record address of the stockholder and (b) the class and number of shares of capital stock of the Corporation which are beneficially owned by the stockholder. The Corporation may require any proposed nominee to furnish

such other information as may reasonably be required by the Corporation to determine the eligibility of such proposed nominee to serve as a director of the Corporation. No person shall be eligible for election as a director of the Corporation unless nominated in accordance with the procedures set forth herein. The officer of the Corporation presiding at an annual meeting shall, if the facts warrant, determine and declare to the meeting that a nomination was not made in accordance with the foregoing procedure, and if he should so determine, he shall so declare to the meeting and the defective nomination shall be disregarded. The directors shall be elected at the annual meeting of the stockholders, except as provided in Section 2 of this Article III, and each director elected shall hold office until his successor is elected and qualified; provided, however, that unless otherwise restricted by the Articles of Incorporation or law, any director or the entire Board of Directors may be removed, either with or without cause, from the Board of Directors at any meeting of stockholders by the holders of two-thirds of the voting power of the Corporation's stock.

Section 2. Vacancies on the Board of Directors by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, and newly created directorships resulting from any increase in the authorized number of directors may be filled by a majority of the directors then in office, although less than a quorum, or by a sole remaining director. The directors so chosen shall hold office until the next annual election of directors and until their successors are duly elected and shall qualify, unless sooner displaced. If there are no directors in office, then an election of directors may be held in the manner provided by statute. If, at the time of filling any vacancy or any newly created directorship, the directors then in office shall constitute less than a majority of the whole Board (as constituted immediately prior to any such increase), any stockholder or stockholders holding at least ten percent of the voting power of the Corporation's stock may summarily order an election to be held to fill any such vacancies or newly created directorships, or to replace the directors chosen by the directors then in office.

Section 3. The property and business of the Corporation shall be managed by or under the direction of its Board of Directors. In addition to the powers and authorities by these By-Laws expressly conferred upon them, the Board may exercise all such powers of the Corporation and do all such lawful acts and things as are not by statute or by the Articles of Incorporation or by these By-Laws directed or required to be exercised or done by the stockholders.

MEETINGS OF THE BOARD OF DIRECTORS

Section 4. The directors may hold their meetings and have one or more offices, and keep the books of the Corporation outside of the State of Nevada.

Section 5. Regular meetings of the Board of Directors may be held without notice at such time and place as shall from time to time be determined by the Board.

Section 6. Special meetings of the Board of Directors may be called by the President on twenty-four hours' notice to each director, either personally, by telephone, by facsimile, by mail or by telegram; special meetings shall be called by the President or the Secretary in like manner and on like notice on the written request of two directors unless the Board consists of only one director; in which case special meetings shall be called by the President or Secretary in like manner or on like notice on the written request of the sole director.

Section 7. At all meetings of the Board of Directors a majority of the authorized number of directors shall be necessary and sufficient to constitute a quorum for the transaction of business, and the vote of a majority of the directors present at any meeting at which there is a quorum, shall be the act of the Board of Directors, except as may be otherwise specifically provided by statute, by the Articles of Incorporation or by these By-Laws. If a quorum shall not be present at any meeting of the Board of Directors the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present. If only one director is authorized, such sole director shall constitute a quorum.

Section 8. Unless otherwise restricted by the Articles of Incorporation or these By-Laws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all members of the Board or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board or committee.

Section 9. Unless otherwise restricted by the Articles of Incorporation or these By-Laws, members of the Board of Directors, or any committee designated by the Board of Directors, may participate in a meeting of the Board of Directors, or any committee, by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at such meeting.

COMMITTEES OF DIRECTORS

Section 10. The Board of Directors may, by resolution passed by a majority of the whole Board, designate one or more committees, each such committee to consist of one or more of the directors of the corporation. The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not he or they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent provided in the resolution of the Board of Directors, shall have and may exercise all the powers of the Board of Directors in the management of the business and affairs of the corporation, and may authorize the seal of the corporation to be affixed to all papers which may require it; but no such committee shall have the power in reference to amending the Articles of Incorporation (except that a committee may, to the extent authorized in the resolution or resolutions providing for the issuance of shares of stock adopted by the Board of Directors, fix the designations and any of the preferences or rights of such shares relating to dividends, redemption, dissolution, any distribution of assets of the corporation or the conversion into, or the exchange of such shares for, shares of any other class or classes or any other series of the same or any other class or classes of stock or fix the number of shares of any series of stock or authorize the increase or decrease of the shares of any series), adopting an agreement of merger or consolidation, recommending to the stockholders a dissolution of the corporation, and, unless the resolution, By-laws, or the Articles of Incorporation expressly so provide, no such committee shall have the power or authority to declare a dividend or to authorize the issuance of stock, or to adopt Articles of Merger.

Section 11. Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors when required.

COMPENSATION OF DIRECTORS

Section 12. Unless otherwise restricted by the Articles of Incorporation or these By-laws, the Board of Directors shall have the authority to fix the compensation of directors. The directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed sum for attendance at each meeting of the Board of Directors or a stated salary as director. No such payment shall preclude any director from serving the corporation in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for attending committee meetings.

INDEMNIFICATION

Section 13. (a) The corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, except an action by or in the right of the corporation, by reason of the fact that he is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses, including attorneys' fees, judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with the action, suit or proceeding if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, does not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

(b) The corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the corporation to procure a judgment in its favor by reason of the fact that he is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses, including attorneys' fees actually and reasonably incurred by him in connection with the defense or settlement of the action or suit if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the corporation; except that no indemnification shall be made in respect of any claim, issue or matter as to which such a person has been adjudged by a court of competent jurisdiction, after exhaustion of all appeals therefrom, to be liable to the corporation or for amounts paid in settlement to the corporation unless

and only to the extent that the court in which such action or suit was brought or other court of competent jurisdiction determines upon application that in view of all the circumstances of the case, the person is fairly and reasonably entitled to indemnity for such expenses as the court deems proper.

(c) To the extent that a director, officer, employee or agent of the Corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in paragraphs (a) and (b), or in defense of any claim, issue or matter therein, he must be indemnified by the Corporation against expenses, including attorneys' fees, actually and reasonably incurred by him in connection with the defense.

(d) Any indemnification under paragraphs (a) and (b), unless ordered by a court shall be made by the Corporation only as authorized in the specific case upon a determination that indemnification of the director, officer, employee or agent is proper in the circumstances. The determination shall be made (1) by the holders of a majority of the voting power of the corporation's stock, (2) by the Board of Directors by majority vote of a quorum consisting of directors who were not parties to the act, suit or proceeding, (3) if a majority vote of a quorum consisting of directors who are not parties to the act, suit or proceeding so order, by independent legal counsel in a written opinion, or (4) if a quorum consisting of directors who were not parties to the act, suit or proceeding cannot be obtained, by independent legal counsel in a written opinion.

(e) Expenses incurred by an officer or director in defending a civil or criminal action, suit or proceeding may be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that he is not entitled to be indemnified by the Corporation as authorized in this Section 13. Such expenses incurred by other employees and agents may be so paid upon such terms and conditions, if any, as the Board of Directors deems appropriate.

(f) The indemnification and advancement of expenses authorized in or ordered by a court pursuant to the other paragraphs of this Section 13, (i) does not exclude any other rights to which a person seeking indemnification or advancement of expenses may be entitled under any By-Law, agreement, vote of stockholders or disinterested directors or otherwise, for either an action in his official capacity or an action in another capacity while holding his office except that indemnification, unless ordered by a court pursuant to paragraph (b) or for the advancement of expenses made pursuant to paragraph (e), may not be made to or on behalf of any director or officer if a final adjudication establishes that his acts or omissions involved intentional misconduct, fraud or a knowing violation of the law and was material to the cause of action; and (ii) continues for a person who has ceased to be a director, officer, employee or agent and inures to the benefit of the heirs, executors and administrators of such a person. If a claim for indemnification or payment of expenses under this Section 13 is not paid in full within ninety (90) days after a written claim therefor has been received by the Corporation, the claimant may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim. In any such action the Corporation shall have the burden of proving that the claimant was not entitled to the requested indemnification or payment of expenses under applicable law.

(g) The Board of Directors may authorize, by a vote of a majority of a quorum of the Board of Directors, the Corporation to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another Corporation, partnership, joint venture, trust or other enterprise against any liability asserted against him and incurred by him in any such capacity, or arising out of his status as such, whether or not the Corporation would have the power to indemnify him against such liability under the provisions of this Section 13.

(h) The Board of Directors may authorize the Corporation to enter into a contract with any person who is or was a director, officer, employee or agent of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another partnership, joint venture, trust or other enterprise providing for indemnification rights equivalent to or, if the Board of Directors so determines, greater than those provided for in this Section 13.

(i) For the purposes of this Section 13, references to "the Corporation" shall include, in addition to the resulting Corporation, any constituent Corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent Corporation, or is or was serving at the request of such constituent Corporation as a director, officer, employee or agent of another Corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Section with respect to the resulting or surviving Corporation as he would have with respect to such constituent Corporation if its separate existence had continued.

(j) For purposes of this section, references to "other enterprises" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on a person with respect to an employee benefit plan; and references to "serving at the request of the Corporation" shall include service as a director, officer, employee or agent of the Corporation which imposes duties on, or involves services by, such director, officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner he reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the Corporation" as referred to in this section.

## ARTICLE IV.

### OFFICERS

Section 1. The officers of this Corporation shall be chosen by the Board of Directors and shall include a President, a Secretary and a Treasurer. The Corporation may also have at the discretion of the Board of Directors such other officers as are desired, including a Chairman of the Board, one or more Vice Presidents, one or more Assistant Secretaries and Assistant Treasurers, and such other officers as may be appointed in accordance with the provisions of Section 3 hereof. In the event there are two or more Vice Presidents, then one or more may be designated as Executive Vice President, Senior Vice President, or other similar or dissimilar title. At the time of the election of officers, the directors may by resolution determine the order of their rank. Any number of offices may be held by the same person, unless the Articles of Incorporation or these By-Laws otherwise provide.

Section 2. The Board of Directors, at its first meeting after each annual meeting of stockholders, shall choose the officers of the Corporation.

Section 3. The Board of Directors may appoint such other officers and agents as it shall deem necessary who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board.

Section 4. The salaries of all officers and agents of the Corporation shall be fixed by the Board of Directors.

Section 5. The officers of the Corporation shall hold office until their successors are chosen and qualify in their stead. Any officer elected or appointed by the Board of Directors may be removed at any time by the affirmative vote of a majority of the Board of Directors. If the office of any officer or officers becomes vacant for any reason, the vacancy shall be filled by the Board of Directors.

### CHAIRMAN OF THE BOARD

Section 6. The Chairman of the Board, if such an officer be elected, shall, if present, preside at all meetings of the Board of Directors and exercise and perform such other powers and duties as may be from time to time assigned to him by the Board of Directors or prescribed by these By-Laws. The Chairman of the Board shall in addition be the Chief Executive Officer of the Corporation and shall have the powers and duties prescribed in Section 7 of this Article IV, if no such officer is elected.

### CHIEF EXECUTIVE OFFICER

Section 7. Subject to such supervisory powers, if any, as may be given by the Board of Directors to the Chairman of the Board, if there be such an officer, the Chief Executive Officer shall, subject to the control of the Board of Directors, have general supervision, direction and control of the business and officers of the Corporation. He shall preside at all meetings of the Stockholders and, if there is no Chairman of the Board, at all meetings of the Board of Directors. He shall be an ex-officio member of all committees and shall have the general powers and duties of management usually vested in the office of Chief Executive Officer of corporations, and shall have such other powers and duties as may be prescribed by the Board of Directors or these By-Laws.

### PRESIDENT

Section 8. In the absence or disability of the Chief Executive Officer, the President shall perform all duties of the Chief Executive Officer, and when so acting shall have all the powers of and be subject to all the restrictions upon the Chief Executive Officer. He shall be an ex-officio member of all committees and shall have the general powers and duties of management usually vested in the office of President of corporations, and shall have such other powers and duties as may be prescribed by the Board of Directors or these By-Laws.

### VICE PRESIDENTS

Section 9. In the absence or disability of the President, the Vice Presidents in order of their rank as fixed by the Board of Directors, or if not ranked, the Vice President designated by the Board of Directors, shall perform all the duties of the President, and when so acting shall have all the powers of and be subject to all the restrictions upon the President. The Vice Presidents shall have such other duties as from time to time may be prescribed for them, respectively, by the Board of Directors.

## SECRETARY AND ASSISTANT SECRETARY

Section 10. The Secretary shall attend all sessions of the Board of Directors and all meetings of the stockholders and record all votes and the minutes of all proceedings in a book to be kept for that purpose; and shall perform like duties for the standing committees when required by the Board of Directors. The Secretary shall give, or cause to be given, notice of all meetings of the stockholders and of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors or these By-Laws. The Secretary shall keep in safe custody the seal of the Corporation, and affix the same to any instrument requiring it, and when so affixed it shall be attested by his signature or by the signature of an Assistant Secretary. The Board of Directors may give general authority to any other officer to affix the seal of the Corporation and to attest the affixing by his signature.

Section 11. The Assistant Secretary, or if there be more than one, the Assistant Secretaries in the order determined by the Board of Directors, or if there be no such determination, the Assistant Secretary designated by the Board of Directors, shall, in the absence or disability of the Secretary perform the duties and exercise the powers of the Secretary and shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

## TREASURER AND ASSISTANT TREASURER

Section 12. The Treasurer shall have the custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and shall deposit all moneys, and other valuable effects in the name and to the credit of the Corporation, in such depositories as may be designated by the Board of Directors. He shall disburse the funds of the Corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the Board of Directors, at its regular meetings, or when the Board of Directors so requires, an account of all his transactions as Treasurer and of the financial condition of the Corporation. If required by the Board of Directors, he shall give the Corporation a bond, in such sum and with such surety or sureties as shall be satisfactory to the Board of Directors, for the faithful performance of the duties of his office and for the restoration to the Corporation, in case of his death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in his possession or under his control belonging to the Corporation.

Section 13. The Assistant Treasurer, or if there shall be more than one, the Assistant Treasurers in the order determined by the Board of Directors, or if there be no such determination, the Assistant Treasurer designated by the Board of Directors, shall, in the absence or disability of the Treasurer, perform the duties and exercise the powers of the Treasurer and shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

## ARTICLE V.

### CERTIFICATES OF STOCK

Section 1. Every holder of stock of the Corporation shall be entitled to have a certificate signed by, or in the name of the Corporation by, the Chairman or Vice Chairman of the Board of Directors, or the President or a Vice President, and by the Secretary or an Assistant Secretary, or the Treasurer or an Assistant Treasurer of the Corporation, certifying the number of shares represented by the certificate owned by such stockholder in the Corporation.

Section 2 Any or all of the signatures on the certificate may be a facsimile. In case any officer, transfer agent, or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent, or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if he were such officer, transfer agent, or registrar at the date of issue.

Section 3. If the Corporation shall be authorized to issue more than one class of stock or more than one series of any class, the voting powers, designations, preferences, limitations, restrictions and relative rights of each class of stock or series thereof and the qualification, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of the certificate which the Corporation shall issue to represent such class or series of stock, provided that, except as otherwise provided in section 78.195 of the Revised Nevada Statutes, in lieu of the foregoing requirements, there may

be set forth on the face or back of the certificate which the Corporation shall issue a statement setting forth the office or agency of the Corporation from which the stockholders may obtain a copy of a statement setting forth in full or summarizing the voting powers, designations, preferences, limitations, restrictions and relative rights of each class of stock or series thereof that the Corporation will furnish without charge to each stockholder who so requests.

## LOST, STOLEN OR DESTROYED CERTIFICATES

Section 4. The Board of Directors may direct a new certificate or certificates to be issued in place of any certificate or certificates theretofore issued by the Corporation alleged to have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen or destroyed. When authorizing such issue of a new certificate or certificates, the Board of Directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate or certificates, or his legal representative, to advertise the same in such manner as it shall require and/or to give the Corporation a bond in such sum as it may direct as indemnity against any claim that may be made against the Corporation with respect to the certificate alleged to have been lost, stolen or destroyed.

## TRANSFERS OF STOCK

Section 5. Upon surrender to the Corporation, or the transfer agent of the Corporation, of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignation or authority to transfer, it shall be the duty of the Corporation to issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.

## FIXING RECORD DATE

Section 6. In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of the stockholders, or any adjournment thereof, or to express consent to corporate action in writing without a meeting, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors may fix a record date which shall not be more than sixty nor less than ten days before the date of such meeting, nor more than sixty days prior to any other action. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

## REGISTERED STOCKHOLDERS

Section 7. The Corporation shall be entitled to treat the holder of record of any share or shares of stock as the holder in fact thereof and accordingly shall not be bound to recognize any equitable or other claim or interest in such share on the part of any other person, whether or not it shall have express or other notice thereof, save as expressly provided by the laws of the State of Nevada.

## ARTICLE VI.

## GENERAL PROVISIONS

## DISTRIBUTIONS

Section 1. Distributions upon the capital stock of the Corporation, subject to the provisions of the Articles of Incorporation, if any, may be declared by the Board of Directors at any regular or special meeting, pursuant to law.

Section 2. Before payment of any distribution there may be set aside out of any funds of the Corporation available for distributions such sum or sums as the directors from time to time, in their absolute discretion, think proper as a reserve fund to meet contingencies, or for equalizing distributions, or for repairing or maintaining any property of the Corporation, or for such other purpose as the directors shall think conducive to the interests of the Corporation, and the directors may abolish any such reserve.

## CHECKS

Section 3. All checks or demands for money and notes of the Corporation shall be signed by such officer or officers, or such other persons, as the Board of Directors may from time to time designate.

## FISCAL YEAR

Section 4. The fiscal year of the Corporation shall be fixed by resolution of the Board of Directors.

SEAL

Section 5. The corporate seal shall have inscribed thereon the name of the Corporation and the words "Corporate Seal, Nevada". Said seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

NOTICES

Section 6. Whenever, under the provisions of the statutes or of the Articles of Incorporation or of these By-Laws, notice is required to be given to any director or stockholder, it shall not be construed to mean personal notice, but such notice may be given in writing, addressed to such director or stockholder, at the stockholder's address as it appears on the records of the Corporation, with postage thereon prepaid, and such notice shall be deemed to be given at the time when the same shall be deposited in the United States mail.  Notice to any director may be by any reasonable means, including, without limitation, mail, personal delivery, facsimile, or electronic communication. All notices shall be deemed given when sent.

Section 7. Whenever any notice is required to be given under the provisions of the statutes or of the Articles of Incorporation or of these By-Laws, a waiver thereof in writing, signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent thereto.

ARTICLE VII.

AMENDMENTS

Section 1. Except as otherwise restricted in the Articles of Incorporation or these By-Laws:

(a) Any provision of these By-Laws may be altered, amended or repealed at the annual or any regular meeting of the Board of Directors without prior notice, or at any special meeting of the Board of Directors if notice of such alteration or repeal be contained in the notice of such special meeting.

(b) These By-Laws may also be altered, amended or repealed at a duly convened meeting of the stockholders by the affirmative vote of the holders of a majority of the voting power of the Corporation's stock. The stockholders may provide by resolution that any
By-law provision repealed, amended, adopted or altered by them may not be repealed, amended, adopted or altered by the Board of Directors.

</TEXT>
</DOCUMENT>

EXHIBIT 21.1

SUBSIDIARIES OF THE REGISTRANT

| Name | State or Country of Incorporation or Organization | Name under which subsidiary is doing business other than its own |
|------|--------------------------------------------------|------------------------------------------------------------------|
| ADAP, Inc. | New Jersey | AutoZone |
| ALLDATA Corporation | Delaware | |
| AutoZone Stores, Inc. | Nevada | |
| AutoZone Development Corporation | Nevada | |
| AutoZone Management, L.P. | Delaware | |
| AutoZone de Mexico, S. de R.L. de C.V. | Mexico | |
| AutoZone Texas, L.P. | Delaware | |
| Chief Auto Parts Inc. | Delaware | AutoZone |
| TruckZone, Inc. | Nevada | TruckPro |

In addition, three subsidiaries operating in the United States and five subsidiaries operating outside of the United States have been omitted as they would not, considered in the aggregate as a single subsidiary, constitute a significant subsidiary as defined by Rule 1-02(w) of Regulation S-X.

</TEXT>
</DOCUMENT>

Exhibit 23.1

CONSENT OF INDEPENDENT AUDITORS

We consent to the incorporation by reference in this Annual Report (Form
10-K) of AutoZone, Inc. of our report dated September 30, 1998, included
in the 1998 Annual Report to Stockholders of AutoZone, Inc.

Our audits also included the financial statement schedule of AutoZone,
Inc. listed in Item 14(a). This schedule is the responsibility of the
Company's management. Our responsibility is to express an opinion based
on our audits. In our opinion, the financial statement schedule referred
to above, when considered in relation to the basic financial statements
taken as a whole, presents fairly in all material respects the
information set forth therein.

We also consent to the incorporation by reference in the Registration
Statement (Form S-8 No. 33-41308) pertaining to the AutoZone, Inc.
Employee Stock Purchase Plan, the Registration Statement (Form S-8 and
Form S-3 No. 33-41618) pertaining to the Amended and Restated Stock
Option Plan of AutoZone, Inc., the Registration Statement (Form S-8 No.
333-19561) pertaining to the AutoZone, Inc. 1996 Stock Option Plan, the
Registration Statement (Form S-8 No. 333-48979) pertaining to the
AutoZone, Inc. Director Compensation Plan, the Registration Statement
(Form S-8 No. 333-48981) pertaining to the AutoZone, Inc. 1998 Director
Stock Option Plan and the Registration Statement (Form S-3 No. 333-
58565), of our report dated September 30, 1998, with respect to the
consolidated financial statements and schedule of AutoZone, Inc. included
or incorporated by reference in this Annual Report (Form 10-K) for the
year ended August 29, 1998.

                    /s/ ERNST & YOUNG LLP

Memphis, Tennessee
November 23, 1998

</TEXT>
</DOCUMENT>

Created by 10KWizard Technology   www.10KWizard.com