# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ADAP, INC. | : | CASE NO. 3:03 CV 350 (MRK) |
| VS. | : | |
| RITZ REALTY CORP., | : | |
| AVALON BAY COMMUNITIES, INC. | : | FEBRUARY 1, 2005 |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT

The plaintiff submits this memorandum in support of its motion for summary judgment.

**I.      INTRODUCTION**

This is an action for specific performance to enforce the plaintiff's rights pursuant to its written lease. The plaintiff is the lessee. It operates an AutoZone store in a shopping center in Norwalk, CT known as Riverview Plaza. The defendant, Ritz Realty Corp. ("Ritz"), is the owner/lessor of Riverview Plaza. The defendant, AvalonBay Communities, Inc. ("AvalonBay"), is the contract purchaser of a portion of Riverview Plaza.

The present Riverview Plaza is a strip shopping center with a large open field parking lot. AvalonBay proposes to construct an apartment complex in the present open field parking lot.

1

## II. FACTS

### A. Riverview Plaza

1. Ritz Realty Corp. ("Ritz") is the owner of that certain piece or parcel of real property known as "Riverview Plaza" located at located 24 Belden Avenue, Norwalk, Connecticut ("Premises").  See complaint ¶ 7 and Ritz' answer (admission) thereto.

2. AvalonBay Communities, Inc. ("AvalonBay") submitted plans ("Plans") to construct two (2) apartment buildings on the Premises.  Exhibit A (Plans) and Robbins Deposition 149:5 – 149:9.

3. The Norwalk Planning and Zoning Commission granted site plan approval of the Plans.   See complaint ¶ 38 and answers (admissions) thereto.

4. Riverview Plaza presently has retail space with a large open field parking area immediately adjacent to it, has excellent visibility from all surrounding roads and is easily accessible from points of ingress and egress from Belden Avenue and Cross Street.  Exhibit A, page PK0056 and PK0074 and Exhibit B.

### B. AutoZone Lease

5. On or about April 17, 1997, ADAP and Ritz entered into a written lease ("Lease") for ADAP to exclusively occupy a portion of Building #1 of Riverview Plaza consisting of approximately Five Thousand Six Hundred Eighty (5,680) Square Feet (the "Leased Premises").  Exhibit C and Affidavit of James O. McClain ¶6.

6. The Leased Premises is located in the corner location, or "end cap", of Building #1 - closest to the access way from Belden Avenue. Exhibit A, page PK0056 and PK 0074 and Exhibit B.

7. The AutoZone store has frontage along the open parking lot and Belden Avenue. Exhibit A, page PK0056 and PK0074 and Exhibit B.

8. AutoZone has a large sign on the front of its store that is visible from the open parking lot, Cross Street and Belden Avenue. Exhibit B.

9. The lease provides the lessee, among other rights, use and occupancy of the Leased Premises for an initial term of ten (10) years commencing not later than October 1, 1997, followed by two (2) successive renewal terms each of five (5) years. Exhibit C, Articles 4 and 5.

10. ADAP and Ritz agreed in Article 1 of the lease as follows:

Landlord agrees that at all times during the term of this lease, adequate roadways and passageways shall be provided at the building for passage by motor vehicles and on foot between the leased premises, the parking areas and the public streets, and highways adjoining the building. Landlord further agrees that Exhibit A is a complete and accurate representation of the layout of the building, parking areas, access roads, loading docks, passageways and other common areas and facilities and improvements shown thereon, now completed or under construction or planned for [Riverview Plaza], as well as of the locations of the store enterprises noted thereon and that the layout thereof, as shown on Exhibit A will be adhered to in the development of [Riverview Plaza] and/or any subsequent expansion and/or alteration thereof so as to maintain the relative position of the buildings, the parking areas, the roadways and passageways, and the spaces of the tenants, all as shown on Exhibit A. Landlord agrees that there shall be no change whatever in the location, shape or dimensions of the premises hereby demised, and no substantial change in [Riverview Plaza] layout which would in any manner or to any degree adversely or materially

affect the accessibility to the leased premises from the parking areas or the visibility of tenant's signs or storefront, without tenant's prior written consent in each instance, which consent shall not be unreasonably withheld.  Landlord further agrees not to place any free-standing buildings, kiosks, planters, trees, shrubs, stairs or other obstructions any place in front of the leased premises so as to affect the accessibility to or the visibility of the leased premises without first obtaining tenant's written consent, which consent shall not be unreasonably withheld or delayed.

11.  ADAP and Ritz agreed in Article 14 of the lease as follows:

Landlord agrees throughout the term of this Lease to properly maintain and operate all parking areas and other common areas and facilities or appurtenances to the building and to keep same in good order and condition and properly lighted and cleaned.  The aforesaid obligations of Landlord shall include maintaining and at all times having adequate means of ingress and egress to and from accepted highways and public streets …

All of the aforesaid obligations of Landlord shall be performed in accordance with good and accepted real estate practices throughout the term of this lease, Landlord recognizing that all of said common areas must be available at all times, in good and attractive order and condition, to serve Tenant's customers, employees and invitees.

   *       *       *

Landlord acknowledges that due to the fact the Premises has no rear loading door or dock, Tenant must unload its deliveries of goods and products to the Premises through the front door via access from the parking area in front of the Premises.  Landlord agrees that, notwithstanding anything in this Lease to the contrary or any rules and regulations now or hereafter established by Landlord for tenants of the shopping center, Tenant shall be permitted to load and unload its goods and products through the front door of the Premises.

B.  Landlord agrees that throughout the term of this Lease it shall provide and maintain, in good order and condition, paved and line painted parking areas adjacent to the building for use by Tenant's customers and invitees, which parking shall comply with all local ordinances and regulations applicable thereto including with respect to the required ratio parking spaces to area of the leased premises.  If at any time during the term hereof the total parking

      area shall be decreased permanently by more than thirty-five percent (35%), than in such event Landlord shall designate and reserve for the exclusive use of Tenant's customers (including by cordoning off spaces to identify them as reserved for Tenant's customers) fifteen (15) parking spaces within the cross-hatched area identified on Exhibit A hereto and Landlord shall enforce such parking restrictions as may be reasonably necessary to ensure the [exclusiveness] of such parking spaces. If Landlord shall fail to provide such parking or to enforce restrictions as are reasonably necessary to ensure such parking to Tenant's customers and such failure shall continue for thirty (30) days after notice from Tenant, then Tenant may, in lieu of the fixed annual rent herein specified, pay to Landlord a reduced rent equal to three (3%) percent of its gross sales from the leased premises, plus all utilities it is required to pay under this Lease, until such time as the situation is remedied by Landlord; provided, however, that if such failure shall continue for more than ninety (90) days after such notice, then Tenant may cancel and terminate this Lease upon written notice to Landlord of such termination. Landlord further agrees that it will use reasonable efforts to limit access to parking in the parking areas of the Shopping Center to patrons of the Shopping Center and will establish and use reasonable efforts to enforce such parking restrictions as may be necessary in order for that to occur.

12. At present, there exist 262 parking spaces in the open field lot. Exhibit C, JM00369.

13. The Lease dedicated at least fifteen (15) parking spaces ("Reserved Parking Area") to AutoZone if parking were reduced in the open lot by more than 35%. Exhibit C, Article 14(B) and JM00369 (Highlight Original).

    **C.**    **AvalonBay's Contract**

14. On October 17, 2001 Ritz entered into a contract ("Contract") for the purchase and sale of a portion of the Premises to AvalonBay. AvalonBay is the contract buyer of the portion of the Premises including the open

parking lot.  See complaint ¶ 29 and 30 answers (admissions) thereto. Exhibit D.

15. Pursuant to the Contract, AvalonBay had the right to conduct due diligence and to terminate the Contract "… for any other reason whatsoever, or for no reason …".  Exhibit D, ¶ 4.1(b).

### D. AvalonBay's Knowledge Of AutoZone's Lease

16. On or about October 31, 2001 and during the due diligence period, AvalonBay was provided a copy of the plaintiff's Lease.  Exhibit E and Valente Deposition, 94:12 – 94:25.

17. On or before October, 2001, Day, Berry & Howard, LLP commenced to represent AvalonBay Communities, Inc. in the purchase and sale of a portion of the premises referred to as "Riverview Plaza" in Norwalk, Connecticut.

18. Submitted herewith as Exhibit F and Exhibit G are letters dated January 29, 2002 and February 7, 2002 respectively from Allen Roberts, of Day, Berry & Howard, LLP.

19. Those letters are genuine, authentic and accurate copies of the letters sent on the dates set forth therein.

20. The letters were prepared and sent at or about the date(s) set forth therein.

21. AvalonBay identified the terms of plaintiff's Lease, and in particular, Article 1 thereof, as providing a potential basis for objecting to the Proposed Development.  Exhibit F.

### E. AvalonBay's Proposed Development

22. By application dated November 26, 2002 ("Application"), AvalonBay submitted a site plan review application with the Norwalk Zoning Commission ("Proposed Development").  See complaint ¶ 31 and answers (admissions) thereto.

23. The Proposed Development consists of construction of two (2) new multi-story buildings, one in the area now used as an open parking lot and the other in an area formerly housing a Pathmark grocery store.  See complaint ¶ 32 and answers (admissions) thereto.

24. AvalonBay does not intend to make any structural additions to the building where AutoZone is located, but intends on making "improvements" to the exterior thereto.  Exhibit A, page PK0062.

25. The "improvements" consist of façade renovations and the addition of trees and landscaping along Belden Avenue.  Exhibit A, page PK0062.

26. The Proposed Development will result in the:

    a. Addition of 312 residential units;

    b. Addition of 1,500 square feet of retail space;

    c. Reduction of parking spaces in the open parking lot;

    d. Installation of landscaping trees along Belden Avenue.

See complaint ¶ 33 answers (admission) thereto.

### F.  AutoZone's Objection To The Proposed Development

27. Beginning in January 2002, the plaintiff has continuously and strenuously objected to the Proposed Development. Affidavit of James O. McClain ¶10.

### G.  Construction Interference

28. AvalonBay has represented that the Proposed Development will take approximately eighteen to twenty-one (18 - 21) months to complete. Exhibit H and Robbins 140:18 – 141:21.

29. During construction, parking will be altered and the existing open field parking lot will be closed or largely inaccessible to customers, employees and invitees of AutoZone.  Robbins 143:11 – 145:23 and Exhibit H.

30. During months one through seven, approximately two hundred (200) parking spaces at grade for retail customers and employees will exist in the "Western Lot".  Exhibit H and Robbins 143:11 – 145:23.

31. During months eight through twenty-one, there will be no parking at grade. Exhibit H.

32. During construction, there will be significant business interruption and disruption.  Robbins 143:11 – 145:23 and Exhibit H.

33. On February 7, 2002, AvalonBay admitted that there will be an impact upon tenants during construction.  Exhibit G.

### H.  Interference After Construction

#### 1.  Visibility

34. At present, travelers proceeding westerly on Cross Street who approach the intersection of Belden Avenue with the Premises on their left have a clear view across the open parking lot of the retail stores including AutoZone and its storefront sign.  Exhibit B.

35. At present, travelers proceeding southerly on Belden Avenue who approach the intersection with Cross Street with the Premises in front of them have a clear view across the open parking lot of the retail stores including AutoZone and its storefront sign.  Exhibit B.

36. If the Proposed development is built, there will be significant reduction in visibility.  Exhibit A, PK0055, PK0059, PK0062 and PK0069.

37. For travelers going westerly on Cross Street, there will no longer be any visibility of the AutoZone Store or its sign.  Exhibit A, PK0055, PK0059, PK0062 and PK0069.

38. For travelers going southerly on Belden Avenue, there will no longer be clear visibility across an open field parking lot of the AutoZone Store or its sign.  Exhibit A, PK0055, PK0059, PK0062 and PK0069.

39. There will also be very substantial and numerous trees planted along Belden Avenue that will further block any remaining view cars may have had of the AutoZone store from the Belden/Cross intersection.  Exhibit A, PK0062 and PK0069.

### 2. Parking

40. After the Proposed Development there will be 82 parking spaces shared between residential and retail. Exhibit A, PK0057.

41. The parking will be reduced by more than 35%. Thus, AutoZone is entitled to the exclusive use of fifteen (15) spaces in the Reserved Parking Area. Exhibit C.

42. The Proposed Development does not allow for any parking in the Reserved Parking Area.

43. The character of the parking will be changed from an open field to covered parking under a building with limited access. Exhibit A, PK0059, Exhibit B and Exhibit C, JM00369.

### 3. Accessibility

44. Presently, there are two (2) points of ingress and egress to the open field parking lot in Riverview Plaza. Exhibit A, PK0056.

45. After the Proposed Development, there will remain the same access off the street; however, interior circulation will be dramatically changed. Exhibit A, PK0059.

46. There will no longer be many drive aisles. From Belden Avenue, there will be one (1) entry point to the parking closest to AutoZone. It will be covered and under a building. There are no close parking spaces. The customer must travel down the aisle and around if no spaces are available

rather than enjoy the many options a customer now has. Exhibit A, PK0059.

47. Further, once parked, the distance of travel from the parking space to the AutoZone front door will increase. Further, the travel for the customer will be restricted to the driveway in which cars are entering – there will be no sidewalk or crossing areas for retail customers. Exhibit A, PK0059

### I. Expert Opinions - Robert Blank

48. The existing site provides an ideal retail location on account of its location, accessibility from major thoroughfares, accessibility from the parking lot to the store, excellent visibility, and convenient customer friendly parking. Exhibit I (Report of Robert Blank).

49. The Leased Premises has an end cap location with plentiful, unobstructed and convenient open field parking. Exhibits A, B, C and I.

50. The parking is immediately adjacent to the Leased Premises. Exhibits A, B, C and I.

51. Access to the parking spaces is excellent. Exhibits A, B, C and I.

52. The Leased Premises has:
    a. Excellent visibility from Cross Street;
    b. Excellent visibility from Belden Avenue;
    c. Is located near Route 7;
    d. Enjoys easy access from all directions;

    e.    Is located in an area close to population centers that utilize the retail center.

Exhibits A, B, C and I.

53.    The Proposed Development will negatively and adversely affect the desirability for AutoZone customers to frequent its store on account of:

    a.    Reduced accessibility;

    b.    Reduced visibility; and/or

    c.    Reduced convenient parking.

Exhibits A, B, C and I.

54.    The benefit of the end cap location will be diminished on account of the placement of a new building adjacent to the store.

Exhibits A, B, C and I.

55.    The desirability of parking will be diminished in at least the following ways:

    a.    No open field;

    b.    Obstructed parking;

    c.    Lack of convenient access to parking areas;

    d.    Lack of convenient access to the store from the parking areas.

Exhibits A, B, C and I.

56.    Visibility will be significantly diminished in that a large building will be placed where the open parking field presently exists.

Exhibits A, B, C and I.

57. The atmosphere of the shopping center will be altered in style and appearance making Riverview Plaza less desirable to a convenience auto parts retailer. Exhibits A and I.

### III. ARGUMENT

#### A. Standard For Summary Judgment

Summary judgment is appropriate when there is no dispute as to a genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); See Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986). There exists a genuine issue of fact when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome if the substantive law renders them so. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party carries the burden of demonstrating that there is no genuine material dispute of fact. Celotex Corp. v. Catrett, 477 U.S. at 323-325. "[I]n determining whether a genuine issue has been raised, the inferences to be drawn from the underlying facts revealed in the affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." Tomka v. Seiler, 66 F.3d 1295, 1304 (2d Cir. 1995).

#### B. Specific Performance

"The specific performance remedy is a form of injunctive decree in which the court orders the defendant to perform the contract.... The specific performance decree originated in the old equity courts and continues today to be

thought of as an equitable remedy, with the usual attributes of such remedies." (Internal quotation marks omitted.) Marquardt & Roche/Meditz & Hackett, Inc. v. Riverbend Executive Center, Inc., 74 Conn. App. 412, 418, (2003). "The availability of specific performance is not a matter of right, but depends rather upon an evaluation of equitable considerations." Kakalik v. Bernardo, 184 Conn. 386, 395 (1981); see also Syncsort, Inc. v. Indata Services, 14 Conn. App. 481, 484 ("by bringing an equitable action for specific performance the plaintiff brings all principles of equity into consideration"), cert. denied, 209 Conn. 804 (1988).

"The determination of what equity requires in a particular case, the balancing of the equities, is a matter for the discretion of the trial court." Kakalik v. Bernardo, 184 Conn. 386, 395 (1981); Kubish v. Zega, 61 Conn. App. 608, 615, cert. denied, 255 Conn. 949 (2001).

In balancing the equities, the court is not "bound by a formula but is free to fashion relief 'molded to the needs of justice.' " Hall v. Dichello Distributors, Inc., 6 Conn. App. 530, 540, cert. denied, 200 Conn. 807 (1986), quoting Montanaro Bros. Builders, Inc. v. Snow, 4 Conn. App. 46, 54 (1985); see also 71 Am.Jur.2d, Specific Performance § 94 (2001).

### C. Breaches Of Lease

The Proposed Development will result in Ritz breaching its lease in one or more of the following ways:

    a.    Failing to maintain Riverview Plaza and the layout of the buildings, parking areas, access roads, loading docks, passageways and

      other common areas and facilities and improvements in the same or similar condition as that set for in the Lease as required by Article 1;

b. Failing to maintain the locations of the store enterprises noted in the Lease and adhering to the layout thereof in the development of Riverview Plaza and/or any subsequent expansion and/or alteration thereof so as to maintain the relative position of the buildings, the parking areas, the roadways and passageways, and the spaces of the tenants as required by Article 1;

c. Failing to maintain the Riverview Plaza layout with no substantial change as required by Article 1;

d. Adversely or materially affecting the accessibility to the Leased Premises from the parking areas as required by Article 1;

e. Adversely or materially affecting the visibility of AutoZone's signs or storefront as required by Article 1;

f. Adding free-standing buildings, trees, shrubs or other obstructions in front of the Leased Premises so as to affect the accessibility to or the visibility as prohibited by Article 1;

g. Failing to properly maintain and operate all parking areas and other common areas and facilities or appurtenances to the building and to keep same in good order and condition as required by Article 14;

    h.    Failing to maintain all of the common areas so as to be available at all times, in good and attractive order and condition, to serve AutoZone's customers, employees and invitees as required by Article 14;

    i.    Failing to permit the AutoZone store to load and unload its goods and products through the front door of the Leased Premises as required by Article 14;

    j.    Failing to provide and maintain, in good order and condition, paved and line painted parking areas adjacent to the building for use by AutoZone's customers and invitees, in compliance with all local ordinances and regulations applicable thereto including with respect to the required ratio parking spaces to area of the Leased Premises as required by Article 14;

    k.    Failing to designate and reserve for the exclusive use of AutoZone's customers (including by cordoning off spaces to identify them as reserved for AutoZone's customers) fifteen (15) parking spaces within the area identified in the Lease as required by Article14.

    **D.**    **Balance Of The Equities**

The balance of the equities requires an examination first of the status of the parties before Ritz and AvalonBay decided to develop the parking lot. The

plaintiff entered into the Lease knowing the following were granted to it and required by the Lease:

1. It enjoyed an "endcap" location;

2. There was plentiful convenient, customer friendly parking;

3. Visibility was excellent from all surrounding roads;

4. Signage was visible from all surrounding roads;

5. Interior traffic circulation was excellent;

6. No material changes could be made to the layout or configuration of the shopping center;

7. No free standing buildings could be built in the open field parking lot.

The lease terms, including rent to be paid, decision to locate in Norwalk, Connecticut and term of the lease were all predicated upon those provisos.

AutoZone has remained faithful to its end of the bargain. It has paid its rent and fulfilled each and every other obligation required of it under the Lease.

Customers of AutoZone have come to know the store and its relative convenience for parking and accessibility.

AutoZone has invested money in marketing and in the erection of signs on the exterior façade of the store to attract customers to "Get in the Zone".

When Ritz and AvalonBay began the process of doing their deal, they both knew of the AutoZone lease and the concerns it raised to the ability and viability of any deal. Thus, any detriment to Ritz or AvalonBay is self imposed, of their own making or manufactured.

If the Proposed Development proceeds, the plaintiff will lose each of the benefits it contracted for in its Lease.  As a result, it may lose a viable store, lose a prime location and/or lose market penetration in Norwalk.  In addition, monetary loses may be incurred but are not ascertainable because they will rely upon factors that can only be determined when they occur.

On the other hand, Ritz and AvalonBay will suffer no damage, monetary or otherwise by the specific performance of the Lease – other than the risk and losses they took when they pursued the Proposed Development knowing full well of the AutoZone Lease and AutoZone's strenuous objections to the Proposed Development.

Therefore, the balance of the equities clearly falls in favor of AutoZone and against Ritz and AvalonBay in the circumstances presented here.

### IV. CONCLUSION

For the reasons expressed, there are no genuine issues of material fact concerning the breach of the Lease or an anticipatory breach of the Lease. The balance of the equities is in favor of the plaintiff. Therefore, a decree granting specific performance should enter in favor of the plaintiff and declaratory judgment declaring that the Proposed Development in the open field parking lot violates the Lease.

                            **THE PLAINTIFF**
                            **ADAP, INC. D/B/A AUTOZONE**

                        By:_____
                            Bruce L. Elstein, Esq.
                            Elstein and Elstein, P.C.
                            1087 Broad Street
                            Bridgeport, Connecticut 06604
                            Telephone: (203) 367-4421
                            Facsimile: (203) 366-8615
                            Fed. Bar No. ct 01250
                            Email: belstein@snet.net

# **C E R T I F I C A T I O N**

This is to certify that a copy of the foregoing has on February 1, 2005 been sent to:

Joseph Hammer, Esq.
Day, Berry & Howard, LLP
City Place 1
Hartford, CT  06103-3499
    Attorney for the defendant, AvalonBay Communities, Inc.

Andrew Houlding, Esq.
Rome McGuigan Sabanosh, P.C.
One State Street
Hartford, CT  06103
    Attorney for the defendant, Ritz Realty Corp.

                                                     _____
                                                   Bruce L. Elstein

\\Server\Common\AUTOZONE\Adap v. Ritz(Avalon)\MFSJ\MFSJ - Memo in support.doc