UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ADAP, INC. D/B/A AUTOZONE        :          CASE NO. 3:03cv350 (MRK)
     Plaintiff,

        vs.                :

RITZ REALTY CORP. AND
AVALONBAY COMMUNITIES, INC.
     Defendants.                :        FEBRUARY 25, 2005

## DEFENDANT RITZ REALTY'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Defendant, Ritz Realty Corp., ("Ritz") hereby opposes Plaintiff's Motion for Summary Judgment and Memorandum of Law in Support dated February 1, 2005. Ritz respectfully urges the Court to deny Plaintiff's Motion and to hold that Plaintiff's leasehold obligations require it to show why it should not grant consent to the development planned by Ritz and its co-defendant AvalonBay Communities, Inc. ("AvalonBay").

## I.    INTRODUCTION

When Plaintiff AutoZone, Inc., acquired ADAP, Inc., it succeeded to ADAP's lease of a portion of the Riverview Shopping Plaza ("Riverview") in Norwalk, Connecticut, where AutoZone operates an auto parts store.

Ritz has entered into an agreement with the co-defendant AvalonBay for the sale of a portion of Riverview. AvalonBay plans to construct two residential apartment complexes on the property. One building would be constructed on a portion of the site that was formerly occupied

by a 50,000 square foot Pathmark Supermarket that has been vacant for several years. The other building would be constructed where there is now an open parking lot. Both of the apartment buildings would be constructed on columns or stilts. Surface parking spaces would be available underneath the buildings for the remaining retail tenants of Riverview.

The Ritz-ADAP lease (the "Lease") commenced in 1997 and continues until 2007, with two five-year renewal options. The proposed development will substantially enhance Riverview and, indeed, the City of Norwalk and its tax base. In pursuing the development, Ritz intended that AutoZone and several other Riverview retail tenants would remain and prosper in the shopping plaza.

However, AutoZone has taken an extreme and unreasonable position, claiming – without any evidentiary support – that the proposed development will "destroy" its business. Pursuant to the Lease, Ritz may make changes to the Riverview layout subject to AutoZone's consent, but that consent may not be unreasonably withheld or delayed. Whether AutoZone has unreasonably delayed or withheld its consent is a material issue rife with facts that remain in dispute. Summary judgment cannot be granted to AutoZone in the present posture of the case.

Plaintiff also must be denied specific performance of its "rights pursuant to its written lease," as requested in Plaintiff's Memorandum in Support of Motion for Summary Judgment, (**P. Memo**) at p.1. As set forth in AvalonBay's cross-Motion for Summary Judgment, Memorandum of Law, and Rule 56(a)(1) Statement, an action for specific performance cannot

succeed.[1] Plaintiff is a multinational corporation with more than 3,500 similar stores in the United States and Mexico, with $5.6 billion in gross sales, and any possible harm to this behemoth as a result of the proposed development outside its Norwalk store would be minimal and, in any event, legal remedies would be available.

## II.    FACTS

Ritz hereby joins in AvalonBay's Local Rule 56(a)(2) responses to Plaintiff's Rule 56(a)(1) Statement, and in AvalonBay's Rule 56(a)(2) Statement of Disputed Facts. In addition, Ritz supplies its own brief Rule 56(a)(2) Statement, incorporating facts asserted in the attached excerpts from the deposition of Eric Berliner and the attached Berliner Affidavit.

## III.    ARGUMENT

Although AutoZone has only briefed the issue of whether it may obtain specific performance of its lease, it seeks summary judgment on its entire Amended Complaint. *See* Plaintiff's Motion for Summary Judgment, p. 1. The Amended Complaint is in three (3) counts: (1) anticipatory breach of contract; (2) breach of contract; and (3) breach of the covenant of good faith and fair dealing. By way of relief, it seeks a decree of specific performance; a temporary restraining order preventing defendants from violating the lease; a temporary and permanent injunction to the same effect; a declaratory judgment "declaring that the Proposed Development

---

[1] Ritz, in its Motion for Summary Judgment, Memorandum of Law in Support, and Local Rule 56(a)(1) Statement, has adopted all of the AvalonBay pleadings and arguments by reference.

violates the Lease of ADAP," legal costs as provided under the Lease; and "such other relief as the Court may deem proper in law or in equity."[2]

AutoZone now asserts that the Proposed Development (as defined in P. Memo) will result in Ritz breaching its lease in one or more of eleven (11) enumerated ways. All of them revolve around anticipated changes in Riverview. Plaintiff claims the changes will violate Articles 1 and/or 14 of the Lease. Defendants Ritz and AvalonBay point out that the Lease does not bar the Proposed Development, and there are a host of genuine issues of material fact in dispute that bar summary judgment.

### A.     Summary Judgment Standard.

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact to be tried and that the facts as to which there is no such issue warrant judgment as a matter of law. M.C.I. Telecommunications Corp. v. Southern New England Tel. Co., 27 F. Supp. 2d 326, 331 (D. Conn. 1998); Fed. R. Civ. P. 56(c). If, as to any issue on which summary judgment is sought, "there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Samander v. Flemmig, 20 F. Supp. 2d 343, 344 (D. Conn. 1998) (citation

---

[2] Plaintiff initially claimed monetary damages. Its original Complaint claimed, at Paragraph 28, that Plaintiff's store "is highly profitable for ADAP, providing it with a competitive advantage over other auto parts stores in the vicinity," and claimed damages as one element of its prayer for relief. The Amended Complaint, dated November 2, 2004, eliminated Paragraph 28 and eliminated the claim for money damages.

omitted). "[A]ll reasonable inferences and any ambiguities must be drawn in favor of the non-moving party." *Id.* at 345 (citing <u>Thompson v. Gjivoje</u>, 896 F.2d 716, 720 (2d Cir. 1990)).

### B.    The Lease Will Not Be Breached By The Proposed Development.

The elements of a breach of contract action are "the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." <u>Bouchard v. Sundberg</u>, 80 Conn.App. 180, 189, 834 A.2d 744 (2003); <u>Rosato v. Mascardo,</u> 82 Conn.App. 396, (Conn.App. 2004).

Plaintiff cannot show a current or existing breach of the Lease.  It claims that the Proposed Development *will* breach the Lease.  Plaintiff therefore presumably relies on its second count, alleging anticipatory breach.

> "An anticipatory breach of contract occurs when the breaching party repudiates his duty before the time for performance has arrived.... Its effect is to allow the nonbreaching party to discharge his remaining duties of performance, and to initiate an action without having to await the time for performance.... The manifestation of intent not to render the agreed upon performance may be either verbal or nonverbal ... and is largely a factual determination in each instance." (Citations omitted; internal quotation marks omitted.) <u>Pullman, Comley, Bradley & Reeves v. Tuck-It-Away, Bridgeport, Inc.</u>, 28 Conn.App. 460, 465, 611 A.2d 435, *cert. denied*, 223 Conn. 926, 614 A.2d 825 (1992). "Repudiation can occur either by a statement that the promisor will not perform or by a voluntary, affirmative act that indicates inability, or apparent inability, substantially to perform." <u>Gilman v. Pedersen,</u> 182 Conn. 582, 584, 438 A.2d 780 (1981).

<u>Cottman Transmission Systems, Inc. v. Hocap Corp.</u>, 71 Conn.App. 632, 803 A.2d 402, (Conn.App. 2002).

-5-

Plaintiff does not mention repudiation anywhere in its pleadings, and does not attempt to address the elements set forth in <u>Cottman</u> (or any other legal standard). It also fails to acknowledge that the Lease contemplates that Ritz would retain flexibility to develop Riverview and to make major changes, subject to certain limitations.

The Lease provides that Ritz must obtain the Tenant's consent for material changes, provided that such consent may not be withheld unreasonably. Ritz has not repudiated the Lease; and if any breach of the Lease has occurred, it is AutoZone that has breached its obligation not to withhold or delay its consent unreasonably.

1.    **Relevant provisions of Lease.**

**Article 1** provides in pertinent part:

Landlord further agrees that Exhibit A is a complete and accurate representation of the layout of the building, parking areas, access roads, loading docks, passageways and other common areas and facilities and improvements shown thereon, now completed or under construction or planned for the Shopping Center, as well as of the locations of the store enterprises noted thereon and that the layout thereof, as shown on Exhibit A will be adhered to in the development of the Shopping Center and/or any subsequent expansion and/or alteration thereof so as to maintain the relative positions of the buildings, the parking areas, the roadways and passageways, and the spaces of the tenants, all as shown on Exhibit A. Landlord agrees that there shall be no change whatever in the location, shape or dimensions of the premises hereby demised, and no substantial change in the Shopping Center layout which would in any manner or to any degree adversely or materially affect the accessibility to the leased premises from the parking areas or the visibility of Tenant's signs or storefront, without Tenant's prior written consent in each instance, which consent shall not be unreasonably withheld. Landlord further agrees not to place any free-standing buildings, kiosks, planters, trees, shrubs, stairs or other obstructions any place in front of the leased premises so as to affect the accessibility to or the visibility of the leased premises without

-6-

first obtaining Tenant's written consent, which consent shall not be unreasonably withheld or delayed.
* * * * *
**Article 3**: "In the Shopping Center, as presently planned or as it may be expanded or altered, and within three (3) miles thereof, Landlord shall not, either directly or indirectly, during the term of this Lease and any renewals thereof, lease to or otherwise authorize or permit the operation of any other auto parts store . . ..
* * * * * *
**Article 14**:

Landlord has constructed all parking area, driveways, entrances and exits, service drives, lighting, truckways, loading docks and doors . . .package pick-up stations, pedestrian sidewalks and ramps, landscaped areas, exterior stairways, and other areas and improvements as shown on Exhibit A hereto (the "common areas"). All of said common areas shall be for the general use, in common, of tenants, their agents, employees, customers and invitees. Tenant, its agents, employees, customers and invitees are hereby granted the right to use all of said common areas for their intended purposes. Landlord agrees throughout the term of this Lease to properly maintain and operate all parking areas and other common areas and facilities or appurtenances to the building and to keep same in good order and condition and properly lighted and cleaned. The aforesaid obligations of Landlord shall include maintaining and at all times having adequate means of ingress and egress to and from accepted highways and public streets, the prompt repairing and restriping when required of the parking areas, the maintenance and repair of all curbing and directional markers, the cleaning and repair of the sidewalks, the prompt removal of snow and ice, landscaping, security, common area utility usage and adequate lighting during all hours of darkness that Tenant shall be open for business.

All of the aforesaid obligations of Landlord shall be performed in accordance with good and accepted real estate practices throughout the term of this Lease, Landlord recognizing that all of said common areas must be available at all times, in good and attractive order and condition, to serve Tenant's customers, employees and invitees.
* * * * *
The costs in which Tenant is to share hereunder shall not include . . . (iii) costs for construction of additional common areas, buildings or parking areas, or costs for the expansion of existing common areas, buildings or parking areas . . ..
* * *
If Landlord shall fail to perform any of its obligations under this Article, then Tenant shall have the right, upon thirty (30) days' written notice to the

-7-

Landlord (other than in an emergency, in which case only such notice as shall be reasonable under the circumstances) and Landlord's failure to so perform within said thirty (30) day period, to perform Landlord's obligations under section (a) of this Article. . . .."

\* \* \* \* \* \*

     Landlord acknowledges that due to the fact the Premises has no rear loading door or dock, Tenant must unload its deliveries of goods and products to the Premises through the front door via access from the parking area in front of the Premises. Landlord agrees that notwithstanding anything in this Lease to the contrary or any rules and regulations now or hereafter established by the Landlord for tenants of the Shopping Center, Tenant shall be permitted to load and unload its goods and products through the front door of the Premises. Tenant shall use reasonable efforts to minimize any inconvenience to customers of the Shopping Center that may result from or as a result of its unloading through the front door of the Premises.

     B.     Landlord agrees that throughout the term of this Lease it shall provide and maintain, in good order and condition, paved and line painted parking areas adjacent to the building for use by Tenant's customers and invitees, which parking shall comply with all local ordinances and regulations applicable thereto, including with respect to the required ratio parking spaces to area of the leased premises. If at any time during the term hereof the total parking area shall be decreased permanently by more than thirty five percent (35%), then in such event Landlord shall designate and reserve for the exclusive use of Tenant's customers (including by cordoning off spaces to identify them as reserved for Tenant's customers) fifteen (15) parking spaces within the cross-hatched area identified on Exhibit "A" attached hereto and Landlord shall enforce such parking restrictions as may be reasonably necessary to ensure the exclusiveness of such parking spaces. If Landlord shall fail to provide such parking or to enforce restrictions as are reasonably necessary to ensure such parking to Tenant's customers and such failure shall continue for thirty (30) days after notice from Tenant, then Tenant may, in lieu of the fixed annual rent herein specified, pay to Landlord a reduced rent equal to three (3%) percent of its gross sales from the leased premises, plus all utilities it is required to pay under this Lease, until such time as the situation is remedied by the Landlord; provided, however, that if such failure shall continue for more than ninety (90) days after such notice, then Tenant may cancel and terminate this Lease upon written notice to Landlord of such termination. Landlord further agrees that it will use reasonable efforts to limit access to parking in the parking areas of the Shopping Center to patrons of the Shopping Center and

-8-

will establish and use reasonable efforts to enforce such parking restrictions as
may be necessary in order for that to occur.
            * * * * *

**Article 22**:  If Landlord shall fail to perform its obligations under this
Lease and as a result thereof Tenant finds it necessary to close its business
operations in the leased premises, or if any action of Landlord, its agents or
employees shall cause Tenant to close its business operations in the leased
premises, then, in any such event, all rent and other payments required to be made
by Tenant under this Lease shall abate until such time as Tenant shall be able to
reopen the leased premises for business.  Without in any way limiting Tenant's
rights aforesaid, it is further agreed that in the event that Landlord shall default in
the performance of any of its obligations under this Lease, which default
materially and adversely affects Tenant's quiet enjoyment and/or use of the leased
premises, and such default continues for a period of more than thirty (30) days
after written notice from Tenant specifying such default (or if such default
requires more than thirty (30) days to remedy, if it continues after such notice
beyond the time reasonably necessary to cure) Tenant shall have the right, in
addition to all other remedies available hereunder or available at law or in equity,
to terminate this Lease upon written notice to Landlord.
            * * * * *

**Article 25(k)**:  Whenever under this Lease provision is made for either
party to obtain the written consent or approval of the other party, such consent or
approval shall not be unreasonably withheld, conditioned or delayed.
            * * * * *

**Article 25(n)**  This Lease shall be governed by and construed pursuant to
the laws of the state in which the leased premises are located, as such laws may
exist from time to time during the term hereof.
            * * * * *

**Article 25(p)**.  This Lease contains and embraces the entire agreement
between the parties hereto and may not be changed or terminated orally or by any
agreement unless such agreement shall be in writing and signed by the party
against whom enforcement of such change or termination is sought.  If any term,
clause or provision of this Lease shall be judged to be invalid, the validity of any
other term, clause or provisions hereof shall not be affected thereby.

2.    **The Lease Anticipates Development Of the Shopping Center.**

It is readily apparent that the Lease anticipates development of the Shopping Center. As Ritz President Eric Berliner testified, when Ritz negotiated the Lease with ADAP, a large portion of the Shopping Center retail space (50,000 square feet) was occupied by a Pathmark supermarket and

> " . . . there was a belief on our side that Pathmark, as they were winding down their Connecticut operation, wouldn't be there for long, and we knew that the company would have to probably get repositioned or changed. So, we couldn't restrict ourselves from not making changes to the parking area or things like that. So, in order to live with that, it was modified to allow for the tenants couldn't unreasonably withhold their consent to any changes."

> Q.    "So, as you recall it, ADAP had a position with this, without the language about consent, and the consent language was added by you?

> A.    Yes.

Berliner deposition 29:14-30:3. (Excerpts from the Berliner deposition are attached to Ritz's Local Rule 56(a)(2) Statement as **Ritz Exhibit B**.) *See also,* Berliner Affidavit (attached to Ritz's Local Rule 56(a)(2) Statement as **Ritz Exhibit A**).

There are multiple references in the Lease to a potential for development, expansion or alteration of the Shopping Center:

- "the layout thereof, as shown on Exhibit A will be adhered to in the **development of the Shopping Center and/or any subsequent expansion and/or alteration thereof**," Article 1 (emphasis supplied).
- "In the Shopping Center, as **presently planned or as it may be expanded or altered,** and within three (3) miles thereof, Landlord shall not, either directly or indirectly, during the term of this Lease and any

-10-

renewals thereof, lease to or otherwise authorize or permit the operation of any other auto parts store . . ..Article 3(emphasis supplied).

- "The costs in which Tenant is to share hereunder shall not include . . . (iii) **costs for construction of additional common areas, buildings or parking areas, or costs for the expansion of existing common areas, buildings or parking areas . . ."** Article 14. (emphasis supplied).

- If at any time during the term hereof the **total parking area shall be decreased permanently by more than thirty five percent (35%),** then in such event Landlord shall designate and reserved for the exclusive use of Tenant's customers (including by cordoning off spaces to identify them as reserved for Tenant's customers) fifteen (15) parking spaces within the cross-hatched area identified on Exhibit "A" attached hereto and Landlord shall enforce such parking restrictions as may be reasonably necessary to ensure the exclusiveness of such parking spaces. (Article 14)(emphasis supplied).

The highlighted provisions of the Lease demonstrate that the parties anticipated some form of development, expansion or alteration of the Shopping Center, including potential construction of structures in the then-existing parking lot that might significantly reduce the available parking. The Lease, accordingly, does not bar such development, but it contains some limitations:

- "Landlord agrees that there shall be no change whatever in the location, shape or dimensions of the premises hereby demised, and no substantial change in the Shopping Center layout which would in any manner or to any degree adversely or materially affect the accessibility to the leased premises from the parking areas or the visibility of Tenant's signs or storefront, without Tenant's prior written consent in each instance, **which consent shall not be unreasonably withheld**." Article 1 (emphasis added).

- "Landlord further agrees not to place any free-standing buildings, kiosks, planters, trees, shrubs, stairs or other obstructions any place in front of the leased premises so as to affect the accessibility to or the visibility of the leased premises without first obtaining Tenant's written consent, **which**

-11-

**consent shall not be unreasonably withheld or delayed.** *Id. (*emphasis added).

- "Landlord agrees that throughout the term of this Lease it shall provide and maintain, in good order and condition, paved and line painted parking areas adjacent to the building for use by Tenant's customers and invitees, which parking shall comply with all local ordinances and regulations applicable thereto, including with respect to the required ratio parking spaces to area of the leased premises. **If at any time during the term hereof the total parking area shall be decreased permanently by more than thirty five percent (35%), then in such event Landlord shall designate and reserve for the exclusive use of Tenant's customers (including by cordoning off spaces to identify them as reserved for Tenant's customers) fifteen (15) parking spaces within the cross-hatched area identified on Exhibit "A" attached hereto and Landlord shall enforce such parking restrictions as may be reasonably necessary to ensure the exclusiveness of such parking spaces.** Article 14(emphasis added).

**3.    AutoZone Ignores The Consent Covenant.**

Under the Lease, Shopping Center changes that require Tenant consent are as follows:

- a substantial change in the Shopping Center layout which would adversely or materially affect the accessibility to the leased premises from the parking areas;
- substantial change in the Shopping Center layout which would adversely or materially affect the visibility of Tenant's signs or storefront; and
- placement of any free-standing buildings, kiosks, planters, trees, shrubs, stairs or other obstructions any place in front of the leased premises so as to affect the accessibility to or the visibility of the leased premises.

In each such instance, the Tenant's written consent is required, but that consent shall not

be unreasonably withheld, conditioned or delayed. Article 1; Article 25(k) (hereinafter the

"Consent Covenant").

In <u>Warner v. Konover</u>, 210 Conn. 150 (1989), the Connecticut Supreme Court established that the discretion to withhold consent must be "exercised in a manner consistent with good faith and fair dealing." 210 Conn. 154-55. "An unreasonable withholding of consent to an assignment of a lease of commercial premises is a breach of the covenant of good faith and fair dealing. The good faith and fair dealing obligations between a commercial landlord and tenant are mutual." <u>Greenwich Plaza, Inc., v. Whitman & Ransom,</u> 1996 WL 240458 (Conn.Super. 1996)(copy attached)(citing <u>Konover</u>, *supra*).

The Second Circuit, interpreting New York law, has found that an agreement by a landlord not to withhold consent unreasonably to a tenant's assignment of lease is regarded as a covenant to permit assignment unless the landlord can demonstrate just cause. <u>Speare v. Consolidated Assets Corp.,</u>360 F.2d 882, 886 (2d.Cir. 1966). *See also* <u>Toys "R" Us, Inc. v. NBD Trust Co. of Ill.,</u> 904 F.2d 1172, 1177 (7th Cir. 1990) (lease language that "[t]enant may not assign . . . the Demised Premises without first obtaining Landlord's consent thereto, which consent shall not be unreasonably withheld" imposed "a duty on the landlord to consent, on a reasonable basis, to a sublease. . . .").

Applying these principles to the Lease, it should be held that the Consent Covenant means that the burden is on AutoZone to show why its consent should not be given. Far from meeting this burden, AutoZone has acted as if the Lease contains an absolute prohibition against any development whatsoever. AutoZone effectively reads the Consent Covenant out of the Lease and discards it.

-13-

In construing a written lease, "three elementary principles must be kept constantly in mind:  (1) The intention of the parties is controlling and must be gathered from the language of the lease *in the light of the circumstances surrounding the parties at the execution of the instrument;*  (2) the language must be given its ordinary meaning unless a technical or special meaning is clearly intended;  (3) the lease must be construed as a whole and in such a manner as to *give effect to every provision, if reasonably possible.*" Marquardt and Roche/Meditz and Hackett, Inc. v. Riverbend Executive Center, Inc., 74 Conn.App. 412 812 A.2d 175, (Conn.App. 2003)(internal citation omitted; emphasis added).

In this regard it is noteworthy that AutoZone was not involved when the Lease was executed.  The Lease was prepared and negotiated by AutoZone's predecessor ADAP, through its representatives, and Eric Berliner on behalf of Ritz.  *See* Berliner Affidavit ¶ 3.  As Berliner points out, Ritz anticipated that Pathmark would leave Riverview and that the shopping center would be developed or substantially altered, and ADAP understood this.

Presumably ignorant of the circumstances in which the Lease was negotiated (and without ever making an effort to ascertain or consider those circumstances), AutoZone, through its in-house counsel James O. McClain, has taken an uninformed and obstructionist approach to the impact of the Proposed Development on the Lease.

He states in his affidavit (attached to Plaintiff's Motion for Summary Judgment as Plaintiff's Exhibit C): "In late December 2001, I was informed about the Proposed Development of AvalonBay Communities, Inc.  (¶ 9.)  In early January 2002 and consistently ever since, I

-14-

voiced to Ritz Realty Corp. and AvalonBay Communities, Inc. AutoZone's strong objection to the Proposed Development." McClain Affidavit ¶ 10.

It is undisputed that McClain has been consistent in voicing his objections, but those objections have been consistently alarmist and unreasonable. His first response was to assert that the Proposed Development would "destroy" AutoZone's business. *See* McClain fax of January 3, 2002, attached to Berliner Affidavit as **Attachment 2.**[3] He has never re-examined that extremist position despite its lack of an objective basis.

Moreover, he fails to acknowledge AutoZone's Consent Covenant; and consistent with this myopic and unreasonable approach, AutoZone fails to acknowledge the Consent Covenant in its Motion for Summary Judgment and supporting pleadings. While AutoZone alleges that "AutoZone has remained faithful to its end of the bargain . . [and] has . . . fulfilled each and every other obligation required of it under the Lease," P. Memo at 17, it fails to mention, let

---

[3] The McClain fax of January 3, 2002, stated in its entirety:
"I have received a letter dated December 17, 2001 from a Mr. Paxton Kinol of AvalonBay Communities Inc. Mr. Kinol's letter included some preliminary development plans that show multistory apartment buildings with basement garages located in place of most of the improvements in the shopping center in which ADAP's store is located. These plans are a complete surprise to us. We are concerned because ADAP's store is highly profitable and the proposed construction would destroy ADAP's business and violate ADAP's lease. ADAP has not consented to or encouraged either the development of any construction plans or any construction, and we will not consent to or suffer the proposed construction or any other construction in violation of ADAP's lease. Please acknowledge that you have no plans to commence any construction at this location."
McClain fax message, attached to Berliner affidavit as Attachment 2.

-15-

alone address, the Consent Covenant.  Lease Article 25(k) is not even mentioned in AutoZone's

Local Rule 56(a)(1) Statement.

### 4.    Ritz Has Made Good-Faith Efforts To Obtain AutoZone's Consent.

If the Lease is interpreted correctly, in light of the circumstances in which it was

executed, giving effect to all its provisions including the Consent Covenant, AutoZone at all

times material herein has been under a duty to grant its consent absent demonstrable good cause.

To the extent that it is Ritz's duty to obtain AutoZone's consent, the evidence shows that Ritz

made a good faith effort to obtain AutoZone's consent.

Eric Berliner testified that he called McClain in 2001:

> " . . .to advise him I was the owner of Ritz Realty Corp. at 24 Belden
>
> Avenue, that it was our intention to redevelop the property, and that we'd
>
> like to submit plans to Jim McClain for approval."
>
> Q.    What did Mr. McClain say?
>
> A.    He was extremely obnoxious, and basically said they would never
>
> approve of anything, and they wanted it to remain exactly as it is, without
>
> even seeing the plans."

Berliner Deposition 79:4-12.

Berliner further testified that "there were weeks and weeks we tried to contact them

[AutoZone], [they] never returned phone calls, and we were just dealing with a nightmare." *Id.*,

at 81:14-16.

As set forth in the Berliner Affidavit, Ritz made many efforts to provide AutoZone with information concerning the Proposed Development; Berliner intended to engage in a dialogue that could have led to commercially reasonable modifications of the development. *See* Berliner Affidavit ¶14-16. McClain's Chicken Little attitude – the development will "destroy ADAP's business" -- precluded any reasonable consideration of the project by AutoZone.

C.     **Genuine Issues of Material Fact Preclude Summary Judgment.**

There are multiple issues of fact in dispute as to the effect of the Proposed Development on AutoZone's alleged interests.

1.     **Parking.**

AutoZone contends that during construction of the Proposed Development, parking will be altered and the existing open field parking lot will be closed or largely inaccessible to customers, employees and invitees of AutoZone. P. Memo at ¶ 29.

Defendant denies this allegation. The existing parking lot will remain open for the first seven months of construction and sufficient parking will remain available throughout the construction phase. Robbins Depo. at 143:11-145:23 (attached to AvalonBay's Local Rule 56(a)(2) Statement as Exhibit A). AvalonBay phased its construction plans to ensure that parking would remain available for retail tenants throughout construction. Kastl Depo. 54:5-9 (attached to AvalonBay's Local Rule 56(a)(2) Statement as Exhibit C); Kastl Depo. Ex. 6 (attached to AvalonBay's Local Rule 56(a)(2) Statement as Exhibit C); Berliner Depo. 117:19-118:3.

AutoZone contends that after the Proposed Development there will be "82 parking spaces shared between residential and retail;" P. Memo at ¶ 40; that the "[p]arking will be reduced by more than 35%," and that "AutoZone is entitled to the exclusive use of fifteen (15) spaces in the Reserved Parking Area." *Id.*, at ¶ 41, citing Plaintiff's Exhibit C (the Lease).  In this regard, Eric Berliner testified:

> "The parking goes up, the ratio goes up three or four to one of what's there existing today.  Right now, you have 100,000 feet of retail with 262 spaces in front.  You're going to 40,000 feet of retail with 160 spaces.  Do your calculation.  Your parking is going up tremendously.  That's my first where they're being unreasonable.  They didn't even look at the plans. They didn't give it any thought or anything else.  They don't – how is your visibility being reduced?  They don't state anything.  And they keep talking about parking areas, which they're getting exclusive parking spaces in front that they don't have today."

Berliner Depo. 131:19-132:8.

AutoZone contends that the Proposed Development "does not allow for any parking in the Reserved Parking Area."  ¶ 42, and the "character of the parking lot will be changed from an open field to covered parking under a building with limited access."  ¶ 43, *citing* Plaintiff's Exhibit A, PK0059, Plaintiff's Exhibit B and Plaintiff's Exhibit C, JM00369.[4]

The Lease requires the designation of 15 reserved parking spaces for AutoZone's customers "[i]f at any time during the term hereof the total parking area shall be decreased

---

[4] Although Plaintiff's Memo alleges that the "character of the parking will be changed….," Plaintiff does not point to any provision of the Lease that prohibits a change of parking "character."  Ritz contends that the Lease contemplates changes in the Shopping Center including, but not limited to, changes in the character of the parking. *See* Berliner Affidavit.

-18-

permanently by more than thirty five percent (35%), . . .." Lease Article 14. The Lease refers to

Landlord's obligation to "designate and reserve for the exclusive use of Tenant's customers

(including by cordoning off spaces to identify them as reserved for Tenant's customers) fifteen

(15) parking spaces within the cross-hatched area identified on Exhibit 'A' attached hereto." *Id.*

However, Exhibit A of the Lease does not contain a depiction of the parking lot with such a

"cross-hatched area," and does not even depict the parking lot. *See* Plaintiff's Exhibit C, Exhibit

A, Bates #JM 00361-363. A document Bates stamped JM 00365 is found in AutoZone's copy of

the Lease as the second page of an Exhibit B, and it does depict both the parking lot and the

overall Shopping Center; there is cross-hatching but that cross-hatching appears to cover a

portion of the AutoZone retail space. *See* Plaintiff's Exhibit C, Bates # JM 00365. It is unclear

whether the "Reserved Parking Area" is anywhere depicted in the Lease. *See* Berliner Affidavit

¶ 4 ("the page Bates stamped JM 00369 is not a part of the Lease or the authentic exhibits to the

Lease.") It is therefore uncertain whether AutoZone can enforce a right to a "Reserved Parking

Area" in any specific location.

Notwithstanding this uncertainty, Ritz and AvalonBay have promised to provide

AutoZone with 15 reserved, designated parking spaces.

### 2. Visibility.

There are disputed factual issues as to the visibility of the AutoZone store and the effects

of the Proposed Development. Plaintiff claims that travelers on Cross Street have a "clear view

across the open parking lot of the retail stores including AutoZone and its storefront sign," that

travelers proceeding southerly on Belden Avenue have a "clear view; and if the Proposed development is built, there will be significant reduction in visibility.

These factual allegations are in dispute. *See* Defendant AvalonBay's Local Rule 56(a)(2) Statement, ¶¶ 8, 34-38; *see also* Berliner Affidavit ¶ 17 and photographs attached as Attachment 3 thereto. The AutoZone store is simply not as visible as Plaintiff contends, and the effect of the Proposed Development on visibility will not be so radical as it contends. Furthermore, Defendants have at all times been willing to develop signage for AutoZone that could enhance its visibility. Berliner Dep. 132:18-25; 133:21-134:25.

### 3.    Access.

AutoZone seems to concede that the existing ingress and egress access points will continue through and after the Proposed Development, but contends that interior circulation in the surface parking lot underneath the apartment building will be "dramatically changed," AutoZone customers will not be able to park close to the store, and they may have to walk further. P. Memo 10-11. However, as set forth in Defendant AvalonBay's Rule 56(a)(2) Statement, ¶¶ 45-47, AutoZone customers will have reserved parking in an area close to the store entrance. AutoZone fails to mention the fact that, at present, the lack of reserved parking means there is no assurance of parking close to the store.

In short, genuine issues of fact preclude Plaintiff's Motion for Summary Judgment on its breach of contract claim.

**D.**     **Plaintiff Cannot Obtain Summary Judgment on its Third Count Alleging Breach of Covenant of Good Faith and Fair Dealing.**

In its third count, Plaintiff claims that Ritz has breached the implied covenant of good faith and fair dealing. In order to carry its burden of proof on this count, Plaintiff would have to demonstrate Ritz's bad faith. Plaintiff offers no evidence whatsoever tending to show bad faith conduct by Ritz; to the contrary, if any party has acted in bad faith, it is AutoZone.

> "The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." (Internal quotation marks omitted.) Celentano v. Oaks Condominium Assn., 265 Conn. 579, 617, 830 A.2d 164 (2003). "To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." Alexandru v. Strong, 81 Conn.App. 68, 80-81, 837 A.2d 875, cert. denied, 268 Conn. 906, 845 A.2d 406 (2004), *citing* Gupta v. New Britain General Hospital, 239 Conn. 574, 598, 687 A.2d 111 (1996). "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.... Bad faith means more than mere negligence; it involves a dishonest purpose." (Citation omitted; internal quotation marks omitted.) Habetz v. Condon, 224 Conn. 231, 237, 618 A.2d 501 (1992).

De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 269 Conn. 424, 432-33, (Conn. 2004).

AutoZone makes no effort in its Motion for Summary Judgment to demonstrate that there is any factual basis whatsoever for its breach of covenant claim. It makes no pretense of showing that Ritz has in any measure acted in bad faith with respect to the Lease. Indeed, it does not even mention this Count. In its conclusion, AutoZone simply asserts: "For the reasons

-21-

expressed, there are no genuine issues of material fact concerning the *breach of the Lease or an anticipatory breach of the Lease. . . ..*"  P. Memo at 19 (emphasis added).

As shown above, there are indeed genuine issues of material fact in dispute concerning the potential effects of the Proposed Development with respect to AutoZone's rights under the Lease.  AutoZone offers no evidence to support its claim of breach of covenant of good faith and fair dealing, and Ritz respectfully urges the Court to deny Plaintiff's Motion for Summary Judgment as to this count.

**E.    Plaintiff Is Not Entitled to Specific Performance.**

AutoZone relies upon Connecticut state court decisions which hold that the decision to grant specific performance is an equitable remedy with all of the usual attributes that a court must address when making equitable determinations. (P. Memo at p. 13-14.)  From this foundation, AutoZone asks the Court to construct a ruling that finds AutoZone's view of the evidence to balance the equities so far in AutoZone's favor that the Court must enter judgment for AutoZone as a matter of law.  (Id. at 16-18.)  This argument is flawed in several respects.

First, the facts AutoZone claims to be material to this Court's determination are disputed (*see, e.g.,* Defendant's discussion of the disputed facts as to parking spaces during and after construction; and Defendant's contention that AutoZone has unreasonably delayed and withheld its consent to the Proposed Development without engaging in any meaningful dialogue, *supra.)*

Second, even if such facts were not in dispute, AutoZone's explanation of Connecticut's specific performance standard is deficient.  While AutoZone relies principally upon Marquardt &

-22-

Roche, *supra,* it ignores that case's mandate that "specific relief will be denied when . . . the legal remedy is regarded as adequate or the plaintiff is not subjected to irreparable harm by the breach." 74 Conn. App. at 421 n.2. As extensively briefed in AvalonBay's Motion for Summary Judgment, AutoZone possesses an adequate remedy at law, and any harm which may befall it from the improvements planned for RiverView Plaza are not irreparable. *See* Defendant AvalonBay Communities, Inc.'s Memorandum of Law in Support of its Motion for Partial Summary Judgment ("AvalonBay Memo", at pp.10-18). *See also* Berman v. DePetrillo, No. 97-70, 1997 U.S. Dist. LEXIS 3966 (D. D.C. March 20, 1997) (noting that "the loss of a business opportunity is a purely economic injury, and economic loss alone, however substantial, does not constitute 'irreparable harm'"); Bristol-Myers Squibb Co. v. Shalala, 923 F. Supp. 212, 221 (D. D.C. 1996) (characterizing as "mere speculation" pioneer drug maker's claim that approval of generic drug would encroach on pioneer's market share and rejecting as "inconsequential" pioneer's claim that lost revenues would be irretrievable); Mead Johnson Pharm. Group v. Bowen, 655 F. Supp. 53, 56 (finding that purported loss in market share was "pure speculation"); aff'd, 838 F. 2d 1332 (D.C. Cir. 1988).

Third, AutoZone makes only a bare pretense of demonstrating that the balance of equities would favor it, if such a test were applicable.

AutoZone cites selected aspects of the Riverview location as follows: ("endcap location;" plentiful convenient customer-friendly parking; signage visible from all surrounding roads; excellent interior traffic circulation; "no material changes could be made to the layout or

-23-

configuration of the shopping center;" and "no free standing buildings could be built in the open field parking lot." (P. Memo at 17).[5]

It then claims, without citation to any evidence, that the "lease terms including rent to be paid, decision to locate in Norwalk, Connecticut and term of the lease were all predicated upon those provisos;" and it claims that

> "AutoZone has remained faithful to its end of the bargain. It has paid the rent and fulfilled each and every other obligation required of it under the Lease. Customers . . have come to know the store and its relative convenience for parking and accessibility. AutoZone has invested money in marketing and in the erection of signs on the exterior facade of the store to attract customers to "Get in the Zone."

P. Memo at 17. AutoZone asserts that of the Proposed Development proceeds, "the plaintiff will lose each of the benefits it contracted for in its Lease. As a result, it may lose a viable store, lose a prime location and/or lose market penetration in Norwalk." *Id.* at 18.

Plaintiff's "balance of equities" argument is specious. AutoZone offers no evidentiary basis whatsoever for its assertions that "customers have come to know the store" and no evidence as to what has been "invested in marketing." It offers no evidentiary basis for the proposition that its "Get in the Zone" advertising will somehow be affected by the Proposed Development. These claims are also fundamentally illogical: if AutoZone's customers know the store so well, how will the Proposed Development erase that knowledge? AutoZone's conclusion that "it may lose a viable store, lose a prime location and/or lose market penetration

---

[5] Once again AutoZone fails to acknowledge its Lease obligations not to delay or withhold consent unreasonably.

in Norwalk" is also specious and without evidentiary foundation. Ritz is not evicting AutoZone. The claims that it may "lose" the store or "lose" its location are pure hyperbole. There is no evidence that it will lose "market penetration" in Norwalk.

Finally, if equities were subject to a balancing test, the balance scale should weigh heavily against AutoZone. Ritz has been deprived of the revenues from its proposed sale of property to AvalonBay; *see* Berliner Affidavit ¶16; this litigation has put the Proposed Development on hold (*see* Plaintiff's Exhibit D, AvalonBay-Ritz Contract, Amendment #1, Bates # RR 00042); Ritz's rental income has been reduced, *see* Berliner Affidavit ¶16; and AvalonBay has obviously spent considerable sums of money obtaining permits and approvals for the Proposed Development. AutoZone claims that any detriment to Defendants is "self-imposed" because they both knew of the AutoZone lease, P. Memo at 17, but that statement is disingenuous to say the least, and is based on AutoZone's myopic reading of the Lease. AutoZone's unreasonable response could hardly be anticipated. Rational efforts to offer alterations of the development and to accommodate AutoZone's concerns have been roundly rebuffed. AutoZone has completely abdicated its duty under the Consent Covenant. The equities do not favor AutoZone.

-25-

## IV.    CONCLUSION

Plaintiff's Motion for Summary Judgment should be denied.  Defendant Ritz respectfully requests that the Court declare that, in any trial of this case, the burden is on AutoZone to show why its consent should not be given.

DEFENDANT RITZ REALTY CORP.

By: _____
Andrew Houlding, Esq. (CT12137)
Rome McGuigan, P.C.
One State Street, 13th Floor
Hartford, CT  06103
Phone:  (860) 493-3468
Fax:  (860) 724-3921
ahoulding@rms-law.com
Its attorneys

-26-

## **CERTIFICATION**

This is to certify that a copy of the foregoing Opposition to Plaintiff's Motion for

Summary Judgment has been sent via first class mail on this 25th day of February 2005 to the

following counsel of record:


Joseph Hammer, Esq.
Day, Berry & Howard, LLP
City Place One
Hartford, CT  06103

Bruce L. Elstein, Esq.
Elstein and Elstein, P.C.
1087 Broad Street
Bridgeport, CT  06604


_____
Andrew Houlding

9202-4/395281