# EXHIBIT B

CONFIDENTIAL

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

------------------------------------

ADAP, INC.

    -vs-

RITZ REALTY CORP. and
AVALON BAY COMMUNITIES, INC.

------------------------------------

       The deposition of ERIC BERLINER, taken on behalf of the Plaintiff, pursuant to notice and rules of court, before Stephen F. Bernfeld, a Notary Public of the State of Connecticut, on the 27th day of September, 2004, at 10:00 a.m, at the law offices of Elstein & Elstein, P.C, 1087 Broad Street, Bridgeport, Connecticut.

STEPHEN F. BERNFELD
Licensed Professional Reporter
5 Three Trees Lane
Trumbull, CT 06611-1729
(203) 268-5693
License #SHR.285

```
 1        Q    Does Debra Carpenter ring a bell to you, as
 2   the attorney representing Auto Palace or ADAP?
 3        A    Possibly.  I don't remember.
 4        Q    Do you recall a negotiation over the material
 5   on page 1, the last full paragraph?
 6        A    The last full paragraph?
 7        Q    Yes.
 8        A    There's only two paragraphs.
 9        Q    Correct.  Under Article One, premises, there
10   are two paragraphs on the first page.  Do you remember
11   any negotiation over that second paragraph?
12        A    Yes, the provision from after Exhibit 8, 9
13   from the bottom.  That was negotiated.  Because there
14   was an intention that, and there was a belief on our
15   side that Pathmark, as they were winding down their
16   Connecticut operation, wouldn't be there for long, and
17   we knew that the company would have to probably get
18   repositioned or changed.  So, we couldn't restrict
19   ourselves from not making changes to the parking area or
20   things like that.
21             So, in order to live with that, it was
22   modified to allow for the tenants couldn't unreasonably
23   withhold their consent to any changes.
24        Q    So, as you recall it, ADAP had a position with
25   this, without the language about consent, and the
```

```
 1    consent language was added by you?
 2              MR. HAMMER:  Objection to form.
 3        A    Yes.
 4        Q    Do you remember any other negotiation other
 5    than the addition of the "unreasonably withholding a
 6    consent" language being added?
 7        A    In here?
 8        Q    About that paragraph?
 9        A    In this paragraph?  The same.
10             Going three lines from the bottom, the same
11    thing, we added the "unreasonably delay."  The same
12    thing again, that was also negotiated.
13        Q    Okay.  Starting with the, I think mentioned
14    two parts.  One was the layout?
15        A    Uh huh.
16        Q    There's two sentences at the bottom where
17    you've identified that the language was inserted about
18    unreasonably withholding consent?
19        A    Right.
20        Q    Do you recall the ebb and the flow of the
21    discussion on the issue with the first sentence, talking
22    about changing the shopping center layout, I'll call it?
23             MR. HAMMER:  Objection to form.
24        A    At that time, Pathmark was still there.  It
25    was -- the only thing that was negotiated was that if
```

```
 1        A    Conference call with three people.
 2        Q    Tell me about the conversation, who said what
 3   to whom.
 4        A    I had called Mr. McClain, to advise him I was
 5   the owner of Ritz Realty Corp. at 24 Belden Avenue, that
 6   it was our intention to redevelop the property, and that
 7   we'd like to submit plans to Jim McClain for approval.
 8        Q    What did Mr. McClain say?
 9        A    He was extremely obnoxious, and basically said
10   that they would never approve of anything and they
11   wanted it to remain exactly as it is, without even
12   seeing the plans.
13        Q    Did you describe what the redevelopment plans
14   would consist of?
15        A    No.
16        Q    Did anyone from Avalon describe what the
17   redevelopment plans would consist of?
18        A    Not at that time.
19        Q    What was the purpose of having someone from
20   Avalon on the call?
21        A    Because we were acting in conjunction
22   together; you know.  And in case there were any
23   questions or something, somebody from Avalon could
24   answer it a lot better than I could.
25        Q    And so you simply called up Mr. McClain and
```

```
 1    Mr. Robbins or Mr. Kinol after the call with
 2    Mr. McClain, about AutoZone?
 3         A    Yes.
 4         Q    Would you describe what you said and what they
 5    said?
 6         A    I don't remember.
 7         Q    Describe the gist of what was discussed.
 8         A    That Gary's an obnoxious asshole.
 9              MR. HOULDING:  Referring to McClain.
10         A    Referring to McClain.
11         Q    Anything else?
12         A    Just that -- I don't remember.  I just
13    remember that thing, essentially; that because -- I
14    remember there was also from weeks and weeks and weeks
15    we tried to contact them, never returned phone calls,
16    and we were just dealing with a nightmare.
17         Q    Did you have any discussion after that phone
18    call, but still on the phone, between you and Mark
19    Robbins and Mr. Kinol, other than characterizing the
20    behavior of Mr. McClain, about how to gain AutoZone's
21    acceptance of the project?
22         A    Well, I know we attempted, I don't know on
23    which phone call it was, we offered to fly to Tennessee
24    to sit down with them, to go through everything with
25    them; and of that nature.  And essentially they refused
```

```
 1         Q    Did you know whether either Cory Gubner or
 2    Ms. Caulfield had experience in retail leasing to
 3    national tenants like Radio Shack, McDonald's or
 4    AutoZone?
 5         A    Absolutely.
 6         Q    How did you know that?
 7         A    Well, for one, before I discussed it with Cory
 8    Gubner, the AutoZone was already out looking for tenants
 9    in Norwalk, before the contract with Avalon.  So, I
10    guess AutoZone thought that he was sufficient as a
11    broker retail, for using his ability to find new space.
12         Q    Anything else?
13    (LUNCHEON BREAK)
14              MR. ELSTEIN:  Can I have my last question
15              and answer?
16         Q    Have you read the third paragraph from the
17    bottom?
18         A    Yes.
19         Q    Do you recall asking the buyer to make a
20    representation that there would be no impact on existing
21    tenants?
22         A    I don't know if I phrased it in that way.
23         Q    How do you think you phrased it?
24         A    Well, we were discussing phasing the plan so
25    there would not be interruption with the tenants'
```

```
 1    business during the construction period, where it would
 2    be phased in and there would always be the parking
 3    available in front, for each of the retail tenants.
 4         Q    Before we took a break, you were saying that
 5    you were concerned about the impact after construction?
 6         A    No.  I said -- no, I wasn't saying that
 7    concerned about that.  I was concerned about that before
 8    I signed the contract; I wanted to know the viability of
 9    what I was doing before entering into the contract with
10    Avalon to do that.
11              That's what I said, I believe.
12         Q    Do you see the statement, quote,
13    "unfortunately, it is inevitable that there will be an
14    impact during construction"?  Do you see that sentence?
15         A    Yes.
16         Q    Did that cause any concern in you?
17         A    Yes.  Because the intention was to minimize
18    any interference.
19         Q    What did you do to act on that concern, when
20    you got this letter?
21         A    That's when they decided that they were going
22    to phase the construction, do it in sections; and it was
23    going to actually slow their process down; where
24    initially they were intending to doing those both
25    simultaneously, they were going to do a phasing plan
```

```
 1    had been provided the plans for the project?
 2        A    At the time this letter was written?
 3        Q    Yes.
 4        A    I believe so.
 5        Q    And may have been provideed the phasing
 6    schedule, we've gone over that?
 7        A    I believe so.
 8        Q    And they had been provided with other
 9    information either you or Avalon had sent to it about
10    the proposed project?
11        A    I would believe so.
12        Q    And at that point, AutoZone still refused to
13    give its consent?
14        A    Right.
15        Q    Do you believe at this time that the refusal
16    to give consent by AutoZone was unreasonable?
17        A    Absolutely.
18        Q    Why?
19        A    Okay.  I'll give you an example.  The
20    statement "Our client's particular concerns are the
21    substantial reduction in the amount of parking available
22    to current tenants.  The parking goes up, the ratio goes
23    up three or four to one of what's there existing today.
24    Right now, you have 100,000 feet of retail with 262
25    spaces in front.  You're going to 40,000 feet of retail
```

```
 1   with 160 spaces.  Do your calculation.  Your parking is
 2   going up tremendously.  That's my first where they're
 3   being unreasonable.  They didn't even look at the plans.
 4   They didn't give it any thought or anything else.  They
 5   don't -- how is your visibility being reduced?  They
 6   don't state anything.  And they keep talking about
 7   parking areas, which they're getting exclusive parking
 8   spaces in front that they don't have today.
 9        So, there are many reasons here where their failure
10   to give consent, one, lacks any reasoning, and lacks any
11   looking at the plans.
12        Q    Anything else?
13        A    That's it.
14        Q    Did you believe the statement about visibility
15   being affected was incorrect?
16        A    Yes.
17        Q    Why?
18        A    Well, first of all, we tried to get their
19   cooperation as to what type of signage they would want.
20   They would never respond back.  AutoZone.  So, I mean,
21   how can you make statements, when we gave them, one, we
22   moved the building to give them the clear visibility,
23   and two, we tried to get from them what type of signage
24   they would like on Cross Street, which they currently do
25   not have today.
```

1  Q   In June of '02, did you have an understanding
2  of where the 15 dedicated spaces for AutoZone would be
3  located?
4  A   Yes.
5  Q   Where is that?  Is there any documents we
6  looked at that you could point to, where those spaces
7  were located?
8  A   Yes.  There definitely were.  I don't -- there
9  definitely was a document, I've seen it.  Because Avalon
10 showed it to me for approval on numerous occasions.
11 Q   Showing you what we marked Exhibit 15, is this
12 the document?
13    (PAUSE)   (EXAMINES)
14 A   I mean, I don't see it.  But the letter says
15 it was sent.  But I don't see anything in this letter
16 that shows dedicated spaces.  But it says that there was
17 something submitted.  And they say here, "AutoZone
18 dedicated parking, 15 spaces."  It says it's showing it
19 on something here.  Maybe the page is missing.  But it
20 -- I don't see it in here.  It says it was provided.
21 Q   Did you think that the visibility of the
22 AutoZone storefront from Cross Street would be affected
23 in any way by the character of the Avalon development?
24 A   Not if the appropriate signage was put up on
25 Cross Street.

1    Q    So, you believe that there could be a sign
2    erected on Cross Street that would make the AutoZone
3    store more visible?
4    A    Yes.
5    Q    Than it presently is?
6    A    Or equally visible. Or equally if not
7    greater.
8    Q    And so that you're talking about a pylon sign
9    on Cross Street?
10   A    No, actually I don't believe it was a pylon.
11   I believe it was to be all on the actual Avalon
12   building. I believe it was going to be on the building
13   itself.
14   Q    So, you understood that there was going to be
15   some type of a sign placed on an Avalon building for
16   only AutoZone or for other retail tenants as well?
17        MR. HOULDING:  Objection.
18   A    It would probably have been with other retail
19   tenants.
20   Q    And that the signage put on the side of the
21   building would equal the visibility that an AutoZone
22   storefront presently has on Cross Street?
23   A    With the appropriate signage, yes. And might
24   give more visibility, because there are other things
25   that block the visibility on Cross Street.

C E R T I F I C A T E

STATE OF CONNECTICUT :

                 ss. Trumbull, Connecticut.

COUNTY OF FAIRFIELD:

     I, Stephen F. Bernfeld, a Notary Public duly commissioner and qualified in and for the State of Connecticut, hereby certify, that in the action pending in the United States District Court, District of Connecticut, Case No. 303CV350(MRK), there came before me on the 27th day of September, 2004 at 10:00 a.m, at the law offices of Elstein & Elstein, P.C, 1087 Broad Street Suite 401, Bridgeport, Connecticut, the following named person, to wit: ERIC BERLINER, who was by me duly sworn to testify to the truth and nothing but the truth of his knowledge touching and concerning the matters in controversy in the cause, that the witness was thereupon carefully examined upon his oath and his testimony taken by me stenographically and reduced to laser printing under my supervision; that the transcript is a true and accurate transcript of the testimony given, to the best of my ability.

     I further certify that I am neither counsel for nor related to any of the parties to the matter set forth herein or employed by any of the attorneys.

     Dated at Trumbull, Connecticut, this 13th day of October, 2004.

                                      _____
                                          Notary Public

My commission expires:
September 30, 2005.

                          Steve Bernfeld, LSR
                            (203) 268-5693