

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

----------------------------

ADAP, INC.

    -vs-                      No. 303 CV 350(AWT)

RITZ REALTY CORP. and
AVALON BAY COMMUNITIES, INC.

----------------------------


       The deposition of MARK ROBBINS,

taken on behalf of the Plaintiff,

pursuant to notice and rules of court,

before Stephen F. Bernfeld, a Notary

Public of the State of Connecticut,

on the 27th day of September, 2004, at

4:00 p.m, and 28th day of October, 2004,

at 10:00 .m, at the law offices of

Elstein & Elstein, P.C, 1087 Broad

Street, Bridgeport, Connecticut.


STEPHEN F. BERNFELD
Licensed Professional Reporter
5  Three Trees Lane
Trumbull, CT 06611-1729
(203) 268-5693
License #SHR.285

1    A P P E A R A N C E S :

2        For the Plaintiff:

3            ATTY. BRUCE L. ELSTEIN
                 Elstein & Elstein, P.C.
4                1087 Broad Street - Suite 401
                 Bridgeport, CT 06604
5

6        For the Defendant Avalon Bay Communities, Inc.

7            ATTY. JOSEPH HAMMER
                 Day, Berry & Howard, LLP
8                CityPlace 1
                 Hartford, CT 06103-3499
9

10   S T I P U L A T I O N S :

11           It is hereby stipulated and agreed by

12       and between the attorneys for the respective

13       parties hereto, that all defects as to Notice,

14       Service, Proof of the authority of the Notary

15       are hereby waived.

16           It is further stipulated and agreed that

17       all objections, except as to form, are reserved

18       until the time of trial.

19           It is further stipulated and agreed that

20       the deposition, after it has been transcribed,

21       the deponent may read and sign the transcript

22       before any competent authority.

23                   *  *  *  *  *

24

25

1    Q    When is the first time you reviewed that

2    lease?  Approximately.

3    A    Within the first couple months of being --

4    first three months of being employed by AvalonBay.

5    Q    So, in the fall-winter of '01?

6    A    Yes.

7    Q    What was the purpose you had when you reviewed

8    that lease?

9    A    To get to know all the documents relating to

10   the property.

11   Q    When you read the lease, did you have any

12   concern about how it would impact the proposed

13   development of Avalon?

14             MR. HAMMER:  I object to the form.

15   A    Generally speaking, I tried to be aware and

16   look for all potential circumstances that require

17   attention.

18             MR. ELSTEIN:  May I have my question

19        again?

20   (PENDING QUESTION READ BACK BY THE REPORTER)

21   A    When I read the lease, did I have any concern

22   about -- I was concerned about all tenants, abutters,

23   neighbors, yes.

24   Q    When you read the lease and developed concern,

25   what was the concern based upon, vis-a-vis the AutoZone

```
 1   lease?
 2              MR. HAMMER:  I object to the form.
 3       A    Concern, concern; I just need you to define
 4   the word "concern."  Concern like awareness?  Concern
 5   like worried?  Concern like this deserves attention and
 6   has to be addressed?
 7       Q    You're now working on a project, and I assume
 8   one of your jobs is to spot potential problems, and
 9   solve them, hopefully before they occur, am I correct?
10       A    Correct.
11       Q    When you read the lease of AutoZone, did you
12   identify any areas of concern that you thought needed to
13   be addressed?
14       A    Yes.
15       Q    What were they?
16              And I'm putting Exhibit 2, which is Exhibit 2
17   we used from a deposition of Eric Berliner today.  If
18   you can refer to that, feel free.
19              (PENDING QUESTIONS READ BACK BY THE REPORTER)
20       A    I would like to state my response to your
21   question, as the needed to be addressed.  And I'm saying
22   yes, yes, needed, defining "needed" as need ought to be,
23   as in my position, it would be prudent for me to address
24   these things; in a general way, to assist with the
25   project, neighbor negotiations, how the process occurs;
```

1    not needed as in legally required or required by any

2    strict interpretation of some document.

3        Q    Okay.  And with that understanding, your

4    answer?

5        A    I believed that part of my job was to, is to

6    manage risk and to assist with the most expeditious and

7    best way of developing, and that it behooves the

8    developer to engage dialogues and to be sensitive to

9    issues and to learn of concerns and to try to work with

10   abutters and neighbors and tenants, and, with that

11   understanding, create a project that is designed to be

12   compatible with the tenants' tenancy, I guess.

13       Q    Let me go back to the AutoZone lease.  ADAP

14   lease.  When you read it, did you identify any

15   provisions which you thought ought to be addressed?

16       A    Generally speaking?  Make sure we contemplate

17   the tenants' interest in a need for sufficient parking,

18   access to the premises for their potential customers,

19   and visibility for the tenant.

20       Q    And, was that based upon any specific language

21   that you saw in the lease, or was that based on your

22   experience generally?

23       A    Both.

24       Q    What about the provisions in the lease was it

25   based upon?

1    deposition of Eric.  That appears to be Amendment One

2    to the purchase agreement?

3        A    Uh huh.

4        Q    Did you have involvement in any of the

5    negotiations leading up to the execution of this

6    agreement?

7        A    A little bit of involvement.

8        Q    What was your involvement?

9        A    Involvement suggesting that it is to our,

10   everybody's benefit to work together in harmony with the

11   landlord, to get to establish dialogue with all the

12   tenants.

13       Q    Anything else?

14       A    To be aware of how the site plan would, how

15   our proposed apartment community would integrate with

16   the tenants.

17       Q    Anything else?

18       A    Generally that doing things for the tenants'

19   benefit, that the developer of the apartments has an

20   inherent interest in the viability of the project as a

21   whole.  We had interests in retailers maintaining

22   successful businesses; we were building apartments next

23   to them.  We wanted to engender a beneficial

24   relationship for the vitality of the center, so that

25   tenants do well, the residents appreciate being

1    connected above and amongst a vibrant retail base;

2    storefronts mentioned here, designed to reach out, as a

3    gesture to reach out to the tenants, to help create a

4    uniform positive upgrade investment in the property.

5         Q    With respect to storefronts, did you have any

6    involvement between Avalon and Ritz in discussing what

7    an acceptable finish for the exterior wall would be for

8    the existing retail space post-Avalon development?

9              Do you understand my question?

10    A    No.

11    Q    Look at paragraph one of Exhibit 8.

12    A    Exhibit 8?

13    Q    Yes.

14    A    Okay.

15    Q    It talks about the storefronts.

16    A    Yes.

17    Q    And that the seller approves a particular

18    finish?

19    A    Oh.

20    Q    Did you have any involvement in obtaining the

21    sellers' approval for that finish?

22    A    I don't remember.

23    Q    Prior to this Amendment One being signed, did

24    you have any contact or were you aware of any contact

25    other than that one December 17th letter from Mr. Kinol

1    anything to you?

2        A    It does.  I recollect that that's the e-mail

3    address of Avalon's PR consultant.

4        Q    You described a conference call between you,

5    Mr. McCLain and Eric Berliner a few moments ago.  I'm

6    going to talk about that call now and then we'll call it

7    a night.

8        A    I thought I described it.

9        Q    No, we're going to talk about it now.  You

10   mentioned it.

11       A    Yes.  I remembered at least one.

12       Q    Do you recall when that took place?

13       A    I vaguely.

14       Q    What is your best recollection?

15       A    Oh, first quarter '02.

16       Q    Was it sometime after that fax from AutoZone

17   voicing objection to Avalon?

18       A    I think so.

19       Q    And before the meeting with me and Mr. Store

20   Manager?

21       A    I think so.

22       Q    Could you describe who said what to whom,

23   during that conference call?

24       A    No.

25       Q    What's your recollection of the gist of the

1    conversation?

2        A    The general tenor was that the AutoZone

3    executives were unreceptive to our plans, and not

4    particularly interested in engaging in a dialogue with

5    Avalon about them.

6        Q    Who participated in the call, other than you,

7    Mr. Berliner and, to your knowledge, Mr. McClain?

8        A    Terry McKee was sometimes on the phone with

9    Jim McClain.

10       Q    Do you recall Terry McKee being on the phone

11   that first or that conference call in which AutoZone

12   expressed an unwillingness to entertain a dialogue?

13       A    I don't remember if he was on that first call.

14       Q    Could you describe the demeanor of

15   Mr. Berliner during that call?

16       A    No.

17       Q    Could you describe the demeanor of

18   Mr. McClain during that call?

19       A    Generally curt.

20       Q    Would you describe it as anything other than

21   curt?

22       A    No.

23       Q    Did you keep notes of the conference call?

24       A    Sometimes.

25            MR. ELSTEIN:  Let's mark this.

1      A    The sign on the side of the building is

2    unobstructed, regardless.  There was an early diagram, I

3    think, that showed trees, and that was really a

4    landscaping error that was modified in subsequent

5    transmissions to AutoZone.  I'm not sure they were

6    acknowledging that.

7      Q    When you say their sign on the building was

8    unobstructed, what did you mean; unobstructed from

9    where?

10     A    All of their storefront along -- AutoZone is

11   in a unique position as the only tenant with visibility

12   on Belden Avenue.  They're the closest to the street.

13   And, they, it's impossible to block their signage with a

14   building, because they're along the sidewalk, their

15   frontage is along the sign.

16     Q    It is possible to block the signage from

17   Belden Avenue, correct?

18     A    Correct.

19     Q    Did you believe the visibility of the AutoZone

20   storefront would be impacted by the Avalon building,

21   from Cross Street?

22     A    The signage on Cross Street, their visibility

23   on Cross Street would be enhanced because of the new

24   pylon which we were intending to build, which had more

25   than one dimension to it.  It was a multi-faceted sign.

1    And, so it would be brought closer to the traffic.

2            So, they were getting better visibility.  And,

3    their view to the front door was also being preserved,

4    because we were clipping the corner of our proposed

5    building.

6            MR. ELSTEIN:  Can I have my question read

7            back?  I asked a different question.

8    (PENDING QUESTION READ BACK BY THE REPORTER)

9    A    I believe that it would be -- I think, along

10   with the way of saying that I thought they would be

11   impacted in a positive way.

12   Q    Are you familiar with the shopping center as

13   it presently exists?

14   A    Yes.

15   Q    And as it existed back in 2001 and 2002?

16   A    Yes.

17   Q    And, if you were driving on Cross Street,

18   approaching the intersection with Belden Avenue, with

19   the shopping center on your left, did you have a clear

20   view across the parking lot to the AutoZone storefront?

21           MR. HAMMER:  I'm going to object to the

22           question, just to the extent that you're not

23           specifying -- you're not being specific in

24           terms of the location.  But go ahead.

25   Q    Go ahead.

1        A    Generally speaking, no, you didn't have a

2    clear view.

3        Q    And why not?

4        A    Because that is a vehicular point of travel,

5    it's not a pedestrian thoroughfare, it's U.S. Route 1 at

6    that point.  It's down, as you're approaching the

7    intersection of Cross Street and Route 1 -- as you are

8    on Route 1, otherwise known as Cross Street, approaching

9    Belden Avenue, you're downgraded from the store.  And

10    you're in an automobile.  And therefore your eyes are at

11    a low point.  And the view to the store is obstructed

12    generally by cars in the parking lot, and the fact that

13    you're at a lower grade point as you're approaching the

14    intersection.

15        Q    So, you believe that the storefront is not

16    visible from Cross Street as you're driving in a car,

17    looking left?

18        A    For the most part, with the trees and the cars

19    and the grade, it's difficult to see the storefront,

20    yes.

21        Q    How do you know that?

22        A    Having done it, having driven it.

23        Q    Have you taken pictures?

24        A    At various times, yes.

25        Q    Where were you when you took the pictures?

1       A    I've taken pictures of different points along

2    Cross Street and Belden Avenue.

3       Q    And what was the purpose in taking the

4    pictures?

5       A    To study visibility.

6       Q    Visibility for what purpose?

7       A    For the retail center.  We had an interest in

8    figuring out how to create an enhanced vitality for the

9    shopping center.  The project was uniquely intended as a

10   mixed use development and we were interested in the

11   viability, the quality of retail businesses, as equally

12   as we were interested in residential development.

13      Q    When you took the pictures, on what side of

14   Cross Street were you?  Were you on the side closest to

15   the mall or were you on the side opposite the mall?

16      A    I've taken pictures at different points on the

17   street.

18      Q    When did you take pictures?

19      A    Different times throughout the year.

20      Q    Was it while you were working at Avalon?

21      A    I took pictures while I was working at Avalon.

22      Q    Did you take pictures after you separated from

23   Avalon in February '03?

24      A    Yes.

25           But I was working for Avalon whenever I was

1      A    Looking at the row of cars there?

2      Q    Yes.

3      A    It doesn't refresh my recollection.  But it

4    gives me some boundaries to contemplate.

5      Q    Okay.  Now, earlier you said you thought it

6    was very close to the intersection.  Now, having

7    examined where the cars parked in the parking lots along

8    Belden Avenue, is your position changed at all of where

9    the photograph was taken from?

10     A    It's still very close to the intersection.

11   Maybe it's 20 feet from the intersection.

12          I'd say it's still relatively close.

13     Q    Next is ABS183.  Can you tell me what is

14   depicted in that photograph?

15     A    A car, a truck leaving the shopping center,

16   entering Cross Street.

17     Q    Is it depicting the means of ingress and

18   egress to the shopping center from Cross Street?

19     A    Yes.

20     Q    Is it attempting to depict the storefronts of

21   the shopping center?

22     A    No.

23     Q    When you mentioned earlier --

24     A    It's depicting the existing vegetation along

25   Belden Avenue that effectively blocks the storefronts

1    most of the year.

2         Q    Now, the perspective the photograph was taken

3    from is from Cross Street, across the street from the

4    shopping center?

5         A    It's from the street, it's from in the middle

6    of the street, approaching the intersection, with the

7    shopping center approaching on the left.

8         Q    Was that taken from a car or from a standing

9    position, if you know?

10        A    That looks like it's taken from a car.

11        Q    And, the vegetation you're referring to is a

12   large tree?

13        A    It's a row of short, full -- of trees with low

14   canopies.

15        Q    Is Cross Street a north-south street in the

16   visibility of the shopping center?

17        A    May I?

18        Q    Absolutely.

19        A    It is an east-west.

20        Q    Okay.  West being away from the water, and

21   east being towards the water?

22        A    Water?

23        Q    Long Island Sound?

24        A    Long Island Sound is south.

25        Q    Okay.  There's a river there that bounds the

1      Q      Correct.  And are you aware of vegetation to

2   the west of the means of ingress and egress?

3      A      I can't recall.

4           It's not depicted here.

5      Q      The next photograph is ABS186.  What is that

6   photograph depicting?

7      A      It is depicting trees obstructing the view of

8   AutoZone storefront, on Cross Street.

9      Q      And it's taken from a vantage point of where?

10      A      From an automobile in the westbound lane on

11   Cross Street.

12      Q      Do you agree that but for that tree, that you

13   would have a view of the AutoZone storefront from the

14   vantage point taken in the photograph?

15           MR. HAMMER:  I object to the form.

16      A      No, I don't.

17      Q      Why not?

18      A      Because, the cars block -- if the tree wasn't

19   there, there are still cars that block the storefront.

20      Q      Would you be able to see the AutoZone sign

21   on the storefront, from the vantage point taken in that

22   photograph, but for the tree?

23           MR. HAMMER:  I object to the form.

24      A      Could you restate the question, please?

25      Q      Sure.  Would you be able to see the AutoZone

1    sign above its storefront, from the vantage point taken

2    in that photograph, but for the tree?

3              MR. HAMMER:  I object to the form.

4        A    I don't believe you could.

5        Q    Do you agree from the photograph, that you

6    could see the other signs on the front of the retail

7    stores?

8        A    You could see -- you'd be very aware of the

9    stores if there was a pylon right here.

10       Q    That's not my question.

11       A    You can see -- they're far away.  So, it's

12   hard to --

13       Q    That's not my question.  Could you see them?

14       A    From that vantage point, you can see some of

15   the other store signs.

16       Q    Then, why can't you see the AutoZone store

17   sign, in your opinion?

18             MR. HAMMER:  I object to the form.

19       A    Trees, cars, the parking lot.

20       Q    What car in the parking lot?  Point to it.

21       A    This one.

22       Q    You're talking a black SUV?

23       A    I don't know what it is.  There are several

24   cars parked here.

25       Q    You're talking about what appears to be a car

 1    backed up to the tree?

 2         A    Yes.

 3         Q    Do you know whose vehicle that is?

 4         A    No.

 5         Q    It wasn't your vehicle?

 6         A    No.

 7         Q    Do you recall approximately when this photo

 8    was taken?

 9         A    No, I don't.

10         Q    Was it while you were working at Avalon or

11    sometime after you separated from Avalon but did

12    consulting for Avalon?

13         A    I don't know.

14         Q    What kind of vehicle did you drive when you

15    worked at Avalon?

16         A    A gold, four-door sedan, Infinity.

17         Q    Did that change after you separated from

18    Avalon?

19         A    Yes, it did.

20         Q    When?

21         A    Within about three or four months.

22         Q    What kind of vehicle did you begin to drive

23    after three or four months?

24         A    A two-door BMW coupe.

25         Q    Do you have any knowledge of whose vehicle

1    with this project.

2          Q    How do you remember that?

3          A    I just remember observing it.

4          Q    Do you remember seeing debris or --

5          A    I remember seeing the broken sign, at one

6    point was pointed out to me by the shopping center

7    manager, a woman, Susan, who worked there.

8          Q    You mention a meeting that took place where

9    you explained, with some more detail, what the plans of

10   Avalon were to AutoZone.  Was that the meeting that you

11   mentioned yesterday between you, a store manager and me,

12   or was it some other meeting?

13         A    I'm not sure which meeting I was referring to

14   when I spoke yesterday.  I had several meetings with

15   AutoZone representatives while I was involved with this

16   project.

17         Q    Were these face-to-face meetings or both?

18         A    Both.  Face-to-face meetings and over the

19   telephone.

20         Q    After the telephone call with Mr. McClain,

21   when is the next time you recall contact with AutoZone?

22         A    I did meet with Terry McKee face-to-face.  I

23   flew out to Las Vegas to meet him at a convention.

24         Q    When you say you flew out to Las Vegas, was it

25   your sole purpose in going to Las Vegas, to meet with

1    Mr. McKee?

2        A    Yes.

3        Q    Was Avalon exhibiting there?

4        A    No.

5        Q    Was AutoZone exhibiting there?

6        A    Yes.

7        Q    Did you know Mr. McKee to be there?

8        A    Yes.

9        Q    How did you know that?

10       A    He told me he worked -- we scheduled a time to

11   meet there.

12       Q    When you flew out and met with him

13   face-to-face, what was the topic of the meeting?

14       A    Our development plans for Norwalk.

15       Q    And tell me about the face-to-face meeting.

16       A    I met him at the booth.  He was in the booth,

17   came out.  I had brought with me hard copies of fax

18   transmissions that depicted the proposed plans; and I

19   explained them to him; and I started with the parking

20   and went through the exhibits.

21            I explained that we were increasing the

22   parking in the basement of the building, to accommodate

23   the apartments.  He was not aware that there was parking

24   underground.  I explained to him that we are eliminating

25   the Pathmark building, which previously demanded a

1    majority of the parking field; and that that demand

2    would be eliminated.  And in place of the additional

3    parking was being created when we demolished that

4    60,000-square-foot store, that we would then wrap this

5    store with parking so there'd be parking available

6    on the front and on the side of the retail component,

7    and below it; and explained that we were cutting the

8    corner of the building to increase the visibility to the

9    stores, and we were enhancing and improving the signage,

10   bringing it closer to the intersection; that we would be

11   putting new storefronts and overall the shopping center

12   would benefit from increased, enhanced circulation; with

13   Burnell Boulevard in the rear would become a two-way

14   road, and effectively create full circular access around

15   the shopping center with lighted intersections; and that

16   we were also proposing to enhance the pulse point bus

17   depot for public transportation; and that the corridor,

18   that the area in front of his store would also,

19   pedestrian access would be enhanced, travel would be

20   increased with the benefit of it becoming a destination

21   to a river walk which we're creating and building for

22   the City of Norwalk; and that we were adding

23   approximately 650 new residents who would be living

24   above their store; and those people would have

25   automobiles, and we would expect a percentage of them to

1      be potential customers.

2            And he was very appreciative of the meeting.

3      When he looked at the plans and I described the various

4      exhibits, he implied that they hadn't quite understood

5      or comprehended the plans that we had sent by mail, and

6      that that went a long way -- that he appreciated the

7      in-person explanation, that it went a long way to

8      helping to explain the exhibits, and he feels better

9      about it.  I'm paraphrasing.  That Terry felt better

10     about the development now that I've explained it, and to

11     carry on.

12           I asked him what steps he would like to take,

13     if he would like to discuss signage or types of signs,

14     and fonts, characteristics of the proposed pylon sign.

15     He said he would get back to me.  I said, "What would

16     you like to do?"  At this point, he suggested I carry

17     on.

18     Q      Approximately when did that meeting take

19     place?

20     A      The second quarter of '02.  In Las Vegas,

21     Nevada.

22     Q      What plan did you present to Mr. McKee at that

23     time?

24     A      Schematic plans of the proposed new shopping

25     center, depicting the cut corner of the shopping center,

1          A     Oh.  I'm sorry.

2          Q     This is a month before the project got its

3     zoning approval, correct?

4          A     You're right, yes.

5          Q     Okay.  So, this was the most recent of the

6     construction phasing and parking?

7          A     Yes.  You're right, yes.

8                Yes, during construction period, in the

9     winter.  At this point, we were anticipating a winter

10    start, which it would be longer.

11         Q     But months 1-7, you list western lot and

12    office building garage.  Was that referring to where

13    parking would be during those months?

14               Or where construction would be?

15         A     Parking.

16         Q     When you said the western lot, what lot were

17    you referring to?

18               And let's refer to, I'm going to show you

19    Exhibit 38; and on the second page of that document

20    there is a plan.  And tell me if that depicts the

21    western lot referred to in your memo of January 30th.

22    Exhibit 31.

23         A     Okay.  It's something like this area.

24         Q     Okay.  The western lot?

25         A     The western lot.

1      Q    Is referring to the entire lot which presently

2  exists, the surface parking lot which presently exists?

3      A    I think what was referred to was this -- that

4  there would be staging in here.  So, yes, that currently

5  exists, plus.

6      Q    For the surface lot?

7      A    Plus everything in the basement of the office

8  building.

9      Q    But I just want to focus on western lot.

10  Western lot refers to the existing surface parking lot

11  or a portion of that surface parking lot?

12      A    A portion.

13      Q    Which portion would remain open for parking?

14      A    The western portion, the portion closest to

15  AutoZone.

16      Q    The portion abutting Belden Avenue?

17      A    Yes.

18      Q    Because I think that's the eastern portion.

19      A    It's western.  You know, it's southwestern --

20      Q    Regardless of what is --

21      A    Okay, you've got it.  So, where the end is in

22  Norwalk Mall, that's the western portion, closer to

23  Belden Avenue.

24      Q    Okay.

25      A    West.  And so this is the western portion.

1      Q    Okay.  Yes.  Yes.

2           And how many spaces did you anticipate

3  remaining available for parking in the western portion

4  of the surface parking lot?

5      Q    During months one through seven?

6      A    I believe, all the spaces that are currently

7  there.

8      Q    Okay.  So, no portion of the existing surface

9  lot would be used for construction staging or vehicles?

10     A    Yes.

11     Q    Correct, it won't be used for that?

12     A    Of the western portion, which is, as opposed

13  to the eastern portion, which is to say that this area

14  here between, between the curb cut on Cross and Norwalk

15  River would be staging.  The area directly in front

16  of the old Pathmark.

17     Q    Okay.  Do you know how many parking spaces

18  would remain available to retail customers in that

19  surface parking lot, once the construction staging is

20  installed; during the months one through seven?

21     A    Something like 200, perhaps?

22     Q    Did you ever count?

23     A    Yes.

24     Q    And did you ever put that down in writing

25  somewhere, so that people would know how many spaces

```
 1    remained available during months one through seven,

 2    in the surface parking lot?

 3         A    I don't know that we did.

 4         Q    Is it the purpose of this memo, to identify

 5    where parking would remain available for retail, during

 6    construction?

 7         A    Yes.

 8         Q    Tell me what you identified as the available

 9    parking for retail customers during months eight through

10    eleven of construction?

11         A    A lower level of garage number two of the

12    office building garage.

13         Q    And where was lower level of garage number two

14    located; is that underground?

15         A    Yes.

16              It's all underground.

17         Q    It's all underground parking during months 8

18    through 11?

19         A    Yes.

20              The expanded basement would then be made

21    available.

22         Q    In months 12 through 17, was the parking all

23    underground?

24         A    Yes.

25         Q    And the same is true for months 18 through 21?
```

1          A     No.  18 through 21 was the entire expanded

2     basement plus the upper level of garage two, which is

3     this, at grade.

4          Q     Okay.  So, during the last three months, there

5     would be surface parking where Pathmark used to be?

6          A     Right.

7          Q     The entire lot?

8          A     Yes.

9          Q     Am I to understand from this document, that

10    you believed that between months 8 and 17, there would

11    be no at-grade parking for retail customers?

12         A     Yes.

13         Q     Did you have any ideas where retail customers

14    would park during that nine-month period?

15         A     Yes.

16         Q     Where?

17         A     In the garage facility, in the basement garage

18    facility.

19         Q     Right.  And that's it.  In the underground

20    garage only?

21         A     Street parking, on Belden Avenue, which the

22    site plan contemplated creating spaces.

23         Q     Where was the means of ingress and egress for

24    parkers in the basement, to access the retail store?

25         A     The site plan contemplated creating Burnell,

1    widening Burnell Boulevard to create a two-way street.

2    There's a signal there now.  Making it easier to get in

3    and out of the garage.  So, in the event --

4         Q    I was imprecise.  After you went into the

5    garage and parked your car, if you were a retail

6    customer, what path would you take to get to the store?

7         A    Stairs, there are stairs and an elevator.

8    That's how the Pathmark was serviced, grocers drive in,

9    go up.

10        Q    And where are the stairs located?

11        A    Let's see.  I'm not sure if the core is

12   depicted.  The elevator is here, with stairs, I'm not

13   sure exactly, they're in here somewhere.  In the center

14   -- I believe they're beneath the mall corridor.

15        Q    Have you reviewed the plans that have been

16   produced to me in this litigation?

17        A    Not specifically, no.

18        Q    Why don't you take a look at three sets of

19   plans that were produced -- four sets of plans that were

20   produced yesterday.  And my question is, can you

21   identify which if any of these were the plans submitted

22   and approved by the City of Norwalk for the development?

23              MR. HAMMER:  I'll just also note that I

24          think we previously produced a set of plans

25          for the Peter Kastl deposition as well.

1      A    Yes.  Your entrance is, the entrance is

2  closest to the AutoZone.

3      Q    Then I would pull in off Belden to an

4  accessway, correct?

5      A    Yes.

6      Q    And then I'd have one means of getting into

7  the parking lot under building one, correct?

8      A    Well, depending on who you were.  If you were

9  coming to load merchandise into the store, to delivery,

10  we'd create a new parking immediately in front,

11  convenient to the store, that wasn't there before.

12     Q    Parking or loading?

13     A    Parking for loading.

14     Q    But it wouldn't be considered a parking space

15  as defined in the Norwalk zoning regulations, correct?

16     A    Correct.

17     Q    So, if I'm going to park as a retail customer,

18  there's one means of ingress and egress to the parking

19  area under building one from Belden Avenue?

20     A    Yes.

21     Q    Now, as the lot presently exists, if you were

22  to enter from Belden Avenue into the parking field, I

23  can take one turn into the parking lot, or are there

24  many ways to enter the open surface parking lot?

25     A    There are probably several aisles that are

1   open.

2       Q    Can you show me on this plan, on this page

3   PK59, where the pedestrian traffic is to be sent if they

4   want to go from parking under building one to the

5   existing retail?

6       A    They travel through various, there's an

7   aperture in the building here, there are exits, if

8   you're living here, at various points, and there's also

9   public access that is approximately right in front of

10  the AutoZone store.

11      Q    There's an access, you said.  You said the

12  aperture.  Could you describe what "an aperture" is?

13      A    You walk through the lobby.  It's a lobby

14  that's got entrances on both sides of the building.

15           In your garage.  And you can go in the garage

16  outside, at this point, this point, at this point,

17  et cetera.

18      Q    When you say "walking through the lobby," I'd

19  have to open a door, go into a building, and then open

20  the door and exit the building?

21      A    Yes.

22      Q    When you said there's a direct area in front

23  of the retail space, you were referring to the area that

24  is the entrance and exitway into the lot from Belden

25  Avenue?

1       A    Yes.

2       Q    And are there sidewalks shown for that area?

3       A    No, not specifically on that exhibit.

4       Q    Were you aware of any sidewalks proposed for

5    that area?

6       A    There aren't any sidewalks now.

7       Q    That's not my question.  Were there any

8    proposed sidewalks for that area?

9       A    I'd have to look at the plans in more detail.

10       Q    Sure.  Go ahead.

11       A    (PAUSE)

12            Okay, I would characterize this as a sidewalk.

13       Q    And when you characterize it as a sidewalk, is

14    there a curb installed between the travel for the cars

15    and pedestrian traffic?

16       A    It is actually designed with pavers, concrete

17    pavers, and traffic calming pattern pavers to act as one

18    big sidewalk, shared with the automobiles, I guess.

19       Q    But there's no separate area for pedestrians

20    versus vehicular traffic?

21       A    That's right, yes.

22       Q    The pages you were just referring to were PK59

23    and PK69, is that true?

24       A    L4, Exhibit L4.

25       Q    Yes.

1      A    Yes.

2      Q    And the traffic calming device and concrete

3    pavers were in the middle with what looks like a

4    circular pattern of lines?

5      A    Yes.

6      Q    Did you ever do any analysis to see whether

7    the AutoZone storefronts would be visible from under

8    building one?

9              MR. HAMMER:  Just quick clarification.

10             When you say "under building one," you mean at

11             grade at surface level?

12             MR. ELSTEIN:  At grade.

13     A    Yes.

14     Q    What did you find?

15     A    It is.

16     Q    Is the building proposed for the side of

17   building number one that faces the existing retail, was

18   that to be built to grade, or was that open?

19     A    It was open at points, and to grade at points.

20     Q    Other than the means of ingress and egress for

21   vehicular traffic, and the accessway between building

22   one and building two, were there any other points in

23   which it was open?

24     A    The lobbies; there were a couple of lobbies.

25     Q    The lobbies being where?

1            and claim that ability, then we can agree to

2            disagree or agree at that point, as the case

3            may be.

4                    MR. ELSTEIN:  Okay.  I have nothing

5            further.

6                    MR. HAMMER:  Okay.

7                    MR. ELSTEIN:  Okay.  Thanks.

8                    THE WITNESS:  Thank you.

9            (Record closed at 1:38 p.m. and reopened)

10

11   CROSS-EXAMINATION BY MR. HAMMER:

12        Q    Just quickly.  You have been asked by Attorney

13   Elstein about where the current retail tenants would

14   have parking during the construction of the development.

15   Do you recall that?

16        A    Yes.

17        Q    And, he asked you some questions in terms of

18   parking being located in underground garages at certain

19   times; do you recall that?

20        A    Yes.

21        Q    At any point in time, did you have any

22   discussions with any representatives of AutoZone in

23   terms of maintaining for AutoZone specifically surface

24   parking during the entire construction process?

25        A    Yes.

1          Q      Could you just describe what you discussed?

2          A      There is an issue verbally brought to my

3     attention through phone conversations with Terry McKee

4     and McClain, about how could they maintain their parking

5     specifically during phasing.

6               And, we, as a result of that concern, we

7     modified the excavation plans for the basement and

8     omitted the excavation of a -- that would effectively

9     accommodated a tray of parking for their store.  So,

10    in the earlier plans you see in the attachment to the

11    contract, there's a basement exhibit that is fully

12    parked.  And as a response to tenant concerns, we

13    reduced the parking in the basement and left an area

14    unexcavated; so that, at grade, as referenced in the

15    first bullet point of the letter to Jim McClain,

16    Exhibit 15, elimination of new sub-grade garage

17    significantly improve construction logistics.  And what

18    we were implying was that we decided to leave this area

19    and we were studying, and I believe in one exhibit, when

20    I met with Jim McClain, I briefly pointed to an area we

21    contemplated being able to rope off for AutoZone parking

22    to achieve at least their minimum required spaces in

23    front of their store during phasing face of

24    construction.

25         Q      The 15 spaces?

1      A    The 15.

2      Q    And I take it that during the course of this

3 project you've had discussions with various AutoZone

4 representatives at various times on various occasions?

5      A    Yes.

6      Q    And during the course of those conversations,

7 did you express a willingness to work with them, in

8 terms of logistics for parking during construction, as

9 well any other issues that were of concern to them?

10     A    Yes.  And we also suggested and were trying to

11 document an agreement whereby valet parking could occur

12 if needed, for some tenants, during pinch points in the

13 construction, which is to say, the parking, while there

14 was always sufficient parking somewhere on site, the

15 landlord was agreeing in theory to provide the expense

16 to valet park cars in the basement.

17          MR. HAMMER:  Thank you.

18

19 REDIRECT EXAMINATION BY MR. ELSTEIN:

20     Q    During the time that you state that there

21 would be spaces dedicated to AutoZone, you pointed to an

22 area that would be in front of their store, to be used

23 for that purpose?

24     A    During construction, yes.

25     Q    During construction?  And, would that have a

 1    actually doing, true?

 2              MR. HAMMER:  I object to the form.

 3        A    No, we did envision doing it if the tenant had

 4    identified that as an interest to them.  The other

 5    alternative discussed was the possibility of valet

 6    parking, as an alternative.

 7        Q    And, as an alternative to having a Cross

 8    Street entrance and exit, or as an alternative to

 9    providing parking in front of the store?

10              MR. HAMMER:  During construction.

11        Q    During construction?

12        A    It was, the theory was that we could either

13    create parking in front of their store at all times,

14    with full access, or valet parking, for a period of time

15    during construction.

16        Q    How would a delivery truck get in and out

17    during construction, to deliver to AutoZone?

18        A    There was, we were clearing spaces exclusively

19    for delivery on Burnell -- on Belden Avenue, that are

20    currently parking spaces and they're shown on a site

21    plan.  It says "loading area."  And both of the loading

22    areas for the shopping center are proximate to the

23    AutoZone store, approximately 50 feet on Burnell

24    Boulevard and 50 feet on the entrance drive.

25        Q    You say "Burnell."  You mean Belden?

1      A    Belden.

2      Q    And you agree, during construction there would

3   not be a means to load and unload a truck in the area

4   off of Belden Avenue, but in front of the AutoZone

5   store?

6      A    Here they're depicted, loading here and

7   loading here.  And these are newly-established.

8                MR. HAMMER:  You're pointing to

9                Plaintiff's Exhibit 16 from the Eric Berliner

10               deposition.

11     Q    But, that is post-development, correct?

12               What you pointed to on Exhibit 16 is

13   post-development?

14     A    That's post-development.  That's the proposed

15   final plan.  But it is in agreement with your previous

16   statement, because your previous statement we could

17   accommodate loading for the store throughout

18   construction, either here or here.

19     Q    Let's -- I'm talking about in front of the

20   store now off of Belden Avenue.  How would a truck get

21   into and out of the front of the AutoZone store, during

22   construction?

23     A    Here's the AutoZone store.  Here's the

24   loading.

25     Q    All right.  You're talking about PK59, and

1    you're pointing to there, it says "loading" in two

2    spots, correct?

3        A    Correct.

4        Q    I'm talking about if a truck pulls in off

5    Belden and parks where it says retail loading, how is

6    the truck to get into and out of that space during

7    construction?

8                    MR. HAMMER:  I just object to the form,

9                    to the extent that I don't think the retail

10                   loading that's shown there exists.

11       A    It doesn't exist today.  So, we cut into the

12   curb and we create it.  The truck would pull in and back

13   out.

14       Q    So, there would be no way to turn a truck

15   around?

16                   MR. HAMMER:  I object to the form.

17       A    It depends on where we were in the

18   construction.

19       Q    You didn't envision --

20       A    Loading typically occurs in the evening when

21   there's less traffic of customers.  That would be when

22   construction is prohibited.

23       Q    Did you make any provision for a truck, for a

24   truck to be able to load and unload during construction

25   and be off of Belden Avenue and able to drive without

```
1    the need to back up to get out?

2              MR. HAMMER:  I object to the form.

3       A    Yes, we didn't get into that level of detail.

4       Q    So, the answer is no, you had made no -- you

5    have plan for that, as of yet?

6              MR. HAMMER:  I object to the form.  It

7              doesn't identify a particular site.

8       A    Yes, we didn't -- I believe that a truck could

9    turn around.

10             MR. ELSTEIN:  Okay.  That's all.

11             Thank you.

12             MR. HAMMER:  Thank you.

13             (Record closed at 1:59 p.m.)

14                   *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25
```

C E R T I F I C A T E

STATE OF CONNECTICUT :

                          ss. Trumbull, Connecticut.

COUNTY OF FAIRFIELD:

        I, Stephen F. Bernfeld, a Notary Public duly
commissioner and qualified in and for the State of
Connecticut, hereby certify, that in the action pending
in the United States District Court, District of
Connecticut, Case No. 303CV350(MRK), there came before
me on the 27th day of September, 2004 at 4:00 p.m. and
the 28th day of September, 2004 at 10:00 a.m, at the law
offices of Elstein & Elstein, P.C, 1087 Broad Street
Suite 401, Bridgeport, Connecticut, the following named
person, to wit:  MARK ROBBINS, who was by me duly sworn
to testify to the truth and nothing but the truth of his
knowledge touching and concerning the matters in
controversy in the cause, that the witness was thereupon
carefully examined upon his oath and his testimony taken
by me stenographically and reduced to laser printing
under my supervision; that the transcript is a true and
accurate transcript of the testimony given, to the best
of my ability.

        I further certify that I am neither counsel for
nor related to any of the parties to the matter set
forth herein or employed by any of the attorneys.

        Dated at Trumbull, Connecticut, this 12th day
of October, 2004.

                          _____
                               Notary Public

My commission expires:
September 30, 2005.