CONFIDENTIAL COPY

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

---------------------------------

ADAP, INC.

-vs-

RITZ REALTY CORP. and
AVALON BAY COMMUNITIES, INC.

---------------------------------


The deposition of ERIC BERLINER,

taken on behalf of the Plaintiff,

pursuant to notice and rules of court,

before Stephen F. Bernfeld, a Notary

Public of the State of Connecticut,

on the 27th day of September, 2004,

at 10:00 a.m, at the law offices of

Elstein & Elstein, P.C, 1087 Broad

Street, Bridgeport, Connecticut.


STEPHEN F. BERNFELD
Licensed Professional Reporter
5  Three Trees Lane
Trumbull, CT 06611-1729
(203) 268-5693
License #SHR.285



1    A P P E A R A N C E S :

2        For the Plaintiff:

3            ATTY. BRUCE L. ELSTEIN
                Elstein & Elstein, P.C.
4                1087 Broad Street - Suite 401
                Bridgeport, CT 06604
5
        For the Defendant Ritz Realty Corp.:
6
            ATTY. ANDREW HOULDING
7                Rome, McGuigan & Sabanosh, P.C.
                One State Street
8                Hartford, CT 06103

9        For the Defendant AvalonBay Communities, Inc:

10           ATTY. JOSEPH HAMMER
                Day, Berry & Howard, LLP
11               CityPlace 1
                Hartford, CT 06103-3499
12
                        * * * * *
13
     S T I P U L A T I O N S :
14
            It is hereby stipulated and agreed by
15
     and between the attorneys for the respective
16
     parties hereto, that all defects as to Notice,
17
     Service, Proof of the authority of the Notary
18
     are hereby waived.
19
            It is further stipulated and agreed that
20
     all objections, except as to form, are reserved
21
     until the time of trial.
22
            It is further stipulated and agreed that
23
     the deposition, after it has been transcribed,
24
     the reading and signing of the transcript by the
25
     deponent is hereby waived.

1    did, I thought there was a provision somewhere elsewhere

2    it specified.  But it's not here.  But it was always the

3    intention of the parties that surface parking was going

4    to remain ours.  And that's why that second amendment

5    reflected that giving us the exact number of spaces.

6        Q    Is that the same number of spaces which

7    existed in that surface parking lot, to your knowledge,

8    before the Avalon agreement?

9        A    No, but there's 50,000 less square feet of

10   retail, 39 was previously.  So, the reality is,

11   parking-wise you have more than double the parking of

12   surface parking you have now for the retail.  It would

13   be just about double.

14       Q    So, the ratio is the same or better?

15       A    Oh, the ratio is much better.

16       Q    Because of the exclusion of the Pathmark

17   space?

18       A    Correct.

19       Q    Having now read paragraph 1C, does that

20   refresh your recollection of whether the AutoZone lease

21   had been provided to Avalon before this agreement was

22   signed?

23       A    Yes.  I would say it was provided to them

24   before.

25       Q    I want you to go page RR8.  This concerns

1    Q    Or their customers?

2    A    Correct.

3    Q    Did you believe that the placement of the

4  building by Avalon in the surface parking lot or above

5  the surface parking lot would impact the visibility that

6  AutoZone had before the development would be built?

7              MR. HOULDING:  Objection.

8              MR. HAMMER:  Objection.

9    A    The answer is no, I did not think it would

10  affect visibility.  Because there were appropriate steps

11  for appropriate signage to give the tenants proper

12  visibility and probably better visibility.

13    Q    So, you believe there was a substitute for

14  visibility?

15    A    No, that is visibility.  Signage, that is your

16  visibility, the signage.

17    Q    Do you think visibility is anything other than

18  signage?

19              MR. HOULDING:  Objection.

20              MR. HAMMER:  Objection.

21    A    No.

22    Q    So that, the ability to see a storefront you

23  don't believe falls into the umbrella of visibility?

24              MR. HOULDING:  Objection.

25    A    Without signage it would.

```
 1        Q     But, you limited it only with signage.

 2              You say, if you have no signage, then being

 3     able to see a storefront is visibility?

 4              MR. HOULDING:  Objection.  Is that a

 5              question?

 6              MR. ELSTEIN:  I'm trying to understand

 7              what he's saying.

 8        A     Well, a storefront would be meaningless

 9     without signage.  If you had a storefront and you didn't

10     have signage, you'd have a storefront.

11        Q     You're talking about the sign on the front of

12     the store?

13        A     How else would you know there's a store there?

14        Q     In terms of signage, I believe we were talking

15     about highlight signs.  Let's be more precise.  There's

16     a sign in front of the AutoZone store?

17        A     Yes.

18        Q     And do you believe that the placement of the

19     Avalon building, in the manner that they intended at the

20     time they signed the agreement, would impact the ability

21     of someone on Cross Street to visualize the sign?

22              MR. HOULDING:  Objection.

23              MR. HAMMER:  Objection.

24              MR. HOULDING:  Do you understand the

25              question?
```

1          THE WITNESS:  I think I understand the

2      question.

3      A    And I'll say this again.  When we entered into

4  the contract with Avalon, as you can see by this

5  agreement, AutoZone is in this agreement in numerous

6  places, the contemplation and to do it properly in the

7  course of the lease was in the utmost of Avalon and

8  Ritz's mind; and both the seller and the purchaser

9  wanted to comply fully with the AutoZone lease; and

10  there was extensive steps taken in order to get the

11  appropriate signage so that they would not lose any

12  visibility on Cross Street.

13      Q    Today, if you're driving on Cross Street, do

14  you believe that you can see the AutoZone sign on the

15  front of the store?

16          MR. HAMMER:  Objection.

17          MR. HOULDING:  Objection.

18      A    It depends on how good your eyesight is.

19      Q    You believe there's no impediment, other than

20  trees and shrubbery that would impede?

21      A    Well, there are trees and shrubbery there.

22      Q    Absolutely.  But other than trees and

23  shrubbery, do you have an unimpeded view of the AutoZone

24  store?

25          MR. HAMMER:  Objection.

1    right to review our changes, and we wanted to get their

2    approvals on signage and things of that nature.

3        Q    And, when you made contact with or attempted

4    to make contact with Mr. McClain, what were you going to

5    tell him at the time?

6        A    That we had planned to redevelop the property

7    -- I did make contact with Mr. McClain.  Our plans to

8    redevelop the property; and that we needed to review --

9    that things were going to change as per the plans with

10   Avalon; and we'd like their approval.

11       Q    You said you did make contact?

12       A    Yes.

13       Q    So, you had a conversation, telephone

14   conversation?

15       A    Yes.

16       Q    Who was present, other than you and, to your

17   knowledge, Mr. McClain on the other end?

18       A    I don't remember whether it was Paxton Kinol

19   or Mark Robbins, I don't remember.

20       Q    Was this somebody from Avalon?

21       A    Yes.

22       Q    Made a contact with Mr. McClain?

23       A    Yes.

24       Q    Were you together in the room or was this a

25   conference call with three people.

```
 1          A    Conference call with three people.

 2          Q    Tell me about the conversation, who said what

 3    to whom.

 4          A    I had called Mr. McClain, to advise him I was

 5    the owner of Ritz Realty Corp. at 24 Belden Avenue, that

 6    it was our intention to redevelop the property, and that

 7    we'd like to submit plans to Jim McClain for approval.

 8          Q    What did Mr. McClain say?

 9          A    He was extremely obnoxious, and basically said

10    that they would never approve of anything and they

11    wanted it to remain exactly as it is, without even

12    seeing the plans.

13          Q    Did you describe what the redevelopment plans

14    would consist of?

15          A    No.

16          Q    Did anyone from Avalon describe what the

17    redevelopment plans would consist of?

18          A    Not at that time.

19          Q    What was the purpose of having someone from

20    Avalon on the call?

21          A    Because we were acting in conjunction

22    together; you know.  And in case there were any

23    questions or something, somebody from Avalon could

24    answer it a lot better than I could.

25          Q    And so you simply called up Mr. McClain and
```

1        A    I'm not sure.

2        Q    What was the purpose of the meeting that you

3    recall being at with Mr. Manocherian and the Avalon

4    folks?

5        A    Negotiating price, terms, things like that,

6    on the contract.

7        Q    Was there any discussion between you and

8    Mr. Manocherian before signing the Avalon contract, now

9    back in October of '01, about the AutoZone lease?

10       A    Between the two of us?

11                THE WITNESS:  About AutoZone, without

12            Avalon being present?

13                MR. ELSTEIN:  Correct.

14       A    I don't remember.

15       Q    Prior to signing the contract with Avalon in

16    October, did you have discussions with the Avalon folks

17    about the AutoZone lease?

18       A    Absolutely.

19       Q    Describe the sum and substance of your

20    conversations on that issue.

21       A    Well, we have to be in complete compliance

22    with that lease; we have to provide the parking under

23    the lease, and we can give him the appropriate signage

24    so we do not take away from the visibility.

25       Q    Anything else?

1        A    Yes, AB6.

2        Q    And can you identify where the 12 spaces?

3        A    Sure.

4        Q    Where it would be, with the yellow

5    highlighter, please?

6        A    (PAUSE)

7        Q    Who came up with the number 12 as the correct

8    number of spaces?

9        A    Going by the lease.

10       Q    And would that be contained within -- showing

11   you Exhibit Number 2.  Is that contained within Article

12   14 on Page RR60?  Continuing over to page RR64.

13       A    I don't see anywhere on Page 60.

14       Q    Now go over to 64.  Article 14 begins, "Common

15   areas and parking," and Article 14 continues on to Page

16   64.  And you would be looking for sub b.

17       A    Fifteen.  That was corrected.

18       Q    So, the amount of space that the lease with

19   ADAP provides is 15?

20       A    Yes.

21       Q    And the plans we just looked at, Exhibit 8

22   only has 12?

23       A    No, it's 15.

24       Q    Well, if you look at Page AB003.

25       A    No, I know what it says.  But it depicts 15.

```
 1              Because, if you count the spaces, it's 15 in
 2       there.
 3          Q    There's a number of spaces there, we don't
 4       know which ones have been designated as AutoZone's
 5       exclusive use.
 6          A    Oh, it's the ones right in the front of the
 7       store.
 8          Q    You believe it's the entire 15 in front of the
 9       store?
10          A    Yes.
11          Q    So, you believe that the provision in the
12       agreement which says 12 may be in error?
13          A    Might be in error, correct.
14          Q    Instead of the diagram, which would be
15       correct?
16          A    Because the intention of the parties always
17       was to comply fully with the AutoZone lease.
18          Q    I'll next show you what I marked Exhibit 9.
19       Is this a fax from Jim McClain to Avalon, dated
20       January 8, '02?
21              From the first page.
22          A    I mean, it says to AvalonBay.
23          Q    And, included in that fax are copies of
24       e-mails?  By Jim McClain?
25          A    (PAUSE)
```

1     Q     Did you know whether either Cory Gubner or

2     Ms. Caulfield had experience in retail leasing to

3     national tenants like Radio Shack, McDonald's or

4     AutoZone?

5         A     Absolutely.

6         Q     How did you know that?

7         A     Well, for one, before I discussed it with Cory

8     Gubner, the AutoZone was already out looking for tenants

9     in Norwalk, before the contract with Avalon.  So, I

10    guess AutoZone thought that he was sufficient as a

11    broker retail, for using his ability to find new space.

12        Q     Anything else?

13    (LUNCHEON BREAK)

14                MR. ELSTEIN:  Can I have my last question

15             and answer?

16        Q     Have you read the third paragraph from the

17    bottom?

18        A     Yes.

19        Q     Do you recall asking the buyer to make a

20    representation that there would be no impact on existing

21    tenants?

22        A     I don't know if I phrased it in that way.

23        Q     How do you think you phrased it?

24        A     Well, we were discussing phasing the plan so

25    there would not be interruption with the tenants'

1   business during the construction period, where it would

2   be phased in and there would always be the parking

3   available in front, for each of the retail tenants.

4          Q    Before we took a break, you were saying that

5   you were concerned about the impact after construction?

6          A    No.  I said -- no, I wasn't saying that

7   concerned about that.  I was concerned about that before

8   I signed the contract; I wanted to know the viability of

9   what I was doing before entering into the contract with

10  Avalon to do that.

11              That's what I said, I believe.

12         Q    Do you see the statement, quote,

13  "unfortunately, it is inevitable that there will be an

14  impact during construction"?  Do you see that sentence?

15         A    Yes.

16         Q    Did that cause any concern in you?

17         A    Yes.  Because the intention was to minimize

18  any interference.

19         Q    What did you do to act on that concern, when

20  you got this letter?

21         A    That's when they decided that they were going

22  to phase the construction, do it in sections; and it was

23  going to actually slow their process down; where

24  initially they were intending to doing those both

25  simultaneously, they were going to do a phasing plan

1    aspect?

2        A    From me.  It's possible that maybe Avalon did

3    it before that.  But from me, yes.

4        Q    But if they did, you're not aware of it?

5        A    I'm not aware.  Or, if I was, I don't recall.

6        Q    I show you what I have marked Exhibit 15.

7    AB70, letter of April 18, 2002, from Avalon to AutoZone.

8            Did you receive a copy of this letter?

9            THE WITNESS:  Was this in my file?

10       A    No?  Then, maybe not.  Oh, it says cc to me.

11   So I must have.

12           It's possible.  I mean, it looks like -- I

13   probably did receive it.  It said cc to me.

14       Q    In reviewing the content, do you recall being

15   informed by a copy of the letter, that AutoZone was

16   getting some plans?

17       A    Yes.  It looks that way, yes.

18       Q    In the letter, it references that AutoZone

19   would be getting 15 dedicated spaces, do you see that?

20       A    Yes, uh huh.

21       Q    If you go to the second page of the document,

22   is there a plan depicting parking, among other things?

23       A    It says "parking."  But I see something

24   forward.  Yes, there's parking on RR.

25           Why isn't it marked?

1    Q    And what's the range you're obtaining now from

2    the tenants who are paying close to fair market or

3    better?

4    A    McDonald's pays over $40 a foot, because they

5    pay percent of sales, so their rent is over $40 a foot.

6    Radio Shack is slightly -- about $26 a foot.  OTB is

7    paying $50 a foot.  I mean, so I have tenants paying

8    over and I have tenants who are paying a little under.

9    Q    And what's the per foot that, your

10   understanding, AutoZone is paying?

11   A    I think the first thing.  They're grossing $22

12   a foot, I believe.  Plus, some percentage rent.

13   Q    Showing you what I marked Exhibit 17.  Is that

14   a fax, MW301?  Is that a fax from you to Mark Robbins on

15   June 23, '02?

16   A    June 20th.

17        Oh, June 20th, I think.

18   Q    June 20th, enclosing a copy of a letter, and

19   it was sent to you by Henry Elstein?

20   A    Yes.

21   Q    What was the purpose in providing a copy of

22   this letter to Mark Robbins?

23   A    Because, I believe when you have a contract

24   with somebody, you give full disclosure of everything.

25   So, I provided full disclosure.

1    Q    So, you believe that there could be a sign

2    erected on Cross Street that would make the AutoZone

3    store more visible?

4    A    Yes.

5    Q    Than it presently is?

6    A    Or equally visible.  Or equally if not

7    greater.

8    Q    And so that you're talking about a pylon sign

9    on Cross Street?

10    A    No, actually I don't believe it was a pylon.

11    I believe it was to be all on the actual Avalon

12    building.  I believe it was going to be on the building

13    itself.

14    Q    So, you understood that there was going to be

15    some type of a sign placed on an Avalon building for

16    only AutoZone or for other retail tenants as well?

17          MR. HOULDING:  Objection.

18    A    It would probably have been with other retail

19    tenants.

20    Q    And that the signage put on the side of the

21    building would equal the visibility that an AutoZone

22    storefront presently has on Cross Street?

23    A    With the appropriate signage, yes.  And might

24    give more visibility, because there are other things

25    that block the visibility on Cross Street.

C E R T I F I C A T E

STATE OF CONNECTICUT :

                          ss. Trumbull, Connecticut.

COUNTY OF FAIRFIELD:


        I, Stephen F. Bernfeld, a Notary Public duly
commissioner and qualified in and for the State of
Connecticut, hereby certify, that in the action pending
in the United States District Court, District of
Connecticut, Case No. 303CV350(MRK), there came before
me on the 27th day of September, 2004 at 10:00 a.m, at
the law offices of Elstein & Elstein, P.C, 1087 Broad
Street Suite 401, Bridgeport, Connecticut, the following
named person, to wit:  ERIC BERLINER, who was by me duly
sworn to testify to the truth and nothing but the truth
of his knowledge touching and concerning the matters in
controversy in the cause, that the witness was thereupon
carefully examined upon his oath and his testimony taken
by me stenographically and reduced to laser printing
under my supervision; that the transcript is a true and
accurate transcript of the testimony given, to the best
of my ability.

        I further certify that I am neither counsel for
nor related to any of the parties to the matter set
forth herein or employed by any of the attorneys.

        Dated at Trumbull, Connecticut, this 13th day
of October, 2004.


                          _____
                              Notary Public




My commission expires:
September 30, 2005.

                    Steve Bernfeld, LSR
                     (203) 268-5693



15 River Road, Suite 210 ▲ Wilton, CT 06897-4064 ▲ Tel (205) 761-6500



December 17, 2001

James O. McClain, Esq.
c/o AutoZone, Inc.
123 South Front, D-2
Memphis, TN 38101

Dear Mr. McClain:

At the request of Eric Berliner, I have enclosed preliminary plans of our development in Norwalk, Connecticut. Once you have reviewed the plans you should contact Eric with any questions or concerns. I believe Eric will schedule a meeting or conference call if any substantive issues are raised.

I look forward to talking with you at that time.

Sincerely,

Paxton Kinol
Senior Development Director

Enclosure
cc: Eric Berliner, Esq.

RR 00274

ARC0111



15 River Road, Suite 210 ▲ Wilton, CT 06897-4064 ▲ Tel (203) 761-6500

**Via Federal Express**

April 18, 2002



James O. McClain
Auto Zone, Inc.
Department 8700
123 South Front Street
Memphis, TN 38103

**Re: 24 Belden Avenue (Riverview Plaza) Norwalk, CT.**

Dear Jim:

As you may be aware, I recently met with Richard Abate and Bruce Elstein to present the modified site plan, which should address your concerns. The attached drawings illustrate the following enhancements:

- Elimination of new sub-grade garage – significantly improving construction logistics
- AutoZone dedicated parking – 15 spaces
- New pylon sign
- Building #1 setback with corner cut to increase visibility
- New store fronts
- Construction phasing plan maintains access and parking
- New parking field wraps retail on two sides

I hope you find these revisions satisfactory and I look forward to answering any questions you may have. Should you desire, we would be delighted to meet in your offices to resolve any further concerns.

Sincerely,

Mark Robbins
Development Director

Attachments: Site, Pylon and Construction Phasing Plans.

cc: Eric Berliner
    Greg Manocherian
    Bill McLaughlin
    Allen Roberts

AB00070



P E R K I N S
E A S T M A N
A R C H I T E C T S

PROJECT: AVALON NORWALK

DRAWING TITLE: GROUND LEVEL PLAN

DATE: 4/18/02

PROJECT No.: 16560

DRAWING No.: SK-1

SCALE: NO SCALE



PROPOSED POLE SIGN
BELDEN AVE. & CROSS ST

RIVERVIEW PLAZA
AUTO ZONE
McDONALDS
RADIO SHACK
WASH & DRY

PARKING
RETAIL PARKING
PARKING

AB00072



PHASE ONE

AB00073

BOULEVARD

BURNELL

GARAGE

OTB TO REMAIN

RIVER

NORWALK

EXISTING GARAGE AND SUPERMARKET TO BE DEMOLISHED AND REPLACED WITH NEW GARAGE AND SURFACE PARKING

EXISTING ARCADE TO REMAIN

AVENUE

STAGING AREA FOR DEMOLITION AND CONSTRUCTION

CONSTRUCTION FENCE

PARKING FOR EXISTING RETAIL

BELDEN

NEW PYLON SIGN

CROSS STREET

AB00074



PHASE TWO

BURNELL BOULEVARD

RIVER

NORWALK

OTB TO REMAIN

EXISTING ARCADE TO REMAIN

AVENUE

CONSTRUCTION FENCE

CONSTRUCTION FENCE

STAGING AREA FOR CONSTRUCTION

THIS BUILDING TO BE BUILT FIRST

BELDEN

NEW PYLON SIGN

CROSS STREET

PHASE THREE

AB00075



JUN 25 2002 10:12AM    HP LASERJET 3200
(212) 425-8500
FAX (212) 425-6444

## BERLINER & PILSON

### ATTORNEYS AT LAW
### 3 NEW YORK PLAZA
### 18TH FLOOR
### NEW YORK, NEW YORK 10004

ERIC L. BERLINER
RICHARD J. PILSON

* PAUL V. LUCAS

*ALSO ADMITTED IN
NEW JERSEY

### FACSIMILE COVER SHEET

TO: _Mark Robbins_

COMPANY NAME: _____

FACSIMILE NO: _(203) 761-6565_

NO. OF PAGES
INCLUDING COVER SHEET: _Two (2)_

FROM: _Eric L. Berliner_

DATE: _June 25, 2002_

CLIENT: _____    MATTER: _____

COMMENTS: _____

_____

_____

_____

_____

IF YOU DO NOT RECEIVE THE PAGES IN LEGIBLE CONDITION, PLEASE CALL SENDER IMMEDIATELY AT (212) 425-8500.

THE ORIGINAL OF THIS DOCUMENT WILL BE SENT BY:

( ) ORDINARY MAIL

( ) MESSENGER

( ) OVERNIGHT MAIL

( ) WILL NOT BE SENT

PLAINTIFF'S
EXHIBIT

17 DMC
9-27-04-5

THIS FACSIMILE TRANSMISSION CONTAINS CONFIDENTIAL AND/OR LEGAL PRIVILEGED INFORMATION INTENDED ONLY FOR THE USE OF THE PERSON(S) NAMED ABOVE ON THE TRANSMISSION SHEET. IF YOU ARE NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISCLOSURE, DISTRIBUTION OR REPRODUCTION OF THIS COMMUNICATION OR THE TAKING OF ANY ACTION IN RELIANCE ON THE CONTENTS OF THE FACSIMILE TRANSMISSION IS STRICTLY PROHIBITED.

MW0301

JUN 25 2002 10:12AM  HP LASERJET 3200                                    P.2

203-761-6565
MARK ROBBINS

ELSTEIN AND ELSTEIN, P.C.
ATTORNEYS AT LAW
SUITE 400
1087 BROAD STREET
BRIDGEPORT, CONNECTICUT 06604-4280
(203) 367-4421

HENRY ELSTEIN*
BRUCE L. ELSTEIN

*ALSO ADMITTED IN NEW YORK

MAURICE J. MACILNICK
1940-1983

TELECOPIER (203) 366-8615

June 20, 2002

Ritz Realty Corp.
24 Belden Avenue
Norwalk, CT  06850

RE:   **Lease with ADAP, Inc. dated April 17, 1997 to
       Premises at 24 Belden Avenue, Norwalk, CT
       now occupied by AutoZone, Inc. (the "Premises")**

Dear Sirs:

    We represent AutoZone, Inc., the Tenant of the Premises.  After a
thorough review of the proposals and plans to develop the shopping
center where the Premises are located, our client has concluded that
the substantial changes you propose would adversely and materially
affect the accessibility to the Premises from the parking area as well
as the visibility of the storefront.

    Our client's particular concerns are the substantial reduction in
the amount of parking available to current tenants, the proposed
changes to the location of parking spaces from being adjacent to the
Premises to being substantially less accessible, the great reduction
in the visibility of the store from both Belden Avenue and Cross
Street and the disruption to the parking area now used by our client's
customers that will be caused by the construction you contemplate.

    Accordingly, AutoZone, Inc. will not give its consent to the
proposed changes.

                              Sincerely yours,

                              Henry Elstein

HE/gy
Cc:  Eric L. Berliner, Esq.
     James O. McClain, Esq.

\\mary\mary's pc\Clients-Common\AUTOZONE\Ltr-Ritz Realty.DOC

MW0302