# U N I T E D   S T A T E S   D I S T R I C T   C O U R T

## D I S T R I C T   O F   C O N N E C T I C U T

ADAP, INC.                                    :         CASE NO. 3:03 CV 350 (MRK)

VS.                                               :

RITZ REALTY CORP.,                        :
AVALON BAY COMMUNITIES, INC.    :         APRIL 1, 2005

## O B J E C T I O N   T O   D E F E N D A N T S '   M O T I O N   F O R   S U M M A R Y   J U D G M E N T

The plaintiff hereby objects to the defendants' motions for partial summary judgment.

In support hereof, the plaintiff submits the following evidence:

1.     Defendant's Rule 30(b)(6) Notice of Deposition (Exhibit 1);

2.     Plaintiff's designation to Rule 30(b)(6) Notice (Exhibit 2);

3.     McClain deposition, 91:5 – 92:16 (Exhibit 3);

4.     McKee deposition 86:1 – 91:25; 101:18 – 102:20; 167:4 – 170:13 (Exhibit 4);

5.     Oliphant fact deposition, 181:24 – 183:7 and 185:1 – 9 (Exhibit 5);

6.     Oliphant expert deposition, 23:14 – 25:25 (Exhibit 6);

**ORAL ARGUMENT REQUESTED**

A memorandum in support of this objection and the Local Rule 56(a)(2) Statement are submitted herewith.

Wherefore, the defendants' motions for partial summary judgment should be denied.

**THE PLAINTIFF**
**ADAP, INC. D/B/A AUTOZONE**


By:_____
        David C. Grimes, Esq.
        Elstein and Elstein, P.C.
        1087 Broad Street
        Bridgeport, Connecticut 06604
        Telephone: (203) 367-4421
        Facsimile:  (203) 366-8615
        Fed. Bar No.  ct25630


## <u>CERTIFICATION</u>

This is to certify that a copy of the foregoing has on APRIL 1, 2005 been sent to:

Joseph Hammer, Esq.
Day, Berry & Howard, LLP
City Place 1
Hartford, CT  06103-3499
        Attorney for the defendant, AvalonBay Communities, Inc.

Andrew Houlding, Esq.
Rome McGuigan Sabanosh, P.C.
One State Street
Hartford, CT  06103
        Attorney for the defendant, Ritz Realty Corp.


_____
David C. Grimes

2

# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ADAP, INC. | : | CASE NO. 3:03CV350(MRK) |
| | : | |
| VS. | : | |
| | : | |
| RITZ REALTY CORP. and | : | |
| AVALONBAY COMMUNITIES, INC. | : | |
| | : | AUGUST 5, 2004 |

## NOTICE OF DEPOSITION

PLEASE TAKE NOTICE that, pursuant to Rules 26 and 30(b)(6) of the Federal Rules of

Civil Procedure, defendant AvalonBay Communities, Inc. ("AvalonBay"), by its counsel, will take

the deposition upon oral examination of plaintiff **ADAP, Inc.** on **Thursday, August 19, 2004 at**

**10:00 a.m.** at the offices of Day, Berry & Howard LLP, CityPlace I, Hartford, Connecticut 06103-

3499, before a court reporter in and for the State of Connecticut or other competent authority

authorized to administer oaths.

Plaintiff ADAP, Inc. shall designate one or more persons to testify on its behalf as to

matters known by or reasonably available to ADAP, Inc. concerning the topics set forth on

Schedule "A".

DEFENDANT,
AVALONBAY COMMUNITIES, INC.

By _____
Joseph L. Hammer (ct00446)
Day, Berry & Howard LLP
CityPlace I
Hartford, CT  06103-3499
Tel:  (860) 275-0100
Fax:  (860) 275-0343
E-mail: jlhammer@dbh.com

## CERTIFICATION

THIS IS TO CERTIFY that a copy of the foregoing was sent this 5th day of August, 2004, via electronic mail and via certified mail, return receipt, to:

Bruce L. Elstein, Esq.
Elstein & Elstein
1087 Broad Street
Bridgeport, CT 06604-4294
Phone: (203) 367-4421
Fax:    (203) 366-8615

Andrew L. Houlding, Esq.
Rome McGuigan Sabanosh, P.C.
One State Street
Hartford, CT 06103-3101
Phone: (860) 493-3468
Fax:    (860) 724-3921

Joseph L. Hammer

**SCHEDULE A**

I.   DEFINITIONS

A.  "Concerning" means relating to, referring to, describing, evidencing or constituting.

B.  The words "and" and "or" shall be construed either disjunctively or conjunctively as necessary to make the request inclusive rather than exclusive.

C.  The "Norwalk AutoZone Store" means the AutoZone store located in Riverview Plaza at 24 Belden Avenue, Norwalk, Connecticut which is the subject of the Action.

D.  The "Action" means the lawsuit entitled ADAP, Inc. v. Ritz Realty Corp., et al. pending in the U.S. District Court for the District of Connecticut, Case No. 3:03CV350(MRK).

E.  The "Complaint" means the Verified Complaint dated February 26, 2003 filed by plaintiff in the Action.

F.  "Plaintiff," "ADAP, Inc." and "AutoZone" shall be deemed synonymous and shall be deemed to include plaintiff ADAP, Inc., its directors, officers, agents, servants, employees, representatives, corporate parents, subsidiaries, affiliates and all persons acting on its behalf.

II.  TOPICS

1.  The alleged damages set forth in Plaintiff's Damage Analysis dated July 15, 2004.

2.  The allegation in Paragraph 42 of the Complaint that "[i]f the Proposed Development is allowed to proceed, ADAP will suffer irreparable harm including, but not limited to, loss of convenient parking, loss of access from common areas, loss of visibility, business interruption and

disruption during construction and inability to load and unload deliveries of goods, particularly during construction."

3. The allegation in Paragraph 49 of the Complaint that "ADAP has suffered actual loss in ways including, but not limited to, expense of seeking an alternative location, retention of counsel, harm to reputation and tarnished public perception in being forced to oppose an otherwise attractive project in order to enforce its rights under the Lease."

4. The allegation in Paragraph 36 of the Complaint that "[d]uring construction, there will be significant business interruption and disruption."

5. The allegation in Paragraph 50 of the Complaint that "[i]f the proposed development is approved and constructed, ADAP will suffer further and significant losses."

6. Any efforts by plaintiff at any time to identify an alternative location for the Norwalk AutoZone Store.

7. Any investigation or analysis undertaken by or on behalf of plaintiff concerning the potential impacts of the proposed development on the Norwalk AutoZone Store.

8. Studies, data or information prepared for or in the possession of plaintiff regarding marketing and sales demographics in connection with AutoZone stores, including the volume of repeat customers and analyses of the volume of sales that are destination-based or impulse-based.

-2-

# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ADAP, INC. | : | CASE NO. 303CV350(MRK) |
| VS. | : | |
| RITZ REALTY CORP. and | : | |
| AVALON BAY COMMUNITIES, INC. | : | AUGUST 18, 2004 |

### DESIGNATION/OBJECTION PURSUANT TO RULE 30(b)(6)

The plaintiff hereby responds to the defendant, AvalonBay Communities, Inc.'s, notice of deposition dated August 5, 2004 pursuant to Fed. R. Civ. Pro. 30(b)(6) as follows:

**TOPICS (in accord with the notice)**

1.   Terry McKee;

2.   Alex Oliphant.  In addition, numerous other deponents have previously been exhaustively examined by the defendants.  Thus, to the extent that it is duplicative, the plaintiff objects to this repeat inquiry as it is not likely to lead to discoverable information and/or is unduly burdensome.  Further, to the extent it implicates expert disclosure, it is objected to at this time as expert disclosure will be made in accordance with the scheduling order;

3.   Terry McKee.  In addition, numerous other deponents have previously been exhaustively examined by the defendants.  Thus, to the extent that it is duplicative, the plaintiff objects to this repeat inquiry as it is not likely to lead to discoverable information and/or is unduly burdensome.  Further, to

**ORAL ARGUMENT NOT REQUESTED**

the extent it implicates expert disclosure, it is objected to at this time as

expert disclosure will be made in accordance with the scheduling order;

4.    Numerous deponents have previously been exhaustively examined by the

defendants on this issue.  Thus, the plaintiff objects to this repeat inquiry

as it is not likely to lead to discoverable information and/or is unduly

burdensome;

5.    Terry McKee and Alex Oliphant.  In addition, numerous other deponents

have previously been exhaustively examined by the defendants.  Thus, to

the extent that it is duplicative, the plaintiff objects to this repeat inquiry as

it is not likely to lead to discoverable information and/or is unduly

burdensome.  Further, to the extent it implicates expert disclosure, it is

objected to at this time as expert disclosure will be made in accordance

with the scheduling order;

6.    Numerous deponents have previously been exhaustively examined by the

defendants on this issue.  Thus, the plaintiff objects to this repeat inquiry

as it is not likely to lead to discoverable information and/or is unduly

burdensome.  Further, to the extent it is for the time period after the filing

of the complaint, it is irrelevant and immaterial.

7.    Alex Oliphant.  Further, to the extent this implicates experts retained but

not expected to testify at trial, it is objected to as beyond the scope of Rule

26.

8.    Alex Oliphant.

**THE PLAINTIFF**
**ADAP, INC.**


By:_____

　　Bruce L. Elstein
　　Elstein and Elstein, P.C.
　　1087 Broad Street
　　Bridgeport, CT 06604
　　Telephone Number (203) 367-4421
　　Facsimile Number (203) 366-8615
　　Federal Bar No.: CT01250

## C E R T I F I C A T I O N

This is to certify that a copy of the foregoing has on AUGUST 18, 2004

been sent First Class Mail to:

Joseph Hammer, Esq.
Day, Berry & Howard, LLP
City Place 1
Hartford, CT  06103-3499
　　Attorney for the defendant, AvalonBay Communities, Inc.

Andrew Houlding, Esq.
Rome McGuigan Sabanosh, P.C.
One State Street
Hartford, CT  06103
　　Attorney for the defendant, Ritz Realty Corp.


_____

Bruce L. Elstein

Z:\AUTOZONE\Adap v. Ritz(Avalon)\Designation per 30b6.doc

3

# EXHIBIT 3

1

1                 UNITED STATES DISTRICT COURT

2                    DISTRICT OF CONNECTICUT

3                      REGULAR TRANSCRIPT

4

5    ---------------------------x

6    ADAP, INC.,                :

7            Plaintiff,         :

8       -versus-               : No. 303CV350 (AWT)

9    RITZ REALTY CORP. and      :
     AVALONBAY COMMUNITIES, INC.,
10
             Defendants.       :
11   ---------------------------x

12

13

14

15              Deposition of JAMES O. McCLAIN,

16        taken pursuant to the Federal Rules of

17        Civil Procedure, at the law offices of Day,

18        Berry & Howard, L.L.P., CityPlace I - 185

19        Asylum Street, Hartford, Connecticut,

20        before Gerald Gale, L.S.R. 00027,

21        Registered Merit Reporter and a Notary

22        Public in and for the State of Connecticut,

23        on August 26, 2003, at 9:00 a.m.

24

25

                    SANDERS, GALE & RUSSELL
                       (203) 624-4157

2

```
 1   A P P E A R A N C E S:

 2          For the Plaintiff:

 3          ELSTEIN & ELSTEIN
            1087 Broad Street
 4          Bridgeport, Connecticut  06604-4231
            By:  BRUCE L. ELSTEIN, ESQ.
 5               (203) 367-4421

 6
            For the Defendant Avalonbay
 7          Communities, Inc.:

 8          DAY, BERRY & HOWARD, L.L.P.
            CityPlace I - 185 Asylum Street
 9          Hartford, Connecticut  06103
            By:  JOSEPH L. HAMMER, ESQ.
10               (860) 275-0100

11
            For the Defendant Ritz Realty Corp.:
12
            ROME, McGUIGAN & SABANOSH
13          One State Street
            Hartford, Connecticut  06103-3101
14          By:  ANDREW L. HOULDING, ESQ.
                 (860) 493-3468
15

16

17

18

19

20

21

22

23

24

25
```

1    ones closest to your storefront?

2         A.    Yes, I would.  Depending on what is

3    done with the rest of the property, the others

4    become important.

5         Q.    So certainly in terms of attempting to

6    evaluate potential impacts on your store from

7    the Avalon development, I take it you would be

8    focusing on those areas of important parking

9    that you have just identified; is that fair?

10        A.    I would look -- I would definitely

11   look at those areas, yes.

12        Q.    As we sit here today, what is your

13   understanding in terms of, first of all, whether

14   there still will be parking in those areas, at

15   surface, do you know?

16        A.    There will still be a few parking

17   spaces, only a few parking spaces.

18        Q.    How many?

19        A.    I didn't count them.  There aren't

20   many.

21        Q.    Are you referring to -- which areas

22   specifically where there won't be any?

23        A.    There aren't many near our store.

24        Q.    If we assume that there were still

25   worse spaces near your store, do you think there

92

1    is still --

2        A.   What now?

3        Q.   If we assume there are still going to

4    be 20, 25, 50 spaces, whatever, in the general

5    area of importance that you have identified, you

6    still would have a problem with the parking; is

7    that correct?

8        A.   Yes, definitely.

9        Q.   Why is that?

10       A.   Because it's in a garage that belongs

11   to someone else.

12       Q.   It's going to be at surface, isn't it?

13       A.   I don't know.  If it is, it's still

14   going to be a parking garage with only limited

15   access and not inviting.  It's not good,

16   inviting, customer-friendly parking.

17       Q.   Do you know where the access will be

18   to the parking in the vicinity of the AutoZone

19   store post development?

20       A.   It will be near --  There is an

21   entrance near the front of our store to the

22   garage on the plans I have seen unless it's

23   moved.  You mentioned earlier that the --  They

24   have gone down for two years.  The first we

25   heard of it was two days before, from

# EXHIBIT 4

1

```
 1              UNITED STATES DISTRICT COURT

 2                 DISTRICT OF CONNECTICUT

 3                  REGULAR TRANSCRIPT

 4

 5    ---------------------------x

 6    ADAP, INC.,                 :

 7            Plaintiff,          :

 8       -versus-                 : No. 303CV350 (AWT)

 9    RITZ REALTY CORP. and       :
      AVALONBAY COMMUNITIES, INC.,
10
              Defendants.         :
11    ---------------------------x
12

13

14

15              Deposition of TERRY McKEE,

16        taken pursuant to the Federal Rules of

17        Civil Procedure, at the law offices of Day,

18        Berry & Howard, L.L.P., CityPlace I - 185

19        Asylum Street, Hartford, Connecticut,

20        before Gerald Gale, L.S.R. 00027,

21        Registered Merit Reporter and a Notary

22        Public in and for the State of Connecticut,

23        on September 3, 2003, at 9:37 a.m.

24

25
```

SANDERS, GALE & RUSSELL
(203) 624-4157

2

```
 1   A P P E A R A N C E S:

 2          For the Plaintiff:

 3          ELSTEIN & ELSTEIN
            1087 Broad Street
 4          Bridgeport, Connecticut  06604-4231
            By:  BRUCE L. ELSTEIN, ESQ.
 5               (203) 367-4421

 6
            For the Defendant Avalonbay
 7          Communities, Inc.:

 8          DAY, BERRY & HOWARD, L.L.P.
            CityPlace I - 185 Asylum Street
 9          Hartford, Connecticut  06103
            By:  JOSEPH L. HAMMER, ESQ.
10               (860) 275-0100

11
            For the Defendant Ritz Realty Corp.:
12
            ROME, McGUIGAN & SABANOSH
13          One State Street
            Hartford, Connecticut  06103-3101
14          By:  ANDREW L. HOULDING, ESQ.
                 (860) 493-3468
15

16

17

18

19

20

21

22

23

24

25
```

86

```
1        Q.    Who at AutoZone do you believe is most
2    knowledgeable regarding the evaluation of any
3    potential impacts on the Norwalk operation as a
4    result of the Avalon development?
5        A.    I do not believe it would be any one
6    person.   I think it would be a collective
7    operation, real estate, research issue.
8        Q.    Would you be one of the people with
9    the information?
10       A.    Yes, I would be -- it would --
11   virtually it would be the real estate committee
12   that we described and the research, which
13   include the research group, and the operations
14   group, which would be, in this case, Shawn
15   Sheikhzade, and his boss is Mike Longo, who is
16   on the real estate committee, so it would be
17   kind of a joint review of that circumstance or
18   any similar circumstance in any other store.
19       Q.    Has the Avalon development and any
20   potential impacts from the development been the
21   subject of any discussion at any real estate
22   committee meetings?
23       A.    Yes.
24       Q.    When was the first such discussion,
25   approximately?
```

87

1      A.    Approximately, I am trying to think

2    back.  I think my first exposure, the first time

3    I was approached by Mark Robbins with this plan

4    was in May of, I believe, 2001, and then after

5    seeing his plan, it was taken to the real estate

6    committee as an FYI in probably June or July of

7    2000 -- 2001, so it would have been a couple --

8    within four to six weeks of Mark Robbins

9    presenting a plan to me, which he did at a real

10   estate convention in May of 2001.

11       Q.    Was that in Las Vegas?

12       A.    The ICSC convention.

13       Q.    Was that 2001, or could it have been

14   2002?

15       A.    I want to say 2001, but again, you

16   know, I am responsible for 3,200 stores so I may

17   be --

18       Q.    That's fine.

19             How many instances have there

20   been in total where there was discussion at the

21   real estate committee regarding the Avalon

22   development?

23       A.    Three or four.

24       Q.    I assume you were present at all of

25   those?

88

1      A.   Yes.

2      Q.   The first you said was within a couple

3  of months of your discussion with Mark Robbins;

4  is that correct?

5      A.   If I am off a year there, we'll have

6  to double-check that, but, yes.

7      Q.   Sequentially, when does the other

8  discussion occur, roughly?

9      A.   Probably maybe every once a month

10  thereafter or maybe once every six weeks

11  thereafter.

12      Q.   For how long, approximately, six

13  months or so?

14      A.   Four, five, six months.

15      Q.   Did one of those discussions include a

16  discussion regarding any potential site for

17  relocation?

18      A.   Yes, and that was within a couple of

19  those meetings,, that was the context of

20  discussing the Norwalk store.  It was in the

21  context of possible relocation.

22      Q.   And at the final discussion of the

23  ones that you mentioned, was there an approval

24  given to a potential relocation site?

25      A.   Yes.

89

1      Q.    Is that why you have not had any

2   further discussion at the real estate committee

3   since then?

4      A.    There hasn't been anything new to

5   report other than we have a lawsuit in place,

6   and as far as discussing any issues with the

7   real estate committee, a lawsuit has been --

8   hearings on their position, and so there hasn't

9   been a lot to report, so there hasn't been much

10  discussion after that alternate site was

11  discussed.

12     Q.    Going back to the very first

13  discussion at the real estate committee, was

14  that discussion about the Avalon development or

15  also about a potential relocation site?

16     A.    Avalon development.

17     Q.    Did you make a presentation to the

18  committee on that occasion?

19     A.    It was not a formal presentation.  It

20  was that this is the site plan of what may

21  happen to us in Norwalk and I need to let

22  everybody know so that we can discuss the

23  circumstances.

24     Q.    Did you show them a version of the

25  plan that had been given to you after your Las

90

1    Vegas discussion with Mr. Robbins or before?

2        A.    I think it was given to me at the Las

3    Vegas discussion.

4        Q.    What did you say to the real estate

5    committee in terms of your thoughts about the

6    Avalon development?

7        A.    That it was a --  I can't remember the

8    words, but it was an extremely bad -- it was

9    potentially an extremely bad circumstance or

10   scenario if a project, if that project were to

11   be built out in front of us, but I didn't have

12   the say on that.  I think it was obvious to the

13   five or six people in the room that it was an

14   extremely bad circumstance.

15       Q.    You used the word "potentially."  Did

16   you use the word "potentially" with the

17   committee?

18       A.    I don't recall.

19       Q.    What did you mean now in terms of

20   potentially?

21       A.    Potentially, somebody could build

22   apartments out there.  That's why we are having

23   this, I guess, why there is a lawsuit in place.

24       Q.    Did you get more specific with them in

25   terms of why you thought it could be --

SANDERS, GALE & RUSSELL
(203) 624-4157

91

```
 1       A.   I think it was obvious to those, and I

 2  probably did -- it was a very informal

 3  discussion.  It didn't have aerials, it didn't

 4  have photography.  I think it was very apparent

 5  to those that reviewed the site plan that it was

 6  a bad thing.

 7       Q.   To the best of your recollection, I am

 8  not holding you to specific words, what did you

 9  convey in terms of what you perceived as the

10  negative aspects of the development on the

11  store?

12       A.   Well, again, I think it's obvious to

13  everyone on the AutoZone side that your

14  visibility is vastly diminished, your impact to

15  the street is vastly diminished, your

16  convenience from a parking perspective is vastly

17  diminished, your accessibility across that

18  parking lot is vastly -- it's just everything,

19  all the characteristics we talked about earlier

20  in our discussion are all now potentially -- and

21  I use the word "potential" because it could

22  still happen, but potentially very detrimental

23  to the store.

24                  It's the worst case -- worst

25  potential case that I had seen.  I had seen
```

101

1      A.    No.  I mean, other than --  We just

2   have a dramatically bad impact on the store.  I

3   mean, I don't -- I have not been privy to any

4   discussion whether it's going to take X percent

5   away or going to do this or that.  It's always

6   been --  The idea of what was to be built out in

7   the parking lot was unlike any other scenario

8   that we had ever been faced with over 3,200

9   stores.  There was no way to put a number on

10  it.

11              That was the consensus, other

12  than the fact that it's going to be tremendously

13  bad.

14      Q.    Have you or anyone else within the

15  company ever attempted to put an estimated

16  number in terms of revenue impact?

17      A.    Not to my knowledge.

18      Q.    Have you ever had any informal

19  discussion with anybody in the company where

20  someone simply offered a personal comment in

21  terms of potential revenue impact?

22      A.    I think personal comments would be

23  adversely -- would be to shut the store down.

24  Those were offhand comments, but there has never

25  been a number put on anything.  With no

102

1   visibility, extremely limited, if any, parking

2   and greatly diminished impact, I mean it's Real

3   Estate 101 of things you don't want to happen,

4   so the comment was that I had to adversely kill

5   the store, destroy it.

6        Q.   Do you have a sense sitting here today

7   in terms of what level of decrease in sales

8   would prompt the closure of the store under any

9   circumstance?

10       A.   It's circumstantial.  I mean, there

11  are some stores that obviously don't make as

12  much money as other stores do and they are kept

13  open because they are part of a region that's

14  being served, whatever the case may be, so, you

15  know, the way that the real estate committee

16  viewed it is, you know, a single dollar lost

17  would be too much because we feel that we had

18  the right to be there without this circumstance

19  occurring, so any dollar lost to us would be a

20  loss.

21       Q.   At the time frame that we're now

22  talking about in terms of your real estate

23  committee discussion, was there any discussion

24  regarding potentially going to court over this

25  development?

167

 1   discussions he had with our firm or Jim McClain.

 2              Otherwise you can answer.

 3       A.   No, I have not, no.

 4       Q.   How much time in total would you say

 5   you have spent to date, Mr. McKee, on analyzing

 6   the potential impacts on visibility to the

 7   Norwalk store from the Avalon development?

 8       A.   Well, I think it's pretty apparent to

 9   anybody that was to view the plan that

10   Mr. Robbins presented to the -- to me, and I

11   presented to the real estate committee, without

12   ever having seen the site, anyone could review

13   that plan and see that the visibility was going

14   to be dramatically decreased.

15              You are going from nothing in

16   front, just like your home, nothing in front of

17   your home, to a three- to four-story apartment

18   complex in front of your home.  You would be

19   able to see on paper what a dramatic impact that

20   would have, so I have not spent a whole lot of

21   time studying it.

22              Back to your original question, I

23   have been to the site four, five times, but

24   again, you are going from nothing in front to a

25   potential monster in front, so I think it's

168

1  pretty evident.  I don't know how to answer

2  that.

3      Q.   On another matter, in terms of

4  potential parking impacts on the Norwalk site,

5  how much time would you say you have spent in

6  total looking at that issue, whether on site or

7  looking at Avalon plans or any other

8  information?

9      A.   The same amount of time that was

10  mentioned earlier.  It was three to four trips,

11  an hour to two hours per trip, so six to eight

12  hours, I guess, including some office time, so I

13  don't know precisely but --

14      Q.   As we sit here today, are you familiar

15  in terms of what a current approved plan by the

16  Norwalk zoning commission calls for in terms of

17  parking on the site?

18      A.   You would have to show me the plan for

19  me to recognize -- to remember the specifics,

20  but I have a pretty good indication of what the

21  plans are.

22      Q.   Have there been some evolutions in the

23  plan over time to your knowledge?

24      A.   Yes.

25      Q.   Were there some revisions or

169

1    modifications made to the plan by Avalon as a

2    result of communications with AutoZone?

3        A.   The only one that I can recall, they

4    shaved a portion -- there is a building, the

5    building out front, they cut a small corner off

6    of the building from where it originally squared

7    off, they cut a portion off, a small portion,

8    with -- according to Mark Robbins, with the

9    thought of some better visibility.

10                I think they realized how big an

11   issue visibility was, so they made a small cut

12   off the side of the building, but it wasn't

13   enough to improve the situation or potential

14   situation.

15       Q.   Wasn't enough to make it acceptable

16   from your standpoint?

17       A.   It wasn't enough to make even a

18   difference.

19       Q.   Is there anything in your view that

20   Avalon could do to modify the development while

21   still proceeding in a fashion acceptable to

22   AutoZone?

23       A.   No.  We had that same question with

24   the federal mediator, and the answer was no then

25   and it's still no.

SANDERS, GALE & RUSSELL
(203) 624-4157

170

1     Q.   Do you understand that there are going

2   to be two buildings, one in a portion of the

3   parking lot area --

4     A.   One in front and one alongside of it.

5     Q.   One actually where the Pathmark store

6   was?

7     A.   Yes.

8     Q.   Is your concern more with the parking

9   lot --

10    A.   Our concern is with both, but from a

11  visibility, accessibility, parking, et cetera,

12  the -- if we had to weigh the two, we'd put more

13  weight to the one directly in front of us, yes.

14    Q.   Assuming the Avalon project had never

15  gone forward, are there any circumstances under

16  which AutoZone would relocate or close the

17  Riverview Plaza store?

18    A.   Outside of a lease expiration, no.

19    Q.   For example, in the event of Pep Boys

20  or Advanced Auto moving in at the Kia site, is

21  that a situation that might lead to a relocation

22  of the store?

23    A.   No.  I wouldn't think so, no.  That's

24  probably the best corner in town so there would

25  be no reason to leave it.

# EXHIBIT 5

0001

1               UNITED STATES DISTRICT COURT

2                  DISTRICT OF CONNECTICUT

3                      CONFIDENTIAL

4

5    ---------------------------x

6    ADAP, INC.,                                    :

7               Plaintiff,                          :

8       -versus-                                    : No. 303CV350 (AWT)

9    RITZ REALTY CORP. and AVALONBAY COMMUNITIES, INC.,

10              Defendants.                         :

11   ---------------------------x

12

13

14

15              Deposition of ALEX OLIPHANT,

16       taken pursuant to the Federal Rules of

17       Civil Procedure, at the law offices of Day,

18       Berry & Howard, L.L.P., CityPlace I - 185

19       Asylum Street, Hartford, Connecticut,

20       before James A. Martone, L.S.R. 00248, a

21       Notary Public in and for the State of

22       Connecticut, on September 30, 2004, at

23       10:10 a.m.

24

25

0181

1      Q.   Do you know whether Avalon has

2   communicated information or solicited input from

3   AutoZone on construction logistics?

4      A.   No.

5      Q.   It says in here, referring to "the

6   inability to load and unload deliveries of

7   goods, particularly during construction."  Do

8   you specifically have any information regarding

9   any inability to load and unload during

10  construction?

11     A.   No.  I don't know where they're

12  loading or unloading now or in the future.

13     Q.   If we go down to topic --  Withdrawn.

14          Are you aware of any other impact

15  constituting irreparable harm that you believe

16  will result to the AutoZone store as a result of

17  the development beyond what we've discussed?

18          MR. ELSTEIN:  I'm going to object

19  to the form of the question.  He's not a

20  lawyer.  He doesn't know the term "irreparable

21  harm."  The factual information he's here to

22  testify about, if you ask him questions.

23          MR. HAMMER:  That's fair.

24     Q.   Are you aware, sitting here today,

25  Mr. Oliphant, of any other potential impacts,

0182

1   detrimental impacts, that you expect will result

2   in the AutoZone operation at this site as a

3   result of construction and development?

4        A.   Other than parking and visibility, and

5   the loading that was talked about?

6        Q.   Other than the things you've discussed

7   with me already.

8        A.   No.

9        Q.   Paragraph 5, topic five in that

10  document that you have in front of you, refers

11  to the allegation in paragraph 50 of the

12  complaint, that "if the proposed development is

13  a proved and constructed, ADAP will suffer

14  further and significant losses."

15             Beyond what we've talked about,

16  do you -- what losses do you anticipate, if any,

17  as a result of this development?

18             MR. ELSTEIN:  Let me just state

19  for the record that paragraph 50 is the proposed

20  to be withdrawn.

21             But you can answer the question.

22             MR. HAMMER:  Thank you.

23       A.   In my opinion, looking at what I'm

24  seeing today, I would say losses are those store

25  sales are going to decrease.

0183

1        Q.   Gross sales?

2        A.   Gross sales, yes.  And from what I'm

3   seeing, I would be worried that they're going to

4   decrease significantly.

5        Q.   Okay.  How do you define

6   "significantly"?

7        A.   Over half.

8        Q.   Have you ever experienced a situation

9   comparable to this with another store, where a

10  development was occurring such as this and you

11  believed there would be an impact to store

12  operations?

13       A.   No.  The closest thing would be road

14  construction, where they blocked or closed a

15  road.  Obviously that significantly impacts us.

16       Q.   All right.

17       A.   But I don't ever remember this.  I've

18  never been a part of it anyway.

19       Q.   And again sitting here today, I mean,

20  I think you've told me you really have not sat

21  down and compared all the existing conditions

22  with the proposed conditions, correct?

23       A.   That's correct.

24       Q.   When you mentioned potential sales

25  losses as much as half, I assume you're

0185

1    proceed with some of those stores?

2         A.    Yes.

3         Q.    Okay.  Have you here attempted to do

4    any type of quantification and analysis of

5    potential impacts on sales of this store as a

6    result of this development?

7         A.    No.

8         Q.    Do you have a means of doing so?

9         A.    Unfortunately, no.

10        Q.    Am I correct that the company tracks

11   gross sales very closely from this and other

12   stores; is that correct?

13        A.    Yes.

14        Q.    You track them, you have 13 reporting

15   periods per year where you have a fairly

16   detailed report; is that correct?

17        A.    There's all kinds of detailed

18   reports.  I mean, I'm able to even look at it,

19   go down to the hour in sales.

20        Q.    At any particular store?

21        A.    At any particular store.

22        Q.    So here, assuming that you're right,

23   and that there's a significant -- the

24   development is built and assuming that you're

25   right, that there is a significant decrease in

**EXHIBIT 6**

1

```
 1                IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF CONNECTICUT
   _____
 3
   ADAP, INC.,
 4
                      Plaintiff,
 5
   Vs.                         Case No. 96-2622-4BRE
 6
   RITZ REALTY CORP., and
 7 AVALONBAY COMMUNITIES, INC.,
 8                   Defendants.
   _____
 9
                   THE TELEPHONIC DEPOSITION OF
10                         ALEX OLIPHANT
11                       November 1, 2004
   _____
12

13

14

15

16

17

18

19

20                       H & N COURT REPORTING
21                        3610 Philwood Avenue
                             P.O. Box 41971
22                      Memphis, Tennessee 38174
                            (901) 323-3132
23

24

25


                         H & N COURT REPORTING
                            (901) 323-3132
```

23

1  Q.    Exhibit 17 is a document entitled

2  Disclosure of Expert dated October 1, 2004, Bates

3  number AOE0049 through AOE 52?

4  A.    Yes.

5  Q.    And then finally Exhibit 18 is the set of

6  plans dated January 10, 2003, Bates numbered

7  PK0055 through PK0078?

8  A.    That is correct.

9  Q.    Okay, thank you.  Mr. Oliphant, based on

10  your -- based on the work that you've performed

11  in connection with your testimony as an expert in

12  this case have you formulated any opinions?

13  A.    Yes.

14  Q.    Could you please tell us what those

15  opinions are and then I'll ask you some specific

16  questions about those opinions.

17  A.    My opinion is that the development that is

18  proposed will impact the AutoZone store in

19  Norwalk and that is based from looking at the

20  plans of what's being proposed and what is

21  currently there and also the demographic --

22  looking at where our current customers are coming

23  from in relation to the store.

24  Q.    Do you have any additional opinions?

25  A.    Yes, but how detailed do you want to go

24

1    into it?

2    Q.    Does that first opinion that you told us,

3    does that cover the bases and then you have some

4    additional points within that?

5    A.    Yeah, I mean, from a high level it's going

6    to impact ingress, egress into the site; it's

7    going to impact visibility to the site and it's

8    going to impact parking or convenience for the

9    customer at the site.

10    Q.    Okay.  And is there -- do you get more

11    specific than that in terms of is there a lower

12    level to continue with your opinions?

13    A.    Where do you want to start?

14    Q.    I guess what I'd like you to do first is

15    express what those opinions are, whether there's

16    one or ten, however many, just state them for us,

17    describe them and then we will go back and ask

18    more detailed questions in terms of how you

19    arrived at them, but I would just initially like

20    you to articulate what those opinions are, what

21    the various points are.

22    A.    I think the main points are going to be

23    ingress egress into the site; parking --

24    convenience of the parking to the site;

25    convenience to the customer from the proposed

25

1    parking to the site; visibility to the site from

2    Cross Street as well as Belden.

3    Q.    Is there anything else in terms of the

4    opinions themselves or does that cover all of

5    them?

6    A.    I think those are the high level, yes.

7    Q.    When you say at a high level, do you mean

8    that what you're not telling me is the reasons

9    that -- the reasons or the facts that you're

10   relying on to support the ingress and egress and

11   visibility, is that what you're leaving out at

12   this stage?

13   A.    I think that each one of them as we go into

14   it, there's going to have to be details that

15   we're going to have to look at the evidence in

16   front of us to talk about it.

17   Q.    That's fine.  I just wanted to make sure

18   that we at least covered the subject; that the

19   development you believe will impact the store and

20   that you believe that there will be impacts on

21   ingress and egress, visibility, convenience of

22   parking and convenience for the customer?

23   A.    Yes.  I would also say that it would impact

24   the mind-set of the customer because of the lack

25   of convenience.